Steven Sugarman
New Mexico Bar No. 5717
appearing *pro hac vice*
347 County Road 55A
Cerrillos, New Mexico 87010
(505) 672-5082
stevensugarman@hotmail.com

Attorney for WildEarth Guardians

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13-151-RCC |
| vs. | ) | |
| | ) | |
| UNITED STATES FISH AND WILDLIFE | ) | **FIRST AMENDED** |
| SERVICE and UNITED STATES FOREST | ) | **COMPLAINT FOR** |
| SERVICE, | ) | **DECLARATORY AND** |
| | ) | **INJUNCTIVE RELIEF** |
| Defendants. | ) | |
| | ) | |
| | ) | |

## I.  Preliminary Statement

1.      Twenty years ago, defendant United States Fish and Wildlife Service ("FWS")

listed the Mexican spotted owl as a threatened species in need of the protections afforded

by the Endangered Species Act ("ESA").  58 Fed.Reg. 14248 (March 16, 1993).

2.      At the time that the Mexican spotted owl ("MSO") was listed for protection under the ESA, more than 90% of the individuals of the species resided on national forest lands managed by defendant United States Forest Service ("USFS").  The vast majority of this 90% was found on the eleven national forests in Arizona and New Mexico which together constitute USFS Region 3.

3.      Because Mexican spotted owls are largely limited to national forest lands in Region 3, the protection of MSO populations and habitats on national forest lands in Region 3 is critical to the continued survival and recovery of the species.

4.      When the FWS listed the MSO under the ESA, there was considerable scientific uncertainty as to the population of the species, the viability of that population, the population trend of the species, and the cause-and-effect relationships between various USFS land management practices and MSO demographics.

5.      To account for this high level of uncertainty, the FWS recommended that the USFS implement an "adaptive management" approach to MSO conservation when it issued the first iteration of the MSO Recovery Plan in 1995.[1]

---

[1]
        Pursuant to the requirements of the ESA, the FWS issued a Recovery Plan for the MSO in 1995. 16 U.S.C. §1533(f).  To assist in the development of the MSO Recovery Plan, the FWS created a team of academic and government experts known as the MSO Recovery Team.  The MSO Recovery Team continues to assist the FWS in the course of FWS's effort to comply with the ESA, most notably for purposes of this case by authoring the two iterations of the MSO Recovery Plan – approved in 1995 and 2012.

First Amended Complaint - Page 2

6.      The USFS adopted the FWS's recommendation in 1996 when it amended the eleven Forest Plans in Region 3 to incorporate specific and binding constraints on its management actions to promote the conservation of the MSO.  These mandatory requirements are known as the 1996 Standards and Guidelines ("S&Gs"), and adopt the adaptive management approach that the FWS recommended in the 1995 Recovery Plan.

7.      The mandatory requirements of the 1996 S&Gs remain in force throughout the eleven national forests in Arizona and New Mexico.

8.      USFS scientists define "adaptive management" as "management based on uncertainty" in which "[l]and management projects are implemented one step at a time and tested at each step" so that "any deleterious activity can be corrected before serious, widespread, or irreversible damage takes place."

9.      Pursuant to the adaptive management approach recommended by the FWS and adopted by the USFS, the USFS retained broad latitude to proceed with most on-going management activities on Region 3 national forests because – and *only because* – the USFS also committed to conduct rigorous population trend monitoring in order to validate the FWS's core assumptions as to (1) MSO population and population trends and (2) the effect of USFS management activities on those population trends.

10.     Consistent with principles of adaptive management, the FWS and the USFS contemplated that USFS management actions that were initially permitted by the 1996

First Amended Complaint - Page 3

S&Gs, but which were subsequently discovered by the required monitoring to adversely affect the MSO, would be corrected or modified to attenuate that adverse effect.

11.     The USFS's adaptive management approach towards MSO conservation and recovery has failed in a number of respects, and this failure jeopardizes the continued existence of the species and results in an adverse impact on the species' designated critical habitat.

12.     First, the adaptive management approach has failed because the USFS has failed to acquire scientific data as to the range-wide population of the species or range-wide population trends as specifically contemplated and required by the 1996 S&Gs and the two iterations of the MSO Recovery Plan.

13.     Second, the adaptive management approach has failed because the USFS implements increasingly intensive tree cutting activities in Region 3 forests – outside of the bounds of the "permissive" management constraints previously identified by the FWS and and incorporated by the USFS into the 1996 S&Gs.

14.     In 1999, three years after the USFS adopted the MSO adaptive management plan, the Recovery Team authored an article in which it stated that the USFS had not "completely embraced the recovery plan."  The Recovery Team specifically noted that USFS's failure to acquire the population trend data which is at the core of the adaptive management model: "In summary, gathering the kinds of defensible scientific information

First Amended Complaint - Page 4

necessary for delisting the Mexican spotted owl costs more than management agencies [including, obviously, the USFS] have been able or willing to spend to date."

15.     Ominously, the scientifically credible site-specific studies conducted after MSO listing show that MSO populations are stable in some portions of their range, declining in other portions of their range, and have suffered local extinctions in still other portions of their range.

16.     In the two decades since the MSO was listed, the USFS has failed to acquire any population trend data or cause-and-effect data which would justify continuation of the permissive management recommendations set out in the 1996 S&Gs.

17.     The ESA prescribes an approach of "institutional caution" towards management of listed species.  <u>Tennessee Valley Authority v. Hill</u>, 98 S.Ct. 2279, 2302 (1978).

