Steven Sugarman
New Mexico Bar No. 5717
appearing *pro hac vice*
347 County Road 55A
Cerrillos, New Mexico 87010
(505) 672-5082
stevensugarman@hotmail.com

Attorney for WildEarth Guardians

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | | |
|---|---|---|
| WILDEARTH GUARDIANS, | ) | No. 13-151-RCC |
| Plaintiff, | ) | |
| vs. | ) | |
| UNITED STATES FISH AND WILDLIFE SERVICE and UNITED STATES FOREST SERVICE, | ) | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |
| _____ | ) | |

**TABLE OF CONTENTS**

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY . . . . . . . . . . . . 2

        A.      Summary of the factual context of this dispute . . . . . . . . . . . . . . . . . . . . . 2

        B.      Past litigation against the FWS and the USFS for violations of
                the ESA in connection with MSO management . . . . . . . . . . . . . . . . . . . . 3

III.    THE SUBSTANTIVE AND PROCEDURAL REQUIREMENTS OF
        THE ESA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

IV.     STANDING . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

V.      STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

VI.     THE 2012 BIOLOGICAL OPINIONS ARE ARBITRARY AND
        CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        A.      The FWS's 2012 Biological Opinions indulge in and are premised
                on an irrational fiction: the notion that the USFS has implemented
                and will continue to implement the 1996 Standards and Guidelines . . . . . . 9

        B.      The 2012 Biological Opinions are premised on an irrational finding
                regarding MSO population trends that is inconsistent with reality . . . . . . 16

        C.      The FWS failed to provide any explanation for its decision to issue
                eleven separate Biological Opinions assessing the impacts of USFS
                timber management activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        D.      The 2012 Biological Opinions are arbitrary and capricious because
                they fail to provide any meaningful analysis of climate change issues . . . 18

        E.      The 2012 Biological Opinions contain no meaningful analysis of
                the cumulative effects associated with tribal timber management
                programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        F.      The 2012 Biological Opinion are arbitrary and capricious because
                they fail to incorporate and to assess the best available scientific
                information concerning the relationship between MSOs and wildfire . . . 20

        G.      The 2012 Biological Opinions contain an inadequate discussion
                as to whether or not the USFS's *actual* MSO management
                approach in Arizona and New Mexico promotes MSO recovery . . . . . . . 21

        H.      The Incidental Take Statements of the 2012 Biological Opinions
                are invalid . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

VII.   THE USFS'S RELIANCE ON AN INVALID BIOLOGICAL OPINION
       IS A VIOLATION OF ITS SUBSTANTIVE DUTIES UNDER
       ESA SECTION 7(A)(2) AND ESA SECTION 9 . . . . . . . . . . . . . . . . . . . . . . . . 24

VIII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

**TABLE OF AUTHORITIES**

*Alaska v. Lubchenco,*
723 F.3d 1043 (9th Cir. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*American Rivers v. U.S. Army Corps of Engineers,*
271 F.Supp.2d 230 (D.D.C. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Arizona Cattle Growers' Association v. Salazar,*
606 F.3d 1160 (9th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 21

*Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,*
115 S.Ct. 2407 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Bennett v. Spear,*
117 S.Ct. 1154 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Building Industry Association of Superior California v. Norton,*
247 F.3d 1241 (D.C. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Center for Biological Diversity v. Norton,*
240 F.Supp.2d 1090(D. Ariz. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Center for Biological Diversity v. Provencio,*
2012 WL 96603 (D.Ariz. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Center for Biological Diversity v. U.S. Bureau of Land Management,*
698 F.3d 1101 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 15, 17, 25

*Center for Biological Diversity v. U.S. Forest Service,*
820 F.Supp.2d 1029 (D. Ariz. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
91 S.Ct. 814 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Conservation Congress v. Finley,*
774 F.3d 611 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Conservation Congress v. U.S. Forest Service,*
2012 WL 2339765 (E.D. Cal. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Conservation Council for Hawaii v. National Marine Fisheries Service,*
97 F.Supp.3d 1210 (D. Hawaii 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Cottonwood Environmental Law Center v. U.S. Forest Service,*
789 F.3d 1075 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Forest Guardians v. Johanns,*
450 F.3d 455 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 14

*Forest Guardians v. U.S. Forest Service,*
329 F.3d 1089 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Forest Guardians v. U.S. Forest Service,*
Civil No. 00-490 (D.N.M. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service,*
378 F.3d 1059 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Greater Yellowstone Coalition, Inc. v. Servheen,*
665 F.3d 1015 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Motor Vehicle Manufacturers Association v. State Farm,*
103 S.Ct. 2856 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*National Wildlife Federation v. National Marine Fisheries Service,*
524 F.3d 917 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 6, 22, 25

*National Wildlife Federation v. U.S. Army Corps of Engineers,*
384 F.3d 1163 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Native Ecosystems Council v. U.S. Forest Service,*
418 F.3d 953 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Natural Resources Defense Council v. Kempthorne,*
506 F.Supp.2d 322 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Northwest Environmental Defense Center v. Bonneville Power Administration,*
477 F.3d 668 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Oregon Natural Desert Association v. Tidwell,*
716 F.Supp.2d 982 (D.Ore. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Oregon Natural Resources Council v. Allen,*
476 F.3d 1031 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Organized Village of Kake v. U.S. Department of Agriculture,*
795 F.3d 956 (9th Cir. 2015) (en banc) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Pacific Rivers Council v. Thomas,*
30 F.3d 1050 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*San Luis & Delta-Mendota Water Authority v. Jewell,*
747 F.3d 581 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Sierra Club v. Marsh,*
816 F.2d 1376 (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sierra Club v. U.S.E.P.A.,*
346 F.3d 955 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Silver v. Thomas,*
924 F.Supp. 976 (D.Ariz. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Southwest Center for Biological Diversity v. Department of Interior,*
Civil No. 99-519 (D.N.M. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Tennessee Valley Authority v. Hill,*
98 S.Ct. 2279 (1978) ...................................................... 5

*Wild Fish Conservancy v. Salazar,*
628 F.3d 513 (9th Cir. 2010) ........................................ 17, 24, 25

*WildEarth Guardians v. U.S. Forest Service,*
Civil No. 10-385 (D. Ariz. 2011) ........................................ 4

# I. INTRODUCTION

This Endangered Species Act ("ESA") lawsuit concerns the continuing failures of Defendants U.S. Fish and Wildlife Service ("FWS") and U.S. Forest Service ("USFS") to comply with their procedural and substantive duties under the ESA to conserve and recover the Mexican spotted owl ("MSO") on national forest lands in Arizona and New Mexico. In a nutshell, Plaintiff WildEarth Guardians ("Guardians") will show in this ESA lawsuit that the USFS has a long and continuing history of failing to implement the "adaptive management" approach that it adopted to comply with its ESA obligations in connection with the MSO. Guardians will further show that the FWS overlooks this ongoing failure with a wink and a nod, to the continuing detriment of the MSO.