18.     The 2012 iteration of the MSO Recovery Plan states that the failure to acquire basic demographic and cause-and-effect relationships "suggest[s] that . . . management recommendations in the near term must deal with extremely high levels of uncertainty" and, therefore, admonishes that "managers should proceed cautiously in terms of treatment intensity and extent."

19.     In connection with MSO management, the FWS and the USFS are acting *opposite* to the guiding principle of adaptive management which requires caution in the face of continuing uncertainty and indications of a declining population trend.

First Amended Complaint - Page 5

20.     In this case, "institutional caution" requires that the FWS and the USFS re-calibrate their adaptive management program by modifying the scope of permitted USFS management actions to reflect the USFS's failure to acquire basic demographic trend data for the MSO; the USFS's failure to conduct scientific experiments to assess the relationship between land management actions, habitat, and population trends; and the agencies' joint failure to validate the core assumptions of the adaptive management program.

21.     The FWS and the USFS have *not* acted cautiously in the face of uncertainty. Instead, the agencies have presided over a regime of intensified national forest management actions that go far beyond the bounds of permissible action under the 1996 S&Gs – and in ways that are known to harm the MSOs.

22.     Under the circumstances present here, the programmatic forest-wide Biological Opinions ("BiOps") recently prepared by the FWS to assess the impacts of USFS management practices on MSO – and specifically the FWS's determinations that USFS management practices do not jeopardize the MSO's survival and recovery or result in adverse modification or destruction of critical habitat – are arbitrary and capricious, and violate the ESA.[2]

---

[2]

        In this lawsuit, Guardians alleges that the following BiOps for Region 3 Forest Plans are arbitrary and capricious: the  March 30, 2012 BiOps for the Coconino, Kaibab, Prescott, Lincoln, Santa Fe, Cibola, and Carson National Forests and the April 30, 2012 BiOps for the Coronado, Tonto, Apache-Sitgreaves, and Gila National Forests.

First Amended Complaint - Page 6

23.    In this action Plaintiff WildEarth Guardians ("Guardians") will prove that the recent BiOps are arbitrary and capricious because the FWS's "no jeopardy" determinations are not supported by – and are inconsistent with – the best available scientific evidence which is that the range-wide population of MSOs has been on a downward trend since the species was listed.

24.    Guardians will also show that the BiOps are flawed because a core assumption utilized by the FWS in the preparation of the BiOps is invalid; that is, the assumption that the USFS will implement the management recommendations of the 1996 S&Gs including specifically: (1) the provision requiring rigorous population trend monitoring program incorporated into the 1996 S&Gs and (2) the provision requiring consistency between site-specific actions and the management recommendations of the 1996 S&Gs.

25.    Additionally, Guardians will show that the BiOps are flawed in other respects which render them arbitrary and capricious, including but not limited to the following:

(A)    The 2012 BiOps are arbitrary and capricious because the FWS provides no explanation for departing from its past practice of conducting one region-wide consultation on the impacts of its MSO management strategy.  The FWS's preparation of eleven separate BiOps – one for each national forest in Region 3 – precludes the implementation of a comprehensive landscape-level approach to MSO conservation and recovery in violation of the ESA.

First Amended Complaint - Page 7

(B)     The 2012 BiOps are arbitrary and capricious because they do not adequately account for the consideration of the cumulative impacts of other actions affecting the MSO and its habitat, including but not limited to land management practices on the White Mountain Apache and Mescalero Apache tribal lands.

(C)     The 2012 BiOps are arbitrary and capricious because they do not quantify the extent of MSO "take" that will be caused by USFS actions outside of MSO Protected Activity Centers ("PACs").  Instead, the 2012 BiOps only estimates the level of Mexican spotted owl incidental take that will occur within PACs on national forest lands.  The FWS's failure to quantify all MSO incidental take associated with USFS management actions is arbitrary and capricious.

26.     Furthermore, under the present circumstances, the USFS's failure to acquire basic demographic trend data for the MSO; the USFS's failure to conduct scientific experiments to assess the relationship between land management actions, habitat, and population trends; the USFS's continuing and increasingly frequent departures from the management constraints of the 1996 S&Gs; and the USFS's failure to provide the FWS with the most current and best available scientific information concerning the MSO constitute violations of the ESA.

27.     In sum, the adaptive management approach towards MSO conservation and recovery – recommended and endorsed by the FWS and adopted by the USFS with the 1996 S&Gs – has been an utter failure, in large part because of the FWS's willingness to

First Amended Complaint - Page 8

accede to the USFS's repeated and serious excursions from the prescribed approach and because of the USFS's cavalier and lackadaisical approach to its ESA duties in connection to the MSO. With this action, Guardians seek to hold the FWS and the USFS accountable for their failure to protect and conserve the MSO in the two decades since the species was listed for protection.

28. Guardians brings this suit against the FWS pursuant to the ESA, and pursuant to the Administrative Procedures Act ("APA"), 5 U.S.C. §701 et seq., in order to enforce the requirements of the ESA.

29. Guardians brings this suit against the USFS pursuant to the citizen's suit provision of the ESA, 16 U.S.C. §1540(g), in order to enforce the requirements of the ESA.