Together, the USFS and the FWS indulge in the fiction that the USFS is "continuing" to implement the adaptive management approach prescribed by the "1996 Standards and Guidelines" – the Forest Plan[1] document that guides and constrains USFS management actions to promote MSO conservation and recovery. However, the undisputed evidence in the Administrative Records lodged by the Federal Defendants in this case show that the so-called "continuing" implementation is a sham: both the USFS and the FWS admit that the USFS has *not* implemented the 1996 Standards and Guidelines in the *past*, and that the USFS will *not* implement the 1996 Standards and Guidelines in the *future*. In this regard, the 2012 Biological Opinions that Guardians challenges in this lawsuit are "little more than an analytical sleight of hand" which manipulate evidence and data "to achieve a 'no jeopardy' finding." *National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 933 (9th Cir. 2008).

---

[1]

Pursuant to the National Forest Management Act, each national forest is governed by a Forest Plan – otherwise known as a Land and Resource Management Plan, or "LRMP." All site-specific management actions that the USFS conducts in any national forest – such as timber harvest and grazing authorizations – must be "consistent" with the governing Forest Plan. 16 U.S.C. §1604(i), *see Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1052 (9th Cir. 1994).

## II. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.     Summary of the factual context of this dispute

In 1993, the MSO was listed as a threatened species in need of the protections of the Endangered Species Act ("ESA").  Statement of Facts ("SOF") at ¶ 1.  Since the time that the MSO was listed as a threatened species, the species' population has continued to decline.  SOF ¶¶ 84-91.  In fact, MSO experts determined in 2000 that its population had decreased post-listing by more than 30% in the national forests of Arizona and New Mexico, with population declines as high as 40% in New Mexico national forests.  SOF ¶ 87.  More recently, the FWS admitted that most populations of MSO have declined in the recent past, and are continuing to decline.  SOF ¶ 85-86.

Over this same period of time – since the listing of the MSO as a threatened species in 1993 – there has been a widely acknowledged institutional failure on the part of FWS and USFS to develop critical information on the impacts of various USFS timber management practices on the MSO.[2]  SOF ¶ 67.  The FWS admits that "[u]nfortunately, empirical data on the effects of thinning and other mechanical forest treatments on Mexican spotted owls are nonexistent," and that "[a]lthough this has been clearly noted for years, no studies on this topic have been funded to date."  *Id.*  Alarmingly, the FWS went on to state that extrapolations from studies of other subspecies of spotted owls "suggest that at least some kinds of mechanical forest treatments may negatively affect spotted owls."  *Id.*  However, even as the population of Mexican spotted owls continued to plunge in the years following its ESA listing, and even as studies of other spotted owl subspecies indicated that USFS timber management practices "negatively affect spotted owls," the FWS and the USFS knowingly (1) neglected  to conduct any studies to assess how on-going USFS timber management activities in Arizona and New Mexico affect the

---

[2]

The impacts of USFS management actions on the MSO are particularly important to the species' survival and recovery because the vast majority of Mexican spotted owls reside on national forest lands in Arizona and New Mexico.  SOF ¶¶ 2-4.

survival and recovery of the MSO and (2) neglected to conduct rigorous MSO population trend monitoring.

**B.     Past litigation against the FWS and the USFS for violations of the ESA in connection with MSO management**

Twenty years ago, Judge Muecke of the United States District Court for the District of Arizona found that the USFS violated its ESA Section 7(a)(2) duty to conserve the MSO because it managed the eleven national forests in Arizona and New Mexico pursuant to Forest Plans which had never been the subject of a programmatic ESA Section 7(a)(2) "formal consultation" with the FWS as to the effects of those Forest Plans on the MSO.  *Silver v. Thomas*, 924 F.Supp. 976, 984-85 (D.Ariz. 1995).  In that case, the USFS argued that its then on-going ESA Section 7(a)(2) consultation with the FWS over expected amendments to the Arizona and New Mexico Forest Plans (which were not yet complete at that time) excused its obligation to comply with its ESA Section 7(a)(2) obligations in connection with implementation of the *actual* and *on-going* Forest Plans.  *Id.*  Judge Muecke disagreed and held that the USFS's obligation under ESA Section 7(a)(2) is to consult with the FWS on the impacts of the MSO conservation approach that it *actually* implements – and not on some hypothetical or aspirational conservation approach which it might implement in the future.  *Id.* at 985 (a consultation as to an action that the USFS might implement in the future "has no bearing on the ongoing activities that affect the MSO").

Ever since Judge Muecke issued that first judicial order aimed at bringing the USFS into compliance with its ESA obligations in connection with the MSO, the USFS has been recurrently brought to heel by the courts for failure to abide by its own MSO management strategy.  For example, in *Center for Biological Diversity v. Norton*, 240 F.Supp.2d 1090, 1094 (D. Ariz. 2003), Judge Bury discussed that the USFS's MSO management guidelines "have either not been implemented at all or have been implemented improperly" and concluded that "the history behind [the USFS's] Forest Plans . . . evidences [the USFS's] own disregard of court orders and the ESA." *Id.* at 1094, 1096.

Likewise, in 2006 the Ninth Circuit found that the USFS violated the ESA when it

failed to implement a critical MSO monitoring plan which it had committed to implement during the course of an ESA Section 7(a)(2) consultation as to the impacts on the MSO of the USFS's grazing management strategy. *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006). The Ninth Circuit found that the FWS's analysis for purposes of the consultation was specifically premised on the USFS's firm commitment to implement a program of monitoring forage conditions. The USFS's subsequent failure to implement the promised monitoring plan vitiated and fatally flawed the FWS's analysis and conclusions, and constituted a violation of the ESA. Id. at 463-67.[3]

More recently, in *Center for Biological Diversity v. U.S. Forest Service*, 820 F.Supp.2d 1029 (D. Ariz. 2011), Judge Bury ruled that the USFS's failure to monitor MSO population trends in Arizona and New Mexico – as specifically required by the FWS's 2005 Biological Opinion assessing the MSO impacts of the USFS's timber management activities – constituted a violation of the ESA in numerous respects:

> The [USFS's] failure to monitor constitutes a failure to conserve these species pursuant to section 7(a)(1) of the ESA. By failing to monitor, and by exceeding or not knowing whether it is exceeding the incidental take limit, the FS is failing to insure that implementation of forest plans in the FS' Southwest Region is not likely to jeopardize the existence of listed species pursuant to section 7(a)(2). Additionally, failure to monitor constitutes new information and a change to the proposed action that will affect these species in ways not considered in the [Biological Opinion], and the failure to immediately reinitiate and complete consultation regarding the implementation of forest plans also violates the ESA. 50 C.F.R. § 402.16. Finally, the FS is failing to comply with its non-discretionary obligations for threatened and endangered species in the Southwest Region under the ESA. 16 U.S.C. § 1540(g).