## II. **Parties**

30. Plaintiff WildEarth Guardians is a non-profit corporation with more than 7,500 members nation-wide. WildEarth Guardians maintains offices in Tucson, Arizona, Santa Fe, New Mexico, and Denver, Colorado. WildEarth Guardians' mission is to protect and restore wildlife, wild places, and wild rivers in the American West. WildEarth Guardians has an active endangered species protection campaign. As part of this campaign, WildEarth Guardians actively participates in USFS planning and decision-making processes that have the potential to affect the Mexican spotted owl and its continued survival and FWS administrative rule-making relative to MSO conservation. WildEarth Guardians' participation in this regard is in the form of public education and outreach,

First Amended Complaint - Page 9

commenting on proposed USFS projects and FWS rule-makings, and administrative

appeals of USFS projects that have a possible adverse effect on the continued survival of

the Mexican spotted owl.  WildEarth Guardians has a long history of litigation with the

FWS and the USFS in connection with protection of the Mexican spotted owl.  Amongst

other accomplishments, this litigation resulted in a court order requiring the USFS to

comply with its mandatory duties under the ESA by engaging in a formal consultation

with the FWS as to the biological effects of the USFS's implementation of the eleven

Forest Plans which guide and constrain USFS management activities on Arizona and New

Mexico national forests.  Furthermore, WildEarth Guardians' members frequently

recreate in the national forests of Arizona and New Mexico.  WildEarth Guardians'

members enjoy viewing the Mexican spotted owl in its native habitat on national forest

lands, and intend to continue their use and enjoyment of national forest lands for this

purpose in the future.  WildEarth Guardians is injured by the FWS's and the USFS's

failures to comply with the ESA in the manners set forth below. WildEarth Guardians and

its members have a substantial interest in this matter and are adversely affected by the

FWS's and the USFS's violations of the ESA.  The relief requested in this Complaint will

redress WildEarth Guardians' and its members' injuries.

31.     Defendant FWS is a federal agency which, amongst other activities, administers

the ESA insofar as terrestrial species – such as the Mexican spotted owl – are concerned.

First Amended Complaint - Page 10

As part of its statutory duty to administer the ESA for terrestrial species, the FWS has a mandatory duty to prepare BiOps which fully comply with relevant law and regulations.

32.     Defendant USFS is a federal agency which manages the eleven national forests in USFS Region 3 in Arizona and New Mexico.  In its management of national forest lands, the USFS has a mandatory statutory and regulatory duty to comply with all relevant environmental laws, including the ESA.

## Jurisdiction and Venue

33.     The Court has jurisdiction over this action under 28 U.S.C. §1331 (federal question jurisdiction), 28 U.S.C. §2201 (declaratory judgment), 28 U.S.C. §2202 (injunctive relief), 16 U.S.C. §1540(g)(1) (ESA citizen suit provision), and 5 U.S.C. §704 (APA provision for judicial review).

34.     As required by the ESA, WildEarth Guardians has provided the USFS with sixty days' notice of its intent to commence a citizen suit in connection with the USFS's ESA violations alleged in this complaint.  16 U.S.C. §1540(g).

35.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(e) because this is an action against agencies of the United States and because the cause of action arises in Arizona, and pursuant to 16 U.S.C. §1540(g)(3)(A) (ESA citizen suit provision).

36.     There exists now between the parties hereto an actual and justiciable controversy in which WildEarth Guardians is entitled to have a declaration of its rights and of the

First Amended Complaint - Page 11

FWS's obligations and further relief because of the facts and circumstances hereafter set out.

## IV. <u>Facts</u>

A. <u>The mandatory requirements of the Endangered Species Act</u>

37. The structure and function of the ESA, 16 U.S.C. §1531 *et seq.*, are premised on Congress's finding that the biggest threat to the continued survival of threatened and endangered wildlife species is the destruction of their natural habitats. Accordingly, the ESA contains various provisions that are specifically intended to halt the trend of habitat destruction.

38. The expressed purpose of the ESA is "to provide a program for the conservation [of] endangered species and threatened species" and "to provide a means whereby the ecosystems upon which [such] species depend may be conserved." 16 U.S.C. §1531(b).

39. Pursuant to the ESA, the FWS has the duty to list imperiled species as threatened or endangered on the basis of biological criteria. 16 U.S.C. §1533(c).

40. Once a species is listed for protection under the ESA, the FWS has an obligation to prepare a "Recovery Plan" for the species pursuant to ESA Section 4(f). 16 U.S.C. §1533(f). The purpose of a Recovery Plan is to define those management constraints and actions that will promote the conservation and survival of listed species, and to develop criteria for the "delisting" of listed species.

First Amended Complaint - Page 12

41.     After a species is listed as threatened or endangered under the ESA, Section 7(a)(1) of the ESA imposes important obligations on federal agencies to "conserve" such species.  16 U.S.C. §1536(a)(1).  For purposes of ESA compliance, the duty to "conserve" requires that federal agencies use their authorities to assure the survival of threatened and endangered species, to protect their critical habitats, and to promote the recovery of the species to the point at which they no longer require the protections of the ESA.

42.     Pursuant to Section 7(a)(2) of the ESA, 16 U.S.C. §1536(a)(2), federal agencies have a mandatory substantive duty to "insure that any action . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of the species' designated critical habitat.[3]

43.     In order to assure that federal agencies comply with their substantive Section 7(a)(1) duty to conserve and their substantive Section 7(a)(2) duty to insure against jeopardy or adverse modification of designated critical habitat, Section 7(a)(2) of the ESA mandates a "formal consultation" process which requires all federal agencies to consult with the FWS as to those projects that may adversely affect a listed species or may

---

[3]

        Hereafter in this Complaint, the statutory phrase "destruction or adverse modification" will be shorted to "adverse modification" or, when contextually appropriate, "adversely modify."

First Amended Complaint - Page 13

adversely modify designated critical habitat.  16 U.S.C. §1536(a)(2).[4]  The duties set out

in Section 7(a)(2) are known as the "Section 7 procedural duties."