*Id.* at 1034 *see also WildEarth Guardians v. U.S. Forest Service*, Civil No. 10-385 (D. Ariz. 2011) (January 5, 2012 Order) [Docket #86] (the USFS's failure to conduct MSO

---

[3]    Similarly, in *Forest Guardians v. U.S. Forest Service*, Civil No. 00-490 (D.N.M. 2003) (April 14, 2003 Memorandum Opinion and Order) [Docket #285], the court found that the USFS's failure to comply with programmatic monitoring requirements intended to protect and conserve the MSO violated ESA Section 7 and in *Southwest Center for Biological Diversity v. Department of Interior*, Civil No. 99-519 (D.N.M. 2000) (March 13, 2000 Memorandum Opinion and Order) [Docket #33] the court found "years of delay relating to FWS' compliance obligations" in connection with conservation of the MSO.

population monitoring constitutes a violation of the ESA).

In this case, Guardians will show that the USFS's and the FWS's lamentable record with respect to ESA compliance and the MSO continues. In theory, the USFS and the FWS have adopted an "adaptive management" approach towards MSO conservation. SOF ¶¶ 8-11, 17-21. This "adaptive management" approach – embodied in the 1995 MSO Recovery Plan and in the 1996 Standards and Guidelines that the USFS incorporated into each of the Arizona and New Mexico Forest Plans – is premised on rigorous MSO population monitoring, cause-and-effect experiments, and the implementation of protective management recommendations. SOF ¶¶ 12-16, 21. The evidence in this case clearly shows that the Federal Defendants have failed to comply with each of these critical components of the adaptive management plan. Both the USFS and the FWS have acknowledged these failures. SOF ¶¶ 28-32, 37-42, 65-67, 69-75.

**III. THE SUBSTANTIVE AND PROCEDURAL REQUIREMENTS OF THE ESA**

The ESA is "the most comprehensive legislation for the preservation of endangered species ever enacted by any nation." *Tennessee Valley Authority v. Hill*, 98 S.Ct. 2279, 2295 (1978). Based upon its review of the ESA's language, history, and structure, the United States Supreme Court holds that "Congress intended endangered species to be afforded the highest of priorities" in an effort to "halt and reverse the trend towards species extinction, whatever the cost." *Id.* at 2292, 2297. The Ninth Circuit holds that the ESA reflects a policy of "institutionalized caution," and that the statutory scheme and its implementation are intended to "give the benefit of the doubt to preserving endangered species." *Arizona Cattle Growers' Association v. Salazar*, 606 F.3d 1160, 1166-67 (9th Cir. 2010).

In pursuit of its lofty goals, the ESA imposes both substantive and procedural duties on federal agencies. *Conservation Congress v. Finley*, 774 F.3d 611, 615 (9th Cir. 2014). Three of those substantive duties imposed upon agencies are at issue in this case: (1) the Section 7(a)(1) duty to "utilize their authorities to further the purpose of . . .

conservation, 16 U.S.C § 1536(a)(1), (2) the Section 7(a)(2) duty to "insure that any action [implemented by the agency] is not likely to jeopardize the continued existence of [a listed species] or result in the destruction or adverse modification" of critical habitat, 16 U.S.C. § 1536 (a)(2), and (3) and the Section 9 duty to avoid "take" of listed species except in certain limited circumstances discussed further below,[4] 16 U.S.C. § 1538.

     "Conservation," "jeopardize," and "adversely modify" are all terms of art under the ESA. "Conservation" is defined as the "use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary." 16 U.S.C. § 1532(3). "Jeopardize" and "adversely modify" have been construed by the Ninth Circuit to encompass a "recovery standard." *National Wildlife Federation,* 524 F.3d at 931-32, *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1069-71 (9th Cir. 2004). That is, any federal action that impairs a species' prospects for recovery – and not just its survival – "jeopardizes" the species or "adversely modifies" its habitat within the meaning of the ESA. Thus, the three substantive duties discussed above work together to assure that actions taken by federal agencies promote the survival and recovery of listed species.

     To assure that agencies comply with their ESA substantive duties, the ESA also imposes procedural duties upon federal agencies. A federal agency proposing to take action must assess whether implementation of that action may affect threatened or endangered species. If there is "no effect," that is the end of the matter. If the action agency determines that its proposed action "may affect" protected species or their

---

[4]

     For purposes of the ESA, "take" means not only killing or injuring the listed species, but also "harm." 16 U.S.C. § 1532(19). "Harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 115 S.Ct. 2407, 2412 (1995).

designated critical habitat, it must commence a "formal consultation" with the FWS pursuant to ESA Section 7(a)(2) to determine whether the action would jeopardize a listed species or adversely modify critical habitat. 16 U.S.C. § 1536(a)(2), 50 C.F.R. § 402.14(a). An ESA Section 7(a)(2) formal consultation is commenced by the action agency's written request to the FWS which must include certain key information assembled by the action agency, including a Biological Assessment which describes the proposed action and the agency's evaluation of its potential effects on listed species and their designated critical habitats. 16 U.S.C. § 1536(c)(1), 50 C.F.R. § 402.14(c).

An ESA Section 7(a)(2) formal consultation is concluded with the FWS's issuance of a Biological Opinion. 16 U.S.C. § 1536(b). In a Biological Opinion, the FWS determines whether the proposed action, together with the cumulative effects of other actions affecting the species, is likely to jeopardize a listed species or adversely modify a listed species' critical habitat. 50 C.F.R. § 402.14(g)(4). If the FWS finds that a proposed action is associated with a jeopardy or adverse modification effect, the FWS must develop and propose implementation of a Reasonable and Prudent Alternative which is a proposal to modify the proposed action – within the constraints of the action agency's authority – in such a way as to avoid jeopardy and adverse modification. 16 U.S.C. § 1536(b)(3)(A).

If, during the course of formal consultation, the FWS concludes that the proposed action might result in the "incidental take" of listed species that would be otherwise prohibited by the take prohibition of ESA Section 9, the Biological Opinion must include an Incidental Take Statement. 16 U.S.C. § 1536(b)(3). An Incidental Take Statement acts as an exemption from the ESA's Section 9 take prohibition and (1) specifies the amount of incidental take authorized; (2) specifies Reasonable and Prudent Measures ("RPMs") to minimize the impact of such incidental take: and (3) sets forth the Terms and Conditions (T&Cs") that the action agency must comply with to implement the RPMs. 50 C.F.R. §§ 402.14(i)(1)(i), (ii), (iv). So long as – and only so long as – the

action agency complies with the RPMs and the T&Cs of an Incidental Take Statement, the agency is exempt from the take prohibition of the ESA in connection with its implementation of the action. 16 U.S.C. § 1536(o).

After having completed a formal consultation with the FWS, an action agency is obligated to re-initiate formal consultation under certain circumstances. 50 C.F.R. § 402.16. Re-initiation of formal consultation is required if the amount of take authorized in an ITS is exceeded or if the agency action analyzed in a Biological Opinion is "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion." 50 C.F.R. §§ 402.16(a), ©.

## IV.  STANDING

Attached to this Motion for Summary Judgment as Exhibits 1 and 2 are declarations of Guardians members in support of Guardians' standing in this case. These declarations establish the requirements of standing as set out in *Cottonwood Environmental Law Center v. U.S. Forest Service*, 789 F.3d 1075 (9th Cir. 2015).