44.     The first step in the formal consultation process is a written request for the

initiation of formal consultation from the action agency to the FWS.  16 U.S.C. §1536(c),

50 C.F.R. §402.14(c).  This submission includes a Biological Assessment prepared by the

action agency in which the action agency identifies the action which it proposes to

implement and assesses the expected impact of the proposed action on listed species and

their designated critical habitats.  16 U.S.C. §1536(c), 50 C.F.R. §§402.12, 402.14.

45.     The formal consultation process, including the FWS's analysis of jeopardy to

species and adverse effects to critical habitat, concludes with the issuance of a BiOp by

the FWS.

46.     In undertaking its ESA Section 7(a)(2) jeopardy and critical analyses, the FWS

must consider how a proposed action affects a species' prospects for *recovery*, as well as

its prospects for *survival.*  A species' prospects for recovery are adversely effected when

an action's impacts reduce the reproduction, numbers, and/or distribution of the species.

50 C.F.R. §402.02,  <u>NWF v. NMFS</u>, 524 F.3d 917, 932 (9th Cir. 2008).

---

[4]

        In the case of threatened and endangered maritime species, federal agencies conduct
their Section 7 consultations with the National Marine Fisheries Service ("NMFS") instead
of the FWS.

47.     Throughout the Section 7(a)(2) formal consultation process – including the development of both the BA and the BiOp – the action agency and the FWS must utilize the "best scientific and commercial data available."  16 U.S.C. §1536(a)(2), 50 C.F.R. §§402.14(f), 402.14(g)(8).

48.     In the BiOps that it issues at the conclusion of the formal consultation process, the FWS determines whether a proposed agency action comports with its Section 7 substantive duties.  If the FWS finds that a proposed agency action will jeopardize a listed species or adversely modify its designated critical habitat, the FWS formulates a "Reasonable and Prudent Alternative" ("RPA") which avoids that effect.

49.     During the course of the Section 7(a)(2) formal consultation process, an agency action is prohibited by ESA Section 7(d) from taking any action that would result in irreversible and irretrievable effects.  16 U.S.C. §1536(d).

50.     The Ninth Circuit Court of Appeals has determined that timber cutting activities on public lands "constitute *per se* irreversible and irretrievable commitments of resources under §7(d) and thus [cannot] go forward during the consultation period."  Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1056 (9th Cir. 1994), Lane County Audubon Society v. Jamison, 958 F.2d 290, 295 (9th Cir. 1992).

51.     Section 9 of the ESA and its implementing regulations prohibit any person, including any federal agency, from "taking" a threatened species.  See 16 U.S.C. §1538(a)(1); 50 C.F.R. §227.21.  Taking is defined broadly under the ESA to include

First Amended Complaint - Page 15

harming, harassing, or killing a protected species either directly or by degrading its

habitat sufficiently to significantly impair essential behavioral patterns.  <u>See</u> U.S.C.

§1532(19); 50 C.F.R. §17.3.

52.     A federal agency may "take" a listed species incidental to an otherwise lawful

activity only after obtaining an Incidental Take Statement ("ITS") from the FWS.  16

U.S.C. §§1536(b)(4), 1536(o).  The FWS incorporates an ITS into the BiOps that it

issues, if it finds that implementation of the action that is the subject of a BiOp will result

in the "incidental take" of individuals of a listed species but that the level of anticipated

incidental take will not jeopardize a species' continued survival or recovery or adversely

modify its designated critical habitat.  16 U.S.C. §1536(b)(4).

53.     An ITS sets forth the amount of incidental take that is permitted, and that is

therefore exempt from the take prohibition of ESA Section 9.  <u>Id.</u>  In every ITS, the FWS

has an affirmative obligation to specify the amount of incidental take that is expected to

occur as a result of the implementation of the federal action which is the subject of the

BiOp.  16 U.S.C. §1536(b)(4)(C)(i), 50 C.F.R. §402.14(i)(1)(i).

54.     If an agency exceeds the amount of incidental take allowed by an ITS, or does not

comply with the "terms and conditions" set forth in the ITS, or modifies the action which

is the subject of a BiOp/ITS in such a way that implementation of the action may affect a

listed species or its designated critical habitat in a manner not addressed in the original

First Amended Complaint - Page 16

BiOp, then the agency has a mandatory obligation to re-initiate formal consultation with the FWS.  50 C.F.R. §402.16.

B.  <u>Mexican spotted owl listing, the 1995 Recovery Plan, and the 1996 Standards and Guidelines</u>

55.  The Mexican spotted owl was listed as a threatened species requiring the protections of the Endangered Species Act on March 16, 1993.  58 Fed.Reg. 14248.

56.  In the final rule listing the Mexican spotted owl as a threatened species, the FWS cited "past, current, and future timber-harvest" practice of USFS Region 3 as one of "the primary factors leading to listing the Mexican spotted owl as a threatened species."

57.  In particular, the FWS identified a USFS timber management practice known as "shelterwood harvest" as the biggest threat to the continued survival of the Mexican spotted owl.  This practice – which was widely used in USFS Region 3 forests at the time of listing – produced even-aged stands of timber, rather than the un-even aged, multi-layered stands most often used by Mexican spotted owl for nesting and roosting.

58.  Since the Mexican spotted owl was listed as a threatened species, populations of the species in Arizona and New Mexico have *not* increased.

59.  Indeed, the 2012 Revised MSO Recovery Plan reports that one credible scientific study shows that the range-wide MSO population declined by more than 30% from the time of listing in 1993 until 2000, and concludes that the best available science

First Amended Complaint - Page 17

"suggest[s] that populations of Mexican spotted owls studied either have declined in the recent past or are still declining."