## V.  STANDARD OF REVIEW

The Administrative Procedure Act governs review of agency decisions under the ESA. *Center for Biological Diversity v. U.S. Bureau of Land Management*, 698 F.3d 1101, 1109 (9th Cir. 2012). Pursuant to this standard, an agency action is arbitrary and capricious if the agency:

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Id. citing Motor Vehicle Manufacturers Association v. State Farm*, 463 U.S. 29, 43, 103 S.Ct. 2856 (1983).

"Although the arbitrary and capricious standard of review is a 'narrow one,' [a court reviewing agency action is] required to 'engage in a substantial inquiry, . . . a thorough probing review.'" *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d

953, 960 (9th Cir. 2005) *quoting Citizens to Preserve Overton Park, Inc. v. Volpe*, 401

U.S. 402, 415-16, 91 S.Ct. 814 (1971). "To have not acted in an arbitrary and capricious

manner, the agency must present 'a rational connection between the facts found and the

conclusions made.'" 418 F.3d at 960 *quoting National Wildlife Federation v. U.S. Army

Corps of Engineers*, 384 F.3d 1163, 1170 (9th Cir. 2004). A reviewing court "'may not

defer to an agency decision that is without a substantial basis in fact' and cannot uphold a

decision based on a 'clear error of judgment.'" 418 F.3d at 960 *quoting Sierra Club v.

U.S.E.P.A.*, 346 F.3d 955, 961 (9th Cir. 2003).

An important considerations guides and constrains the court's application of the

arbitrary and capricious standard of review in the context of an ESA action. In light of

the "institutionalized caution" required by the ESA, the FWS may not base its ESA

compliance actions "on speculation or surmise." *Building Industry Association of

Superior California v. Norton*, 247 F.3d 1241, 1247-48 (D.C. Cir. 2001) *citing Bennett v.

Spear*, 117 S.Ct. 1154, 1168 (1997). Accordingly, the FWS is required to use "the best

available scientific and commercial data available" in its preparation of Biological

Opinions. 16 U.S.C. ¶ 1536(a)(2). This requirement "prohibits an agency from

disregarding available scientific evidence that is in some way better than the evidence it

relies on." *San Luis & Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 602 (9th

Cir. 2014).

**VI. THE 2012 BIOLOGICAL OPINIONS ARE ARBITRARY AND CAPRICIOUS**

The Biological Opinions at issue in this lawsuit are the 2012 forest-wide

Biological Opinions issued by the FWS in connection with the MSO. SOF ¶ 44. In its

First Claim for Relief, Guardians contends that the FWS's 2012 Biological Opinions are

arbitrary and capricious for the following reasons.

**A.     The FWS's 2012 Biological Opinions indulge in and are premised on an
        irrational fiction: the notion that the USFS has implemented and will
        continue to implement the 1996 Standards and Guidelines**

After the MSO was listed as a threatened species in need of the protections of the

ESA, the FWS set to work to develop a Recovery Plan for the species. SOF ¶¶ 5-6. The core purposes of the MSO Recovery Plan were to describe the future management actions believed to be necessary for the survival and recovery of the MSO. SOF ¶ 7. In light of the fact that there were many scientific uncertainties as to the population status of the species and the impacts of USFS timber management practices on the species, the FWS's Recovery Plan recommended an "adaptive management"[5] approach to MSO conservation. SOF ¶¶ 8-17. The 1995 MSO Recovery Plan stressed – emphatically – that monitoring MSO population trends was an indispensable component of the adaptive management approach. SOF ¶¶ 12, 14-17.

In 1996, the USFS amended all eleven of the Forest Plans for Arizona and New Mexico national forests to incorporate the adaptive management approach and recommendations of the 1995 MSO Recovery Plan. SOF ¶¶ 18-19. These amendments, which were adopted to guide and constrain the USFS in its ESA compliance with respect to the MSO, are known as the "1996 Standards and Guidelines" and they applied to all eleven national forests in Arizona and New Mexico. While the provisions of the Recovery Plan itself were merely guidance to – and not binding on – the USFS, the incorporation of the Recovery Plan's provisions into the USFS's Forest Plans for the Arizona and New Mexico national forests (as the 1996 Standards and Guidelines) rendered those provisions binding on the USFS. SOF ¶ 20 *see also* footnote 1 above. By adopting the 1996 Standards and Guidelines, the USFS committed itself to implementation of the Recovery Plan's monitoring components and to implementation of the Recovery Plan's recommendations for timber management activities. SOF ¶¶ 20-22.

As required by Section 7(a)(2) of the ESA, the USFS and the FWS engaged in a

---

[5]

"Adaptive management" is "[a] deliberate and iterative process to optimize management" that "entails formation of a management model, management implementation, monitoring and interpretation of system responses, and ultimately refinement of management model given lessons learned." SOF ¶ 11.

Section 7(a)(2) formal consultation as to the expected impacts on the MSO of implementing the 1996 Standards and Guidelines. That Section 7(a)(2) consultation led to the FWS's issuance of a 1996 Biological Opinion on "the implementation of amended standards and guidelines for the Mexican spotted owl." SOF ¶ 25. This Biological Opinion was a "no jeopardy" Biological Opinion. That is, the FWS determined that implementation of the 1996 Standards and Guidelines would not jeopardize the continued existence of the MSO. *Id.* The "no jeopardy" conclusion was specifically and expressly premised on the FWS's assumption that the USFS would implement all aspects of the adaptive management scheme that were embodied in the 1996 Standards and Guidelines. SOF ¶¶ 25-26.

Within a matter of years, it became apparent that the USFS would not implement all aspects of the 1996 Standards and Guidelines, contrary to the assumptions that formed the basis of the FWS's 1996 Biological Opinion. SOF ¶ 28. Amongst other excursions beyond the boundaries of the binding 1996 Standards and Guidelines, the USFS did not implement the crucial population monitoring component of the 1996 Standards and Guidelines because of funding issues. SOF ¶ 28-30, 69-73.

To address the USFS's failure to implement the 1996 Standards and Guidelines, and also because the USFS exceeded the amount of incidental take authorized by the 1996 Biological Opinion, the USFS and the FWS re-initiated Section 7(a)(2) consultation as to the impacts of the USFS's timber management activities on the MSO. SOF ¶¶ 31-34. This re-initiated consultation led to the FWS's issuance of the 2005 Biological Opinion analyzing "the continued implementation" of the 1996 Standards and Guidelines, despite the fact that those Standards and Guidelines were *not* being implemented at that time. SOF ¶ 34. Like the 1996 Biological Opinion which it replaced, the 2005 Biological Opinion was a "no jeopardy" Biological Opinion that was specifically and expressly premised on the FWS's assumption that the USFS would implement all aspects of the 1995 MSO Recovery Plan's adaptive management approach, as that approach had been

incorporated into the Arizona and New Mexico Forest Plans by the 1996 Standards and Guidelines. SOF ¶¶ 35-36. However, by the time that the 2005 was issued, it was already well known to the FWS that the USFS was *not* implementing all aspects of the 1996 Standards and Guidelines, including the crucial population monitoring component. SOF ¶¶ 28-32. Thus, the FWS's issuance of the 2005 Biological Opinion – which nominally analyzed the USFS's *continuing* implementation of the 1996 Standards and Guidelines – was based on an irrational foundational assumption: the fictional notion that the USFS was *actually* implementing the 1996 Standards and Guidelines.