60.     Pursuant to the requirements of ESA Section 4(f), 16 U.S.C. §1533(f), the FWS prepared a Recovery Plan for the MSO in December of 1995.  The core purposes of the 1995 Recovery Plan are to describe future management actions necessary for the conservation and survival of the Mexican spotted owl and to establish "delisting criteria" which, when met, would support a determination that the Mexican spotted owl has recovered to the point that it no longer needs the protections afforded by the ESA.

61.     As described above, the 1995 Recovery Plan endorses an adaptive management approach to MSO conservation and management.

62.     The USFS formally adopted this adaptive management approach when it amended the eleven Region 3 Forest Plans to incorporate the 1996 S&Gs pursuant to the process set out in the National Forest Management Act ("NFMA").

63.     Since the USFS incorporated the adaptive management program into the Region 3 Forest Plans, all USFS management actions in Region 3 are required by NFMA to be "consistent" with the adaptive management program – as set out in the 1996 S&Gs.  16 U.S.C. §1604(i).

64.     The FWS acknowledged that the adaptive management approach that it endorsed for MSO management was *not* conservative (i.e., did not constrain USFS management activities to the greater extent that would be called for by a "conservative" approach), but

First Amended Complaint - Page 18

stressed the "iterative" nature of the adaptive approach whereby adjustments to permitted

management practices would be implemented if the results of the population trend



Mexican Spotted Owl Recovery Plan

**Figure III.B.1.** Conceptualization of the Recovery Plan and needs for delisting of the Mexican spotted owl depicting the interdependency of population monitoring, habitat monitoring, and management recommendations.

monitoring program showed that certain practices were associated with an adverse effect

on MSO demographics: "We must use the best available knowledge to guide current

management, *recognizing that  new information from research and monitoring is critical*

*for the development of long-term management plans*."  (Emphasis added.)

65.      The FWS characterizes the Recovery Plan's MSO delisting strategy as a three-

legged stool with legs: (1) management recommendations, (2) population monitoring, and

(3) habitat monitoring – and schematically depicts the plan in the above diagram.

First Amended Complaint - Page 19

66.     Implementation of the monitoring component of the adaptive management approach adopted by the USFS for MSO conservation and recovery is as critical to conservation of the species as implementation of the mandatory management constraints and prescriptions.

67.     The MSO Recovery Plan is clear that population and habitat monitoring of the MSO is key to the species' conservation and survival, and that the species should not be delisted unless and until an adequate monitoring program is implemented:

> Many of the ecosystem management guidelines provided in this Plan will provide a foundation for development of the long-term strategy. In formulating the recommendations, the Team assumes that population and habitat status will be monitored in conjunction with implementation of these management guidelines. Therefore, the management guidelines are not meant to stand alone. Monitoring provides objective criteria to assess the efficacies of the management guidelines. Without both habitat and population monitoring, the status of the owl cannot be assessed and it should not be delisted.

68.     The USFS has acknowledged that "[m]onitoring is a critical part of owl recovery" and that "[w]ithout it, we will never know if the owl population is viable, and we will have no indication if management practices are beneficial or harmful to the bird."

69.     Insofar as protection of MSO habitat is concerned, the core of the MSO conservation strategy contemplated by the 1996 S&Gs is the protection of "protected habitat."  Protected habitat is defined as the 600 acre Protected Activity Centers – or "PACs" – that are created around each known MSO or pair of MSOs and steep slopes

First Amended Complaint - Page 20

(>40% slope) of mixed conifer and pine-oak forests that have not been logged in the last twenty years.

70.     In protected habitat, future USFS tree-cutting activity was made subject to significant restrictions on the timing and the extent of permissible cutting.

C.     The FWS's history of formal Section 7(a)(2) consultation as to the biological effects of the USFS's implementation of the 1996 Standards and Guidelines

71.     The USFS acknowledges that its management activities on national forests within USFS Region 3 – even as constrained by the mandatory implementation of the 1996 S&Gs – may adversely affect Mexican spotted owls and/or adversely modify or destroy designated critical habitat.  Accordingly, the USFS is required to conduct a formal Section 7(a)(2) consultation with the FWS as to the biological effects of the USFS national forest lands management program on MSO conservation and recovery.  16 U.S.C. §1536(a)(2).

72.     As described above, a formal Section 7(a)(2) consultation concludes with issuance of a BiOp, which is a judicially reviewable final action.

73.     As a result of an Order issued by Judge Carl Muecke of this District Court, in 1996 the FWS issued two BiOps relative to the USFS's MSO management approach.

74.     One BiOp assessed the continuation of management practices consistent with the existing Forest Plans for Arizona and New Mexico national forests – *without* the incorporation of the mandatory 1996 S&Gs.  The FWS issued a "jeopardy opinion" in

First Amended Complaint - Page 21

connection with this management approach, finding that such an approach imperilled the continued survival of the species across its range.

75.     The second of the two BiOps issued in 1996 analyzed the effects of the USFS's adaptive management approach towards MSO conservation and recovery – assuming the mandatory implementation of the 1996 S&Gs – which is the approach that the USFS committed to implement over the ensuing years.  The FWS issued a "no-jeopardy opinon" in this BiOp, based specifically and expressly upon the understanding that the USFS would implement all aspects of the prescribed adaptive management program, as set out in the 1996 S&Gs.

76.     The 1996 no-jeopardy BiOp contained an ITS that permitted the USFS to incidentally take MSOs in 151 PACs in connection with implementation of its management actions.