Sure enough, the FWS was soon forced to admit – contrary to its stated assumptions in the 2005 Biological Opinion – that the USFS continued to manage its timber program outside the boundaries and constraints of the supposedly binding 1996 Standards and Guidelines. Specifically, the FWS acknowledged that the USFS was not conducting the required population monitoring and that the USFS was not applying the specific management recommendations set out in the 1996 Standard and Guidelines. SOF ¶¶ 37-42. Indeed, in at least one instance, the FWS informed the USFS that its overly intensive timber management practices – and *not* the threat of wildland fire – constituted "the largest threat to the MSO." SOF ¶ 41.

Accordingly, the USFS and the FWS re-initiated – once again – a Section 7(a)(2) consultation as to the impacts on the MSO of the USFS's timber management practices. The re-initiated consultation led to the FWS's issuance of the 2012 Biological Opinions that are at issue in this lawsuit. The FWS states – once again, and still irrationally – that the specific action that is the subject of as the 2012 Biological Opinions is "continued implementation" of the 1996 Standards and Guidelines. SOF ¶¶ 43-45. Like the 1996 and the 2005 Biological Opinions, the 2012 Biological Opinions are all "no jeopardy" opinions that are specifically and expressly premised on the FWS's irrational assumption that the USFS will implement all aspects of the 1996 Standards and Guidelines. SOF ¶ 45. However, it cannot be disputed that by the time that the 2012 Biological Opinions

were issued, it was plainly apparent to the USFS and the FWS that the USFS was *not* implementing the 1996 Standards and Guidelines. SOF ¶¶ 37-42.

The FWS's arbitrary and capricious issuance of the 2012 Biological Opinions on a USFS management action that was not taking place is doubly problematic because the FWS was aware – at the time that it issued the 2012 Biological Opinions – that the USFS would continue to operate its timber management program outside of the boundaries set by the 1996 Standards and Guidelines' adaptive management program. In this connection, a 2013 letter from FWS to USFS acknowledges that the population trend monitoring required by the 1995 MSO Recovery Plan and the 1996 Standards and Guidelines had not been implemented, and would not be implemented. SOF ¶ 75. Instead, this letter suggests, agency biologists had "begun discussions" as to how to acquire crucial MSO population trend information in another way. *Id.* However, the relevant and dispositive fact is that, at the time that the 2012 Biological Opinions were issued, there were *no plans at all* for acquisition of basic MSO population trend data. Therefore, any claim that the USFS has implemented, or continues to implement, an adaptive management approach to MSO conservation and recovery is pure fiction.

The Ninth Circuit has made it abundantly clear – time and time again – that an agency cannot engage the FWS in an ESA Section 7(a)(2) consultation with respect to one proposed action, but then proceed to implement a different action with potentially different effects. "[I]f an agency fails to implement key assumptions on which a [Biological Opinion] was based, the agency is required to re-initiate consultation with the FWS under the ESA." *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1095 (9th Cir. 2003). This principle was first articulated by the Ninth Circuit in *Sierra Club v. Marsh*, where the FWS issued a no-jeopardy Biological Opinion in connection with a proposed action based upon the action agency's commitment to implement certain mitigation measures in connection with the action. 816 F.2d 1376 (9th Cir. 1987). The Ninth Circuit held that the action agency's subsequent failure to implement its mitigation

commitments vitiated the analysis, the conclusions, and the legal effect of the Biological

Opinion. *Id.* at 1384-89.

The Ninth Circuit applied this same principle in the a case which is very similar to

this case. *Forest Guardians v. Johanns*, 450 F.3d 455 (9th Cir. 2006). In *Johanns*, the

USFS conducted an ESA Section 7(a)(2) consultation with the FWS as to the effects of

the USFS Region 3 grazing guidelines on MSOs and MSO habitat. During that

consultation, the USFS committed to implement certain "guidance criteria" in connection

with livestock grazing on national forest lands, including specified monitoring activities.

*Id.* at 459-60. Based on that commitment, the FWS concurred in the USFS's "not likely

to adversely affect" determinations, and the consultation terminated as an "informal

consultation." Subsequently, the USFS developed a "practice of not complying with the

monitoring requirements." *Id.* at 462. The Ninth Circuit found that implementation of

the monitoring requirements was a fundamental and essential component of the "action"

which had been the subject of the Section 7(a)(2) consultation, and that the USFS's

subsequent failure to follow through on its monitoring commitments vitiated the analysis

and the conclusions of the consultation:

> The material inadequacy of the Forest Service's utilization monitoring and
> the results of the limited measurements that were taken constituted
> modifications to the allotment's land management plan [as analyzed during
> the previous consultation] that affected listed species in a manner and to an
> extent not previously considered.

*Id*. at 464-66. Accordingly, the Ninth Circuit held that the USFS violated ESA Section 7

and had a legal obligation to conduct a "reality-based" consultation with the FWS by re-

initiating consultation with the FWS as to the effects of the action it *actually*

implemented. *Id*.

Since *Johanns*, other courts have found ESA Section 7(a)(2) violations in similar

circumstances where the action agency implements an action which is materially different

from the action which it committed to implement during the course of an ESA Section

7(a)(2) consultation. For example, in *Oregon Natural Desert Association v. Tidwell*, 716

F.Supp.2d 982 (D.Ore. 2010), the USFS made monitoring commitments to the FWS in connection with an ESA Section 7(a)(2) formal consultation as to the effects of Forest Plan implementation on threatened steelhead trout, but then subsequently failed to comply with its monitoring commitments.  The court held that the USFS's failure to conduct the required monitoring constituted a violation of ESA Section 7(a)(2) since the Biological Opinion's no jeopardy conclusion was premised on the USFS's compliance with its monitoring commitment:

> The Forest Service may not make empty promises, secure a no jeopardy [Biological Opinion], and then go forward with a proposed action – absent the monitoring and enforcement promised – simply because a no jeopardy [Biological Opinion] has issued . . . The buck must stop somewhere.  Here, the Forest Service acted arbitrarily and capriciously and failed to fulfill its duties under §7(a)(2) by issuing grazing authorizations . . . on a  [Biological Opinion] it knew was based on inaccurate information.

*Id.* at 1004, *see also Center for Biological Diversity*, 698 F.3d at 1109-10, 1117 (Biological Opinion premised on FWS's assumption that an action will take place "is inconsistent with the [ESA], and . . . is therefore invalid")*, American Rivers v. U.S. Army Corps of Engineers*, 271 F.Supp.2d 230, 252-54 (D.D.C. 2003) (invalidating a Biological Opinion because plaintiffs established that the federal action analyzed in the opinion was "virtually certain not to occur").