77.     In the early 2000s, it became apparent that USFS management actions in Arizona and New Mexico national forests would result in more incidental take than contemplated by the ITS in the 1996 no-jeopardy BiOp.  Accordingly, the USFS re-initiated formal Section 7(a)(2)formal consultation with the FWS as to the programmatic effects of its MSO management program in Arizona and New Mexico national forests.

78.     At the conclusion of this re-initiated consultation, the FWS issued a 2005 programmatic no-jeopardy BiOp convering all Arizona and New Mexico national forests.

First Amended Complaint - Page 22

The FWS also raised the amount of permitted incidental take associated with USFS management actions to the MSOs located in a total of 341 PACs.[5]

D.   The USFS's continuing failure to implement the 1996 S&Gs and the irrational 2012 Section 7(a)(2) consultation

79.   By 2010, it had become apparent that the USFS would not comply with the conditions of the ITS of the 2005 BiOp.  Accordingly, the USFS was once again obligated to re-initiate a formal Section 7(a)(2) consultation with the FWS as to the effects of its management actions on MSO conservation and recovery.

80.   To commence this re-initiated formal consultation, the USFS prepared a Biological Assessment as required by the ESA and its implementing regulations.  This USFS issued this Biological Assessment on April 6, 2011, and it was entitled entitled "Re-initation of Consultation on the Continued Implementation of Land and Resource Management Plans for the Eleven National Forests and National Grasslands of the Southwestern Region."

81.   The Biological Assessment states that "[t]he proposed action being analyzed in this BA is the programmatic direction in the [Forest Plans] for the [national forests] and [national grasslands] in the USFS Southwestern Region as elaborated through individual . . . [Forest Plan] S&Gs (including the 1996 Region-wide Amendment)."

---

[5]

    This represents authorization for take in 98 more PACs, over and above the excessive take that had previously occurred in 243 PACs under the umbrella of the 1996 no-jeopardy BiOp.

82.     This "second round" of re-initiated formal Section 7(a)(2) consultation on MSO

impacts culminated in the FWS's unprecedented release of eleven *separate* forest-wide

BiOps, instead of one regional programmatic BiOp on the landscape-level effects of the

USFS's MSO management approach.

83.     Each of the eleven separate 2012 BiOps was a no-jeopardy opinion.

84.     The FWS and the USFS conducted the 2012 consultation with full knowledge that

the USFS has failed to implement the adaptive management program that it previously

adopted for MSO conservation and recovery purposes.  Specifically, the FWS knew that

the USFS was not performing the specific population monitoring required by the 1996

S&Gs and that the USFS was not complying with the management recommendations of

the 1996 S&Gs.

85.     The USFS is not complying with its statutory duty to "carry out" programs for the

conservation of the Mexican spotted owl.  To the contrary, the USFS's failure to acquire

population trend data for the owl and the USFS's practice of implementing tree cutting

projects that are inconsistent with the management requirements of the 1996 S&Gs are

both harmful to the conservation and recovery of the owl.

86.     With respect to population trend monitoring, the USFS admits in the April 2013

Environmental Impact Statement for the Rim Lakes Forest Restoration Project that it has

failed to acquire population trend data for the MSO.  In that document, the USFS states

that after the initial effort to acquire population trend data was abandoned in the late

First Amended Complaint - Page 24

1990s, "[n]o further effort by the collaborative group or the Recovery Team has been proposed since."

87.     The FWS is well aware of the fact that the USFS has failed – for almost two decades now – to implement the most critical part of the MSO adaptive management program: a credible population monitoring program to track demographic trends and to provide information for cause-and-effect analysis.

88.     Further, the FWS acknowledges that in the absence of this core data it is impossible to implement an effective adaptive management program or to "de-list" the MSO.

89.     Yet in the 2012 no-jeopardy BiOps, the FWS merely assumes that a population monitoring program will be implemented in the indefinite future by an indefinite consortium of entities.  Since this monitoring program is uncertain and unidentified, and not reasonably certain to occur, the FWS may not rely on its implementation in reaching its no-jeopardy determinations in the 2012 BiOps.

90.     The USFS recently admitted its failure to implement the population trend monitoring requirement of the 1996 S&Gs which still guide and constrain national forest management in Arizona and New Mexico: "Many of the recommendations in [the 1995 Recovery Plan] were never implemented.  As a result, we still have no rigorous estimates of trend in owl population or habitat, nor have we evaluated the effects of common land-management activities on owls or their prey and habitat."

First Amended Complaint - Page 25

91.     Furthermore, two decades after the MSO's listing there is still substantial scientific uncertainty as to the cause-and-effect relationships between various USFS management practices and MSO population trends.  Indeed, when the MSO Recovery Team issued a Revised MSO Recovery Plan in 2012, it acknowledged that "cause and effect relationships have not been documented" even though it knows that "understanding how the owl responds to environmental variation is key to its recovery."

92.     The complete lack of progress on understanding cause-and-effect relationships – two decades after MSO listing – is highlighted in the 2012 Revised MSO Recovery Plan: "Unfortunately, empirical data on the effects of thinning and other mechanical forest treatments on Mexican spotted owls are nonexistent . . . . Understanding how these treatments affect Mexican spotted owls is one of the major questions faced in integrating recovering this owl with plans for restoring southwestern forests.  *Although this has been clearly noted for years (e.g. USDI FWS 1995, Beier and Maschinski 2003, Ganey et al. 2011), no studies on this topic have been funded to date.*"  (Emphasis added).