In this case, the FWS premised the 2012 Biological Opinions on core assumptions that it knew to be invalid – specifically, that the USFS was implementing the 1996 Standards and Guidelines.  Yet the FWS knew that the Standards and Guidelines had not been implemented in the past, and the FWS likewise knew that the Standards and Guidelines would not be implemented in the future.  Accordingly, those Biological Opinions are arbitrary and capricious, and must be vacated.  In simple terms, it is irrational for the FWS to issue Biological Opinions on the so-called "*continued implementation*" of the 1996 Standards and Guidelines when the agency was plainly aware that core aspects of those Standards and Guidelines had *never* been implemented in the past, and would *not* be implemented in the future.

**B. The 2012 Biological Opinions are premised on an irrational finding regarding MSO population trends that is inconsistent with reality**

Since the MSO was listed as a threatened species in 1993, its range-wide population has declined. SOF ¶¶ 84-91. In 2000, the USFS's best estimate was that the range-wide population had decreased by between 30% and 40%. SOF ¶ 87. While recent surveys in previously unsurveyed MSO habitat have resulted in an increase in the number of known MSO sites, the FWS has cautioned that "an increase in abundance cannot be inferred from these data." SOF ¶ 91. In fact, the FWS recently acknowledged that the downward trend in MSO population continues. According to the FWS's 2012 Revised Recovery Plan, available data as to population trends of the MSO "suggest that most populations have declined slightly in the recent past or are still declining." SOF ¶¶ 85-86. Likewise, the USFS plainly admits that the MSO population is declining in at least one national forest: the Apache-Sitgreaves National Forest. SOF ¶ 89.

Contrary to all the available evidence, each of the 2012 Biological Opinions states as follows in explaining its "no jeopardy" conclusions:

> Although population trend monitoring has not occurred for the MSO, our records indicate no decline in the MSO population based upon an increase in known PAC numbers since the MSO was listed.

SOF ¶ 92. This statement is irrational, arbitrary, and capricious for two reasons. First, the evidence available to the USFS and the FWS – as set out above – actually shows declining MSO populations, and the FWS's statement that "our records indicate no decline" is simply inconsistent with all the evidence. Second, the Biological Opinions' suggestion that an increase in population can be inferred from an increase in known PAC sites is expressly contradicted by another statement in the Biological Opinions to the effect that "an increase in the abundance" in MSO populations "cannot be inferred" from "[t]he increase in known MSO sites" since that increase "is mainly a product of new MSO surveys being completed within previously unsurveyed areas." SOF ¶ 91.

"A Biological Opinion is arbitrary and capricious if it fails to consider the relevant factors and articulate a rational connection between the facts found and the choice made."

1   *Center for Biological Diversity*, 698 F.3d at 1121 (internal citations omitted).  A "no

2   jeopardy" Biological Opinion that fails "to support [the no jeopardy] conclusion with

3   adequate evidence or analysis . . . is arbitrary and capricious."  *Conservation Council for*

4   *Hawaii v. National Marine Fisheries Service*, 97 F.Supp.3d 1210, 1232 (D. Hawaii

5   2015).  Moreover, a Biological Opinion which fails to account for acknowledged

6   population declines in its jeopardy analysis does not satisfy the requirements of the ESA.

7   *Alaska v. Lubchenco*, 723 F.3d 1043, 1052 (9th Cir. 2013).  In this case, the 2012

8   Biological Opinions incorporate "no jeopardy" conclusions that are irrationally based on

9   an erroneous factual premise that is inconsistent with the evidence.  The best available

10   scientific information available to the FWS clearly shows range-wide declines in MSO

11   populations, but the FWS chose to disregard this evidence in order to reach the "no

12   jeopardy" conclusions.  There is no rational connection in this case between the

13   population trend evidence available to the FWS and the no jeopardy conclusions of the

14   2012 Biological Opinions.  For this reason, the 2012 Biological Opinions are arbitrary

15   and capricious, and must be vacated.  *Wild Fish Conservancy v. Salazar*, 628 F.3d 513,

16   525-29 (9th Cir. 2010) (when the population trend of a listed species is declining, a

17   Biological Opinion that fails to explain why a "no jeopardy" conclusion is appropriate

18   despite that decline is arbitrary and capricious).

19       **C.**    **The FWS failed to provide any explanation for its decision to issue**

20              **eleven separate Biological Opinions assessing the impacts of USFS timber management activities**

21      The FWS and the USFS have consistently taken the position that land managers

22   must manage the MSO on a landscape scale – in order to assure habitat connectivity and

23   avoid habitat fragmentation – in light of the fact that gene flow amongst and between

24   *discreet MSO populations is important to the survival of the species.  SOF ¶¶ 76-83.*

25   Reflecting the recognized need for a landscape-level range-wide management approach,

26   the FWS's 1996 and 2005 Biological Opinions were regional in scope, and assessed the

27   MSO impacts of all USFS timber management activities across the MSO's entire range in

28

Arizona and New Mexico national forests.  SOF ¶¶ 47-48.  In contrast, the 2012

Biological Opinions depart from the regional approach, and assess the MSO impacts of

USFS management activities on a forest-by-forest basis.  SOF ¶ 49.

The FWS acknowledges that the 2012 Biological Opinions adopt a new analytical

framework for assessing the MSO impacts of USFS management activities.  Each of

those Biological Opinions admit that "[a] distinct change from the [previous iterations of

the Biological Opinions] is that this consultation will be . . . organized according" to

national forests.  *Id.*  However, the FWS provides no explanation or justification

whatsoever for this significant change in analytical approach.

In a case like this one, where the FWS departed from "its long-standing practice"

of issuing a region-wide Biological Opinion assessing the MSO impacts of USFS

management actions across the species' entire range in Arizona and New Mexico, it

"must supply a reasoned analysis indicating that prior policies and standards are being

deliberately changed, not casually ignored."  *Northwest Environmental Defense Center v.

Bonneville Power Administration*, 477 F.3d 668, 687 (9th Cir. 2007).  Where, as here, the

FWS "glosses over or swerves from prior precedents without discussion," its actions

"cross the line from the tolerably terse to the intolerably mute."  *Id.* at 687-88, *see also*

*Organized Village of Kake v. U.S. Department of Agriculture*, 795 F.3d 956, 966-67 (9th

Cir. 2015) (en banc) (to prevent a claim it was acting in an arbitrary or capricious manner,

where an agency changes it policy, the agency must show awareness that it is changing a

policy and give a reasoned explanation for the adoption of the new policy).

**D.    The 2012 Biological Opinions are arbitrary and capricious because
they fail to provide any meaningful analysis of climate change issues**

The USFS's MSO experts have concluded that climate change "may be the biggest

issue facing Mexican spotted owls."  SOF ¶ 93-99.  One recent study cited in the 2012

MSO Revised Recovery Plan concludes that climate change impacts are associated with a

78% to 93% probability that MSOs will go extinct in Arizona and New Mexico national

forests by the end of the century.  SOF ¶ 97.  For this reason, it is important that the

USFS's management of the MSO incorporate climate change concerns, including the necessity of conserving future MSO habitat in moister and cooler habitat types than are currently used by the MSO. SOF ¶ 99.