93.     Additionally, the FWS has knowledge that current USFS management actions diverge from the management requirements of the 1996 S&Gs in significant respects at the time that it prepared the challenged 2012 BiOps.  Specifically, the FWS knew that many of the USFS's recent decisions authorize tree cutting and other ground-disturbing actions in PACs and other protected habitat that is expressly prohibited by the 1996 S&Gs.

First Amended Complaint - Page 26

94.     The Biological Assessment prepared by the USFS to initiate the formal consultation that culminated in issuance of the eleven 2012 BiOps admits that deviations from the management requirements of the 1996 S&Gs "can and does occur," but stated that this happens "rarely."

95.     In fact, deviations from the 1996 S&G management recommendations is now a commonplace occurrence in connection with the USFS's tree cutting projects in Arizona and New Mexico, and is not "rare" as the USFS stated in the Biological Assessment.

96.     For example, the Four Forests Restoration Initiative in the Kaibab, Coconino, Apache-Sitgreaves, and Tonto National Forests of Arizona; the Pinaleno Ecosystem Restoration Project on the Coronado National Forest; the Wing Mountain Project, the Mahan-Landmark Forest Restoration Project, the Bill Willians Mountain Restoration Protect, and the Turkey Butte - Barney Pasture Forest Health Restoration Project on the Coconino National Forest; the Rim Lakes Forest Restoration Project on the Apache-Sitgreaves National Forest; and the Southwest Jemez Mountains Restoration Project on the Santa Fe National Forest all contemplated tree-cutting in PACs and other protected habitat in excess of that allowed by the 1996 S&Gs.

97.     The USFS's failure to disclose to the FWS with specificity the full extent of its planned deviations from the 1996 S&Gs precluded the preparation of accurate and meaningful analyses of the USFS's *actual* management program during the course of the re-initiated formal consultation.

First Amended Complaint - Page 27

98.     Many USFS timber sales which violate the constraints imposed by the 1996 S&Gs – such as those identified in the preceding paragraphs – are "packaged" by the USFS as "landscape restoration" projects needed to preserve and protect the MSO and its habitat from forest fire.  However, the USFS's best scientific information is that MSOs are extremely fire adapted and not only survive, but also thrive, in a post-fire environment.

99.     In the April 2011 Biological Assessment, the USFS did not incorporate or utilize the best scientific information available regarding the effects of fire on MSO habitat.

100.     In the eleven BiOps issued in 2012, the FWS did not utilize the best scientific information available regarding the effects of fire on MSO habitat.

101.     The FWS has no data to support the hypothesis that tree cutting in excess of the management recommendations set out in the 1996 S&Gs promotes MSO conservation and recovery, yet it routinely issues no-jeopardy BiOps to the USFS for site-specific projects when the USFS seeks to conduct such activities.

102.     The best scientific data available – which was available during the course of the 2012 Section 7(a)(2) consultation that led to the issuance of the challenged BiOps – shows that MSOs thrive in a post-fire environment.  Accordingly, the FWS and the USFS cannot rationally conclude that the recent spate of USFS "restoration" projects is required to protect the MSO.

103.   Each of the 2012 BiOps challenged in this lawsuit incorporates a separate ITS purporting to set forth the estimated amount of incidental take associated with implementation of the USFS MSO management program.

104.   The amount of take specified in the 2012 BiOps is associated with a specific proposed federal action: USFS implementation of the 1996 S&Gs.  As described above, this is not the *actual* action that the USFS is implementing in connection with its MSO management approach.

105.   Specifically, the USFS is not implementing the population trend monitoring component of the 1996 S&Gs and is not implementing the management requirements of the 1996 S&Gs in connection with its tree cutting projects.

106.   Additionally, the ITSs incorporated into the 2012 BiOps do not set a specific amount of authorized incidental take.  Instead, the ITSs utilize PAC disturbances as a proxy for actual numbers of MSO individuals subject to take.  This is arbitrary and capricious because this method of estimating take does not account for incidental take which occurs outside of PACs.

107.   The FWS's finding in the 2012 BiOps that the USFS management actions promote the conservation and recovery of the MSO is not based on substantial evidence since the best scientific evidence shows that the species is in steady decline and vulnerable to extirpation in certain areas of its occupied range.

First Amended Complaint - Page 29

108.    In each of the eleven separate forest-wide BiOps which it issued in 2012, the FWS assumed that the USFS would fully implement the adaptive management approach prescribed by the 1996 S&Gs.  On this specific basis, the FWS concluded that the USFS's management of Arizona and New Mexico national forests would not jeopardize MSOs or destroy or adversely modify MSO critical habitat.

109.    The FWS indulged in the assumptions referenced in the paragraph immediately preceding despite the fact that it knew at the time that it made these assumptions – and at the time that it prepared and issued the 2012 BiOps – that the USFS was not complying with the 1996 S&Gs in the various critical respects discussed above.

110.    Rather than being based on the management approach *actually* implemented by the USFS, the FWS's 2012 BiOps are based on a fiction: that the USFS complies with the 1996 S&Gs.

111.    The FWS's 2012 BiOps are arbitrary and capricious for other reasons that will be detailed by Guardians in this case.

## V. Claims for Relief

First Claim for Relief
FWS Violation of 16 U.S.C. §1536(b)(3)

112.    WildEarth Guardians incorporates by reference all preceding paragraphs.

First Amended Complaint - Page 30

113.   The 2012 BiOps issued by FWS in connection with the USFS's management practices are arbitrary and capricious for many reasons, including these reasons and others as described in this Complaint:

(A)   The FWS did not base 2012 BiOps on the best available scientific information.