Despite the recognized importance of climate change to MSO survival and MSO management, the 2012 Biological Opinions address climate change in only the most cursory of fashions. In fact, the 2012 Biological Opinions contain only a very generic narrative regarding climate change in the United States – and omit any and all analysis of the particular impacts of climate change on the MSO. SOF ¶ 100. When an agency has evidence of an important circumstance affecting a listed species – such as climate change in the case of the MSO – it must rationally and reasonably account for that circumstance in its jeopardy analysis. Here, it is abundantly clear that the FWS simply punted in its assessment of climate change impacts – despite the fact that USFS scientists have determined that climate change is one of the primary threats to the MSO's continued survival. For this reason, the 2012 Biological Opinion are arbitrary and capricious.

E.   **The 2012 Biological Opinions contain no meaningful analysis of the cumulative effects associated with tribal timber management programs**

Pursuant to the ESA, "agencies are required to evaluate the cumulative effects on a listed species . . . during formal consultation." *Conservation Congress v. U.S. Forest Service*, 2012 WL 2339765 at *12 (E.D. Cal. 2012) *citing* 50 C.F.R. § 402.14(g)(3)-(4). The "cumulative effects" sections of the 2012 Biological Opinions do not satisfy the mandatory statutory requirement since those sections are nothing more than boilerplate cut-and-paste paragraphs from the 2005 Biological Opinion, and contain no meaningful analysis of "cumulative effects." SOF ¶¶ 57-62. Indeed, the inclusion of the "cumulative effects" section was an afterthought, as the authors of the Biological Opinions forgot to include this section during drafting of the Biological Opinions. SOF ¶ 61.

In this case, it is plainly obvious on the Administrative Records compiled by the Federal Defendants that the FWS simply "punted" in connection with the required assessment of "cumulative effects" associated with tribal timber management programs.

Even the deferential "arbitrary and capricious" standard of review requires a rational and reasonable analysis of "important aspects of the problem," and that analysis is lacking from the 2012 Biological Opinions insofar as "cumulative effects" are concerned. For this reason, the 2012 Biological Opinions must be vacated.

**F.     The 2012 Biological Opinion are arbitrary and capricious because they fail to incorporate and to assess the best available scientific information concerning the relationship between MSOs and wildfire**

The 2012 Biological Opinions assert that the primary threat to the MSO has "transitioned from commercial-based timber harvest to stand-replacing wildfire," and that "[u]ncharacteristic, high-severity, stand-replacing wildland fire is probably the greatest threat to the MSO within the action area." SOF ¶ 110. However, the 2012 Biological Opinions also candidly – and inconsistently – admit that the FWS "do[es] not know the extent of the effects of these wildland fires on actual MSO numbers." SOF ¶ 111 *see also* SOF ¶ 112 ("we have no data on long-term effects of these fires on occupancy patterns or on components of MSO fitness such as survival and reproduction"). Furthermore, the FWS admits that its unsubstantiated conclusion as to the threat posed by wildland fires is hypothetical, at best, as it acknowledges in the 2012 Biological Opinions that "MSOs appear to be somewhat resilient to wildfire, at least in the short term." *Id.*

In fact, the best available scientific information concerning MSO response to fire indicates that MSOs thrive in a post-fire environment, and this effect has been observed in areas that burned at high severity more than seven years previously. SOF ¶¶ 106-09. At the time that the FWS authored the 2012 Biological Opinions, the USFS had commissioned time-series survey reports of two areas on the Coronado National Forest that had partially burned at high severity. SOF ¶¶ 107-09. Both of those reports showed that MSO reproduction in severely burned areas is actually higher than MSO reproduction outside of those areas, even seven years after the severe fires burned through the survey areas. *Id.* In preparing the 2012 Biological Opinions, the FWS simply failed to consider the scientific evidence concerning successful MSO reproduction in severely burned areas.

1    Instead, the FWS makes a conclusory and unsupported assumption – admittedly based on

2    uncertainty – that wildland fire is the largest threat to MSOs.  Since this core assumption

3    is not supported by the best available scientific information on the issue, the Biological

4    Opinions are arbitrary and capricious.

5        **G.    The 2012 Biological Opinions contain an inadequate discussion as to
            whether or not the USFS's *actual* MSO management approach in
6            Arizona and New Mexico promotes MSO recovery**

7        As noted above, a Biological Opinion that fails to address the impacts of a federal

8    action on a listed species' prospects for recovery is arbitrary and capricious.  The 2012

9    Biological Opinions at issue in this lawsuit do not realistically address how the USFS's

10   *actual* MSO management approach promotes MSO recovery, and they must be vacated

11   for this reason.

12       In previous cases, courts have recognized that "overly flexible adaptive

13   management may be incompatible with the requirements of the ESA."  *Natural Resources*

14   *Defense Council v. Kempthorne*, 506 F.Supp.2d 322, 352-53 (E.D. Cal. 2007).  In *Greater*

15   *Yellowstone Coalition, Inc. v. Servheen*, 665 F.3d 1015, 1029 (9th Cir. 2011), the Ninth

16   Circuit held that "it is not enough to invoke 'adaptive management' as an answer to

17   scientific uncertainty," and that adaptive management approaches to species conservation

18   efforts under the ESA must set out "specific management responses tied to . . . specific

19   triggering criteria."  In the absence of such enforceable specifics in an adaptive

20   management conservation scheme, the FWS "cannot take a full-speed ahead, damn the

21   torpedoes approach" without running afoul of the ESA's "'policy of institutionalized

22   caution.'"  *Id.* at 1030 *quoting Arizona Cattle Growers,* 606 F.3d at 1167.

23       In the case of the Mexican spotted owl, USFS and FWS biologists agree that the

24   adaptive management approach – first set out in the 1995 MSO Recovery Plan and

25   incorporated into the Arizona and New Mexico Forest Plans by the 1996 Standards and

26   Guidelines – has not been implemented in the past and will not be implemented in the

27   future.  SOF ¶¶ 28-32, 37-42, 65-75 *see also* pp. 9-15 above.  The agencies have not

28

acquired crucial population trend data to measure MSO response to USFS management activities and the agencies have not conducted any cause-and-effect experiments that would provide "empirical data on the effects of thinning and other mechanical forest treatments on [MSOs]." SOF ¶¶ 65-67, 69-75. The FWS admits that the failure to obtain all of this essential information "has been clearly noted for years," but that "no studies on this topic have been funded to date." SOF ¶ 67. Indeed, the USFS's leading MSO biologist co-authored an article in 2012 in which he discusses the agency's approach to MSO management as a "case study" of the *failure* of adaptive management. SOF ¶¶ 69-74 *see* SOF ¶ 74 (the USFS's "budget and expertise are not keeping up with progress in wildlife science, namely the use of modern methods to monitor populations and the need for experimental studies to realize cause and effect relationships").

In undertaking its jeopardy analysis during a Section 7(a)(2) consultation, the FWS is "required by regulation to assess not only the impacts of the Forest Service's action on the *survival* of [a listed species], but also on its *recovery*." *Center for Biological Diversity v. Provencio*, 2012 WL 966031 at *11 (D.Ariz. 2012). "Recovery means more than just improved status; it means improvements to the point where the species may be delisted." *Id.* at *12. In this case, the 2012 Biological Opinions – premised as they are on the FWS's irrational assumptions regarding the USFS's implementation of the 1996 Standards and Guidelines and on the FWS's view on MSO population trends which runs contrary to the evidence – simply fail to establish that the FWS adequately assessed how *actual* USFS management actions will affect the MSO's prospects for recovery.