(B)   There is no substantial evidence for the FWS's no-jeopardy and no-adverse modification findings in the 2012 BiOps.

(C)   The 2012 BiOps are based on a fictional USFS management approach to MSO conservation and recovery, and not the management approach that the USFS *actually* implements.

(D)   The 2012 BiOps do not contain an adequate discussion of cumulative impacts.

(E)   The FWS's decision to issue eleven separate BiOps for the Region 3 ntional forests is arbitrary and capricious, since the population structure and distribution of the MSO on USFS Region requires that effective management of the species be conducted at a larger landscape-level scale.

<u>Second Claim for Relief</u>
FWS Violation of 16 U.S.C. §1536(b)(4)

114.   WildEarth Guardians incorporates by reference all preceding paragraphs.

First Amended Complaint - Page 31

115.   The ITSs that the FWS issued in connection with the 2012 BiOps are arbitrary and capricious for various reasons, including:

(A)   The ITSs are associated with the USFS's implementation of the 1996 S&Gs, which is an action that the USFS is *not* implementing, and

(B)   The ITSs utilize an unreasonable proxy measure of incidental take which only captures the amount of MSO take expected to occur within PACs.

<u>Third Claim for Relief</u>

USFS Violation of 16 U.S.C. §1536(a)(1)

116.   WildEarth Guardians incorporates by reference all preceding paragraphs.

117.   The USFS is violating its mandatory duty under the ESA to "conserve" listed species because it is not carrying out conservation actions that have been determined to be necessary to protect and recover the MSO.

<u>Fourth Claim for Relief</u>

USFS Substantive Violation of 16 U.S.C. §1536(a)(2)

118.   WildEarth Guardians incorporates by reference all preceding paragraphs.

119.   The USFS is violating the ESA because it is taking actions that jeopardize the MSO and that adversely modify or destroy designated critical habiat.

<u>Fifth Claim for Relief</u>

USFS Procedural Violation of 16 U.S.C. §1536(a)(2)

120.   WildEarth Guardians incorporates by reference all preceding paragraphs.

First Amended Complaint - Page 32

121.    The USFS is violating its mandatory procedural duties under the ESA in various

respects, including the following:

(A)    In connection with the most recent programmatic formal consultation with

the FWS concerning the MSO, the USFS did not consult with the FWS as

to the MSO management approach which it *actually* implements.  Rather,

the USFS prepared and issued a Biological Assessment on an action which

it does *not* implement: "continued implementation" of the 1996 S&Gs.

(B)    In connection with the most recent programmatic formal consultation with

the FWS concerning the MSO, the USFS did not use the best available

scientific information.

(C)    In connection with the most recent programmatic formal consultation with

the FWS concerning the MSO, the USFS did not utilize or make available

to the FWS the best available scientific information regarding the impact of

fire on MSO demographics.

<u>Sixth Claim for Relief</u>

USFS Violation of 16 U.S.C. §1536(c)

122.    WildEarth Guardians incorporates by reference all preceding paragraphs.

123.    In connection with the most recent programmatic formal consultation with the

FWS concerning the MSO, the USFS did not consult with the FWS as to the MSO

management approach which it *actually* implements.  Rather, the USFS prepared and

First Amended Complaint - Page 33

issued a Biological Assessment on an action which it does *not* implement: "continued implementation" of the 1996 S&Gs.

## Seventh Claim for Relief

### USFS Violation of 16 U.S.C. §1536(d)

124.   WildEarth Guardians incorporates by reference all preceding paragraphs.

125.   The USFS is implementing irreversible and irretrievable land management actions on national forest lands that foreclose the formulation and implementation of an RPA that would not violate Section 7(a)(2) of the ESA.

## Eighth Claim for Relief

### USFS Violation of 16 U.S.C. §1538

126.   WildEarth Guardians incorporates by reference all preceding paragraphs.

127.   Since the USFS does not have a valid ITS for its incidental take of MSOs, all incidental take is unpermitted and consituted a violation of the ESA.

## VI.  Relief Requested

WHEREFORE, WildEarth Guardians respectfully requests the following relief:

1.   An order declaring that the FWS is in violation of its duties under the ESA and the APA.

2.   An order declaring the 2012 BiOps invalid.

3.   An order enjoining the FWS to issue a single programmatic Region 3 BiOp that complies with all requirements of the ESA.

First Amended Complaint - Page 34

4.      An order declaring that the USFS is in violation of its substantive and procedural duties under the ESA.

5.      An order requiring the USFS to initiate and conclude a formal Section 7(a)(2) consultation process with the FWS as to the MSO management approach which the USFS *actually* implements.

6.      An order declaring that the USFS is in violation of the ESA provisions which prohibit the incidental take of MSO in the absence of a valid ITS.

7.      An order enjoining all USFS management actions in Region 3 national forests that involve actions that are inconsistent with the adaptive management approach adopted by the USFS in the 1996 S&Gs pending the FWS's issuance of BiOps that comply with all requirements of the ESA.

8.      An order awarding WildEarth Guardians its reasonable costs in this action, including attorney's fees.

9.      Such other relief as this Court determines is just and proper.

Dated:        July 10, 2013              Respectfully submitted,


                                           /s/ Steven Sugarman
                                          Steven Sugarman
                                          347 County Road 55A
                                          Cerrillos, New Mexico 87010
                                          Telephone:  (505) 672-5082

                                          Attorney for WildEarth Guardians



First Amended Complaint - Page 35

First Amended Complaint - Page 36