When viewed in this light, it is clear that the 2012 Biological Opinions are "little more than an analytical sleight of hand." *National Wildlife Federation*, 524 F.3d at 933. They purport to assess an adaptive management approach towards MSO conservation and recovery which is *not* being implemented. "The ESA requires a more realistic, common sense examination" of USFS management activities affecting the MSO. *Id.* At bottom, the notion that the USFS is implementing the adaptive management program embodied in

1  the 1995 MSO Recovery Plan and in the 1996 Standards and Guidelines is nothing more
2  than smoke and mirrors – and the Federal Defendants have both admitted as much.  For
3  this reason, WEG respectfully submits that this Court must conclude that the FWS
4  conducted an irrational, arbitrary, and capricious assessment of MSO recovery in the 2012
5  Biological Opinions, and must further conclude that the USFS's reliance on the 2012
6  Biological Opinions is likewise arbitrary and capricious.

   **H.    The Incidental Take Statements of the 2012 Biological Opinions are
           invalid**

       The Incidental Take Statements in the 1996 and 2005 Biological Opinions set a
maximum amount of incidental take that could occur as a result of USFS management
activities.  SOF ¶¶ 53-54.  This amount was a "hard cap," and exceeding the set level of
take set out in the Biological Opinions triggered a requirement for re-initiation of Section
7(a)(2) consultation.  In contrast, the Incidental Take Statements incorporated  into the
2012 Biological Opinions allow for open-ended and limitless take so long as a certain
amount is not exceeded each year.  SOF ¶ 55.  Furthermore, the Incidental Take
Statements of the 2012 Biological Opinions do not account for the fact that MSOs use
habitat without any regulatory protection while they are dispersing.  Accordingly, the
incidental take of dispersing owls is not captured by the take limits of the Incidental Take
Statements because those statements only account for the incidental take of MSOs that
occurs in Protected Activity Centers.  SOF ¶¶ 101-05.  Likewise, the Incidental Take
Statements incorporated into the 2012 Biological Opinions do not account for the fact that
MSOs appear to shift about the landscape and do not remain in their "assigned"
Protective Activity Centers.  SOF ¶ 113.  As is the case with dispersing owls, incidental
take of these "shifting" owls is simply not tallied under the 2012 Biological Opinion's
Incidental Take Statements.  The failures of the Incidental Take Statements (1) to set a
hard cap on the amount of incidental take and (2) to account for *all* incidental take of
MSOs renders the Incidental Take Statements arbitrary and capricious.

       One of the important functions of an Incidental Take Statement is to set a limit on

the amount of incidental take that may occur as the result of an action, so that ESA

Section 7(a)(2) consultation may be re-initiated in the event that the maximum level of

take is exceeded. *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1038-39

(9th Cir. 2007). An Incidental Take Statement that does "not set a clear standard for

determining when the authorized level of take had been exceeded" is arbitrary and

capricious. *Id.* at 1039. Here, where the Incidental Take Statements allow for limitless

take, so long as a certain amount is not exceeded each year, the required "clear standard"

does not exist and the Incidental Take Statements are arbitrary and capricious.

Additionally, the Ninth Circuit has held that "the permissible level of take ideally

should be expressed as a specific number." *Id.* at 1037. In this case, the FWS does not

set a specific level of MSOs that may be incidentally taken, but rather expresses the take

limit as a percentage of Protected Activity Centers that can be modified by USFS

management actions. However, the use of "a surrogate is permissible" only in those

instances where "no number may be practically obtained." *Id.* at 1038. Additionally, if

an Incidental Take Statement uses a surrogate for a level of take, it "must articulate a

rational connection between the surrogate and the taking of the species." *Wild Fish

Conservancy*, 628 F.3d at 531. In this case, where the surrogate does not capture for the

incidental take of dispersing MSOs and MSOs that have shifted outside of their Protected

Activity Centers, the use of the selected surrogate is impermissible, and the Incidental

Take Statements are invalid.

**VII. THE USFS'S RELIANCE ON AN INVALID BIOLOGICAL OPINION
IS A VIOLATION OF ITS SUBSTANTIVE DUTIES UNDER
ESA SECTION 7(A)(2) AND ESA SECTION 9**

As noted at this outset of this memorandum brief, the ESA imposes both

procedural and substantive duties on federal agencies. One of the core substantive duties

that the ESA imposes on action agencies – such as the USFS in this case – is the ESA

Section 7(a)(2) duty to avoid jeopardy to listed species. 16 U.S.C. § 1536(a)(2). The

Ninth Circuit holds that an action agency violates this substantive duty when it relies on

an invalid Biological Opinion:

> ESA Section 7 imposes on [a federal agency] a substantive duty to ensure that its operations are not likely to jeopardize the continued existence of [listed species]. Arbitrarily and capriciously relying on a faulty Biological Opinion violates this duty.

*Wild Fish Conservancy*, 628 F.3d at 532 (internal quotations omitted). "In particular, an agency cannot meet its section 7 obligations by relying on a Biological Opinion that is legally flawed or by failing to discuss information that would undercut the opinion's conclusions." *Center for Biological Diversity,* 698 F.3d at 1127-28.

As explained above, the FWS's 2012 Biological Opinions are legally flawed in various respects, and are arbitrary and capricious. Accordingly, the USFS does not meet its substantive obligation under ESA Section 7(a)(2) to avoid jeopardy to the MSO when it relies on those Biological Opinions to establish ESA compliance. To the contrary, the USFS's reliance on the 2012 Biological Opinions is arbitrary and capricious, and constitutes a violation of the USFS's ESA Section 7(a)(2) substantive duty.

Another core substantive duty is the duty to avoid all "take" of listed species, except for that incidental take which is expressly contemplated by and authorized by an ITS. 16 U.S.C. § 1538. As explained above, the Incidental Take Statements that are incorporated into the 2012 Biological Opinions are invalid. Accordingly, the USFS is not exempt from the ESA's take prohibition and all incidental take of MSOs that occurs in connection with the USFS's management activities is unauthorized and illegal.

## VIII. CONCLUSION

As described above, the FWS's 2012 Biological Opinions are "little more than an analytical sleight of hand" drafted to justify no jeopardy conclusions. *National Wildlife Federation,* 524 F.3d at 933. For this reason, they are arbitrary, capricious, and invalid, and the USFS's reliance on the 2012 Biological Opinions is likewise arbitrary, capricious, and invalid.

Dated: March 31, 2016

Respectfully submitted,

_/s/ Steven Sugarman_
Steven Sugarman
347 County Road 55A
Cerrillos, New Mexico 87010
Telephone: (505) 672-5082

Attorney for WildEarth Guardians

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2016, I electronically filed the foregoing PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT with the Clerk of the Court via the CM/ECF system, which will send notification of such to the attorneys of record.

_/s/ Steven Sugarman_
Steven Sugarman