1    **WO**

2

3

4

5

6              **IN THE UNITED STATES DISTRICT COURT**

7              **FOR THE DISTRICT OF ARIZONA**

8

9    WildEarth Guardians,                          No. CV-13-00151-TUC-RCC

10                  Plaintiff,                      **ORDER**

11   v.

12   United States Fish and Wildlife Service, et
     al.,
13
                    Defendants.
14

15          The Mexican Spotted Owl ("MSO")[1] is an elusive creature, making it conceptually

16   and financially difficult to track despite provisions in the 2012 Biological Opinions

17   ("BiOps") recommending population monitoring. Because of this quandary, United States

18   Forest Service ("USFS") and United States Fish and Wildlife Service ("FWS") have been

19   unable to conduct range-wide population monitoring, a measure necessary to remove the

20   MSO from the listing of threatened species. Plaintiff WildEarth Guardians' Amended

21   Complaint claims that FWS' 2012 BiOps, issued for the protection of the MSO, are

22

23   _____

     [1] Acronyms: BiOp = Biological Opinion; ESA = Endangered Species Act; FWS = United
24   States Fish and Wildlife Service; ITS = Incidental Take Statement; MSO = Mexican
     Spotted Owl; RP = Recovery Plan; RRP = Revised Recovery Plan; RPM = Reasonable and
25   Prudent Measure; S&Gs = Standards and Guidelines; PAC = Protected Activity Centers;
     USFS = United States Forest Service.

26

27

arbitrary and capricious in violation of the Endangered Species Act ("ESA"). (Doc. 10.)[2] Plaintiff contends that Defendants' inability to monitor the MSO makes the conclusions in the 2012 BiOps faulty, and the resulting incidental take statement invalid. *Id.*

Currently before the Court are the parties' cross-motions for summary judgment. (Docs. 50, 52.) Plaintiff seeks declaratory and injunctive relief against Defendants, including: (1) an order enjoining all USFS management actions in Region 3 national forests[3] that are non-compliant and (2) an order requiring re-initiation of ESA Section 7(a)(2) formal consultation. (Doc. 10 at 34-35.)

Neither party requested oral argument, and the Court finds that oral argument is unnecessary for a just adjudication of this matter. *See* LRCiv 7.2(f). Upon review of the record, the Court will grant Plaintiff's Motion for Summary Judgment insofar as it alleges the BiOps violate the ESA because the jeopardy analysis fails to account for recovery of the MSO; and grant Defendants' Cross-Motion for Summary Judgment in part.

## STATUTORY AND REGULATORY BACKGROUND

### A. Statutory Framework: The Endangered Species Act

The ESA, 16 U.S.C. § 1531, et seq., "is a comprehensive scheme with the broad purpose of protecting endangered and threatened species." *Ctr. for Biological Diversity v. U.S. Bureau of Land Mgmt.* ("*CBD v. USBLM*")*,* 698 F.3d 1101, 1106 (9th Cir. 2012) (citation and quotation marks omitted); *see also* 16 U.S.C. § 1531. When enacting the ESA, Congress was primarily concerned with "halt[ing] and revers[ing] the trend toward species extinction, whatever the cost." *Tenn. Valley Auth. v. Hill*, 437 U.S. 153, 180 (1978). Yet, "the ESA was enacted not merely to forestall the extinction of the species (i.e., promote species survival), but to allow a species to recover to the point where it may be delisted." *Gifford Pinchot Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1070 (9th Cir.

---

[2] Citations to Court documents reference the page numbers generated by ECF. Citations to the Administrative Record reference the records' Bates stamp number.

[3] There are eleven national forests in Arizona which constitute USFS Region 3: Apache–Sitegreaves, Coconino, Coronado, Kaibob, Prescott, Carson, Cibola, Gila, Lincoln, Tonto, and Gila.

2004).

To address these concerns, the ESA imposes procedural and substantive duties on some federal agencies. *Forest Guardians v. Johanns*, 450 F.3d 455, 457 (9th Cir 2006). These duties are as follows:

### 1.  Recovery Plan

When a species is listed as threatened or endangered, ESA Section 4(f) mandates the development and implementation of a Recovery Plan ("RP"). 16 U.S.C. § 1533(f)(1). RPs should include site-specific recommendations discussing the management actions necessary to permit the survival of the listed species. *Id*. § 1533(f)(1)(B)(i). Also, RPs must detail how the FWS can determine whether a species should be delisted, *id*. § 1533(f)(1)(B)(ii), the timeline for the implementation of these measures, as well as the approximate cost, *id*. § 1533(f)(1)(B)(iii). RPs serve as guidance for recovery, but do not create legally enforceable duties. *See Fund for Animals v. Rice*, 85 F.3d 535, 548 (11th Cir. 1996); *Cal. Native Plant Soc'y v. EPA*, No. C06-03604 MJJ, 2007 WL 2021796, at *21 n.7 (N.D. Cal. Jul. 10, 2007); *Grand Canyon Tr. v. Norton*, No. 04-CV-636PHXFJM, 2006 WL 167560, at *2 (D. Ariz. Jan. 18, 2006).

### 2.  Informal Consultation and Biological Assessment

"Procedurally, before initiating any action in an area that contains endangered or threatened land-based species," federal action agencies (in this instance, USFS) must informally consult with the appropriate consulting agency (in this instance, FWS) "to determine the likely effects of any proposed action on the species and its critical habitat." *Conservation Cong. v. U.S. Forest Serv.,* 720 F.3d 1048, 1051 (9th Cir. 2013) (citing *Nat. Res. Defense Council v. Houston*, 146 F.3d 1118, 11126 (9th Cir. 1998)). If a listed species may be present in an action area, the action agency must create a Biological Assessment. 16 U.S.C. § 1536(c)(1). This is used to determine whether to engage in formal consultation or in "formulating a biological opinion." 50 C.F.R. §§ 402.12(k)(1)-(2).

///

### 3.  <u>Formal Consultation and Biological Opinion</u>

If an action agency finds that an action may affect a listed species or its habitat under the ESA, the action agency must typically initiate a formal consultation with the appropriate consulting agency. 50 C.F.R. §§ 402.14(a)-(c). The formal consultation process culminates in the FWS' production of a BiOp that advises the action agency as to whether the proposed action, either alone or in combination with other effects, would endanger the existence of the listed species or adversely modify its habitat. *Conservation Cong.,* 720 F.3d at 1051 (citing 50 C.F.R. § 402.14(g)(4)). BiOps are considered final actions that may be reviewed by the District Court. *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 524 F.3d 917, 925 (9th Cir. 2008).

#### a.  *Jeopardy Opinion*

The BiOp must decide whether or not an agency action jeopardizes the listed species and then issue a "jeopardy" or "no jeopardy" opinion, 50 C.F.R. § 402.14(h)(3), based on "the best scientific and commercial data available," 16 U.S.C. § 1536(a)(2). An action that jeopardizes a species is one that "reduce[s] appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. When a no-jeopardy opinion issues, the BiOp must also include reasonable and prudent alternatives ("RPA") to promote the listed species' continued existence. 50 C.F.R. § 402.14(h)(3).

#### b.  *Incidental Take Statement*

The ESA imposes a substantive duty upon the action agency to "take" listed species only in specified instances. 16 U.S.C. § 1535(a)(2). "Take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect" a protected species "or to attempt to engage in any such conduct." *Id.* § 1532(19).

If, as here, the FWS issues a "no jeopardy" and "no adverse modification of critical habitat" opinion, but determines that the action may incidentally "take" individual members of a listed species, FWS must issue an incidental take statement ("ITS"). 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The ITS must articulate: (1) the amount or

extent of the incidental take on the species, (2) "reasonable and prudent measures" ("RPMs") needed to minimize the amount or extent of take, and (3) the "terms and conditions" that the action agency must follow to implement the RPMs. 16 U.S.C. §§ 1536(b)(4)(i)-(iv). Take is permissible if it complies with the ITS' terms and conditions. *Id*. § 1536(o)(2). However, action agencies like the USFS must reinitiate consultation if the specified level of take is exceeded, 50 C.F.R. § 402.14(i)(4), or if the action considered in the BiOp is "subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the BiOp*," Id.* § 402.16(c).

### 4.  Independent Obligation to Avoid Excess Take

Finally, ESA Section 7 imposes an independent and continuing obligation upon action agencies to avoid taking action that would jeopardize the existence of a listed species or adversely modify its habitat. 16 U.S.C. § 1536(a)(2); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of the Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990). Therefore, the action agency cannot be relieved of its duty to adhere to the ESA simply through compliance with the BiOp; it has an independent duty to ensure that its reliance on a BiOp is not arbitrary or capricious. *Id*.; *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 532 (9th Cir. 2010).

## HISTORICAL BACKGROUND

### A.  The Mexican Spotted Owl

On March 16, 1993, FWS listed the MSO as a "threatened" species under the ESA. USFS 1. At the time of listing, FWS determined that most of the MSOs known to exist were found on national forest lands. *See* USFS 71. The listing decision acknowledged that, due to the MSO's secretive nature, no historic or current MSO population data existed. USFS 1; FWS 7902-06. What was known includes that MSOs nest and forage in canyons and on mountains with mature-growth forests consisting primarily of high, enclosed, thick, multilayered canopies with uneven-aged tree stands. USFS 1-2.

In the listing, FWS discussed threats to the MSO's habitat or range, including an estimate that historically, 1,037,000 acres of MSO habitat had been converted from suitable

to "unsuitable . . . [but] capable of becoming suitable . . . sometime in the future." USFS 19. Over seventy-five percent of that conversion was attributed to "human activities (primarily timber harvest)" and over twenty-one percent to "natural causes (primarily fire)." *Id*. FWS explained how historic and contemporary timber management practices, specifically even-aged silviculture,[4] compromised the MSO's habitat. USFS 20. FWS surmised that, under the then-existing USFS' Forest Plans[5] for Region 3, such timber management practices could be expected to continue. *Id*. Furthermore, FWS also predicted that "the future incidence [of catastrophic wildfires] can be expected to remain fairly constant." USFS 22. In essence, the primary dangers to the survival of the MSO were (1) timber practices and (2) severe wildfires. USFS 20.

### 1.  The 1995 MSO Recovery Plan

At the same time as the listing, the FWS Southwestern Regional Director appointed a team to develop a species RP. USFS 43. FWS approved the team's resulting 1995 RP. USFS 30. The 1995 RP's Executive Summary explained the purpose of the RP was to "outline the steps necessary to remove the [MSO] from the list of threatened species." USFS 43. To address the primary concerns of timber management and wildfires, the 1995 RP's goal was "to protect conditions and structures used by [MSOs] where they exist and to set other standards on a trajectory to grow into replacement nest habitat or to provide conditions for foraging and dispersal." USFS 133.

To encourage population growth, the Recovery Team created an "adaptive management" plan.  USFS 133-34. FWS described adaptive management as a flexible process that would be refined as data was received through implementation of the

---

[4] Silviculture is "the practice of controlling the establishment, composition, and growth of forests." FWS R 172. At listing, timber management practices included even-aged silviculture. USFS 115, 380. This method "tended to simplify stand structure and harvest a disproportionate share of large trees," USFS 115, which "can conflict with MSO habitat needs." USFS 380.

[5] National forest lands are managed by USFS pursuant to the National Forest Management Act. The Act directs the USFS to prepare Forest Plans—also referred to as Land and Resource Management Plans—to govern its activities in each national forest unit. 16 U.S.C. § 1604(a). Site-specific projects and activities must be consistent with an approved Forest Plan. 16 U.S.C. § 1604(i).

management model and monitoring. USFS 9934 SUP1. Visually, the adaptive management plan was pictured as a three-legged stool, supported equally by population monitoring, habitat monitoring, and management recommendations. USFS 134-35. Members of the recovery team stated, "[l]ike a stool, if any one of the legs were removed, the recovery plan would fail." USFS 1006.

The timeline for the 1995 RP was limited to between ten and fifteen years, at which time it was anticipated that the monitoring protocol in the 1995 RP may enable the delisting of the MSO. USFS 109. Over twenty years later, delisting has not occurred, and information about the current MSO population is still minimal.

### 2.  The 1996 Amendment to the USFS Forest Plan

In May 1996, FWS released a region-wide amendment to the Forest Plans that incorporated the recommendations from the 1995 RP. USFS 380; USFS 2338. It also incorporated the 1996 Standards and Guidelines ("1996 S&Gs"), which committed USFS to protecting MSOs by (1) creating Protected Activity Centers ("PACs")[6] and restricted sites, (2) implementing fuels reduction management, and (3) encouraging MSO habitat by eliminating even-aged silviculture and promoting multi-layered canopies. USFS 466-474. The 1996 S&Gs also provided that agencies should conduct surveys of potential MSO areas. USFS 466. The USFS' adoption of the 1996 Amended Forest Plan meant that all USFS actions must be consistent with the Forest Plans' terms. *See* 16 U.S.C. § 1604(i).

### 3.  1996 BiOp

Two BiOps were produced following the 1995 RP. USFS 633-696, 697-736. The first BiOp contemplated not incorporating the 1996 S&Gs and led to a jeopardy opinion. USFS 633-696. The second BiOp, adopted by FWS, incorporated the adaptive management approach and the 1996 S&Gs, and concluded that USFS forest management programs did not jeopardize the MSO. USFS 724.

///

---

[6] PACs are, at minimum, 600-acre areas surrounding a known MSO habitat, an MSO nesting site, or areas of forest that meet requirements for an MSO habitat. FWS R 108.

**4. 2005 BiOp**

FWS and USFS subsequently reinitiated another Section 7(a)(2) formal consultation about USFS' timber management. FWS R 8920. The findings from the consultation led to the 2005 BiOp. The 2005 BiOp contained an admission that "no long-term monitoring has been initiated pursuant to the [MSO] Recovery Plan." USFS 2339. FWS also admitted in the 2005 BiOp that due to inadequate monitoring methods, existing MSO population data was unreliable and limited. USFS 2300. But, of the sparse information available, it appeared the MSO population was declining. *Id*. Nonetheless, like its predecessor, the 2005 BiOp produced a no-jeopardy opinion. USFS 2338.

**5. 2011 Biological Assessment**

Defendants later reinitiated formal consultation due to concerns that USFS may exceed permissible take. FWS 6973. FWS then created a Biological Assessment discussing the plausible effects of the current Forest Plans on MSOs. FWS 6947. The Biological Assessment was divided into eleven subsections based on national forests. FWS 6974. The assessment explained that USFS management direction may adversely affect the MSO population and habitat. *See e.g.*, FWS 7460. This assessment led to the 2012 BiOps.

**6. The 2012 BiOps**

The 2012 BiOps were similar to previous iterations. First, each BiOp issued a no-jeopardy opinion. USFS 6145, USFS 6795. Second, the BiOps were premised on the continued implementation of the 1996 S&Gs. FWS 8924-25. The major difference between the earlier BiOps and the 2012 version was that the latter BiOps were divided on a forest-by-forest basis. This resulted in eleven BiOps tailored to each national forest. *See* Apache Sitegreaves, FWS 7561; Carson, FWS 7791; Cibola FWS 7839; Coconino, FWS 7889; Coronado, FWS 8085; Gila, FWS 8435; Kaibob, FWS 8662; Lincoln, FWS 8708; Prescott, FWS 8786; Santa Fe, FWS 8913; Tonto, FWS 8960.

***a. Timber Management and Wildfire***

The BiOps indicated that timber harvesting techniques had shifted, reducing the

threat of loss of habitat due to timber management. FWS 8929. Even so, the other significant threat—stand-replacing wildfires—was greater than ever. *Id.*

### b. *Incidental Take Statement and Population Monitoring*

FWS admitted in the BiOps that determining individual take was not plausible because population monitoring had not occurred. *See e.g.*, FWS 8940. In lieu of individual monitoring, which FWS found to be cost prohibitive and logistically difficult, the 2012 BiOps allowed USFS to determine incidental take by measuring PACs. *Id.*

The BiOps touched on a Draft Revised Recovery Plan outlining a possible monitoring procedure to ascertain MSO population trends. FWS 8939.  The BiOps, however, did not describe the plan or specifically incorporate the plan. The BiOps did state that the ITS "attempt[ed] to provide for a level of project-specific implementation monitoring at the individual [BiOp] level in order to assess incidental take associated with a site-specific action." FWS 8940.

FWS concluded that USFS' actions would not jeopardize the MSO because they were consistent with the concerns leading to the MSO's listing. FWS 8938-39.

### 7. __The 2012 Recovery Plan and Revision__

### a. *Population Monitoring*

In June 2011, prior to the issuance of the 2012 BiOps, FWS issued a Draft Recovery Plan for the MSO. FWS R 443. Later, a Revised RP ("2012 Revised RP") issued. USFS 9534 SUP. The goals listed in the 2012 Revised RP focused on five strategies for improving the MSO population: "1) protecting existing populations; 2) managing for habitat into the future; 3) managing threats; 4) monitoring population and habitat; and 5) building partnerships to help facilitate recovery." USFS 9540 SUP 1.

In the 2012 Revised RP, FWS reiterated that there were few population studies currently available, the data was limited, and the size and procedures implemented were varied. USFS 9585 SUP. Therefore, it was difficult to accurately estimate MSO population trends. USFS 9585 SUP ("[R]ange-wide conclusions cannot be reliably inferred from the

limited data available.").

Furthermore, while the FWS noted in the 2012 Revised RP that there was an increase in PACs, it conceded that this increase was likely due to new survey areas, and "an increase in abundance cannot be inferred from these data." USFS 9539 SUP.

Nonetheless, the FWS acknowledged that population monitoring was crucial to track recovery and for eventual delisting. USFS 9540, 9542, 9623 SUP.  To delist, the 2012 Revised RP suggested a combination of managing the MSOs' habitat and "vigilant monitoring." USFS 9540 SUP. But, the FWS admitted that it was impossible to meet the monitoring requirements described in the 2005 BiOp. USFS 9585, USFS 9768; USFS 9540 SUP. So, a surrogate method of tracking overall population was recommended; with surveying of owl occupancy at randomly selected, fixed sites. USFS 9542 SUP.

## B. Plaintiff's Complaint and Cross-Motions for Summary Judgment

The case before the Court concerns Plaintiff's challenges to six of the FWS' 2012 BiOps. In each BiOp, the FWS determined that USFS' proposed programmatic management direction was (1) not likely to jeopardize the continued existence of the MSO and (2) not likely to destroy or adversely modify the MSO's designated critical habitat.[7] As a result, each BiOp also contains an ITS. These ITSs specify the authorized amount of MSO take by way of a surrogate rather than numerical caps. USFS 6797.

As discussed below, Plaintiff alleges the FWS' 2012 BiOps and their various subparts are arbitrary and capricious in various ways. Defendants argue the BiOps are reasoned. Both seek summary judgment in their favor.

---

[7] The Court had great difficulty making sense of the parties' citations to the record. Defendants' briefs did not cite to the statement of facts, but directly to the administrative record in violation of Local Rule 56.1(e). Furthermore, FWS page numbers did not have the FWS Bates stamp as indicated. The administrative record was also filed out of order, forcing the Court to search throughout the entire record to locate Bates stamp numbers. Some citations are to Bates Stamp USFS, others to the exact same record in Bates Stamp FWS. In addition, one party refers to part of the administrative record as USFS # SUP, the other simply labels it USFS. To complicate matters, the pleadings draw support from BiOps that are now moot, so the Court had to locate the equivalent contentions in other similar BiOps. The Court asks the parties to consider organizing the record in a more efficient manner and citing consistently in any future litigation.

## STANDARD OF REVIEW

### A.  Scope of Judicial Review

The District Court's review in ESA litigation is limited to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973). If the court finds the record is insufficient to support the agency's action, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation. The reviewing court is not generally empowered to conduct a de novo inquiry . . . and to reach its own conclusions based on such an inquiry." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).

### B.  Summary Judgment

"Summary judgment is a particularly appropriate tool for resolving claims challenging agency action." *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207, 1215 (D. Mont. 2010). When the facts are not disputed, upon summary judgment, a court must "determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did." *Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). The Court finds the administrative record establishes the facts necessary for judicial review, and it may render an opinion as a matter of law. *See id.*

### C.  Administrative Procedure Act

Agency decisions under the ESA are governed by the Administrative Procedure Act ("APA"), and for summary judgment, "the review is not a determination of whether there is any genuine issue as to any material fact . . . , but rather whether the agency action was arbitrary, capricious, an abuse of discretion, not in accordance with law, or unsupported by substantial evidence on the record taken as a whole." *Good Samaritan Hosp., Corvallis v. Mathews*, 609 F.2d 949, 951 (9th Cir. 1979) (citing 5 U.S.C. § 706(2)).

"Review under the arbitrary and capricious standard is deferential." *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 658 (2007). The reviewing court's "role is simply to ensure that the [agency] made no 'clear error of judgment' that would render

its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir. 2008) (en banc), *overruled on other grounds by Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008). A decision is not arbitrary and capricious when "'a rational connection [exists] between facts found and conclusions made' by the defendant agencies." *Conservation Cong. v. Finley*, 774 F.3d 611, 617 (9th Cir. 2014) (quoting *League of Wilderness Defs./Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755, 760 (9th Cir. 2014)). Accordingly, a reviewing court should "not vacate an agency's decision unless" the agency "has relied on factors which Congress had not intended it to consider," ignored "an important aspect of the problem," explained its decision with no support from the evidence available, or "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658 (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983)). Where the agency has relied on "relevant evidence [such that] a reasonable mind might accept as adequate to support a conclusion," its decision is supported by "substantial evidence." *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076 (9th Cir. 2003).

Moreover, review under the arbitrary and capricious standard requires courts to "be "most deferential" when agencies make determinations within areas of special expertise. *Forest Guardians v. U.S. Forest Serv*. ("*FG v. USFS*"), 329 F.3d 1089, 1099 (9th Cir. 2003)). A court may not "substitute [its] judgment for the agency's in determining which scientific data to credit, so long as the [agency's] conclusion is supported by adequate and reliable data." *Finley*, 774 F.3d at 620.

Plaintiff's first and second claims are brought against FWS under the APA. (Doc. 10; Doc. 36 at 2, n.1.) The final agency actions Plaintiff challenges are the remaining 2012 BiOps and ITSs. (Doc. 10 at 6, n.2; 30-32, ¶¶112-115.)

**D. Claims Under the ESA's Citizen-Suit Provision**

The ESA's citizen-suit provision empowers "any person" to "commence a civil suit on his own behalf" against "the Secretary where there is alleged a failure of the Secretary

1   to perform any act or duty under section 1533 . . . which is not discretionary." 16 U.S.C. §

2   1540(g)(1)(C). The duties of the Secretary are delegated to FWS under 50 C.F.R. §
    402.01(b).

3   FWS issues regulations to protect a species once it is listed as threatened. 16 U.S.C.

4   § 1533(c); *Ctr. for Biological Diversity v. U.S. Forest Serv.*, 820 F. Supp. 2d 1029, 1032

5   (D. Ariz. 2011). FWS can create regulations preventing action that may negatively impact

6   a listed species. 16 U.S.C. § 1533(d). By statute, it is unlawful to violate any regulation

7   established by FWS pertaining to any threatened species. 16 U.S.C. § 1538(a)(1).
    "Irrespective of whether an ESA claim is brought under the APA or the citizen-suit

8   provision, the APA's 'arbitrary and capricious' standard applies." *W. Watersheds Project*

9   *v. Kraayenbrink*, 632 F.3d 472, 481 (9th Cir. 2011).

10  Plaintiff's third, fourth, fifth, sixth, seventh, and eighth claims are brought against

11  the USFS under the citizen-suit provision for violations of statutory provisions regarding

12  threatened species. These claims assert that USFS violated various statutory duties

13  prescribed by the FWS. (Doc. 10.)

14                          **DISCUSSION**[8]

15  **A.  Moot Claims**

16  "A federal court does not have jurisdiction to give opinions upon moot questions or

17  abstract propositions, or to declare principles or rules of law which cannot affect the matter

18  in issue in the case before it." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118,

19  1123 (9th Cir. 1997) (citation and quotation marks omitted). An issue is moot and must be
    dismissed when "an event occurs that prevents the court from granting effective relief." *Id.*

20  The Court previously ruled that Plaintiff's claims as they relate to five of the original

21  eleven disputed BiOps are now moot: those pertaining to the Kaibab, Prescott, Apache-

22  Sitegreaves, Coconino, and Coronado national forests. (*See* Doc. 62-1 at 4, n.3; Doc. 70 at

23  3, 4; Doc. 76.) Therefore, the Court addresses only the remaining six BiOps: the March 30,

24

25  ---
    [8] For simplicity, when citing to the Administrative Record, the Court cites to only one BiOp
    even though all BiOps contain similar propositions.

26

27

2012 BiOps for the Lincoln, Santa Fe, Cibola, and Carson national forests, and the April 30, 2012 BiOps for the Tonto and Gila national forests (collectively the "2012 BiOps").

**B. FWS' Continued Implementation of the 1996 S&Gs**

Plaintiff first argues the 2012 BiOps are arbitrary and capricious because: (1) the "no jeopardy" conclusions rely upon a key assumption that USFS would continue to implement the 1996 S&Gs which include, in relevant part, MSO population trend monitoring requirements; and (2) the administrative record establishes that Defendants knew when the BiOps were issued that USFS had never, in fact, engaged in MSO population monitoring (and had yet to formulate a plan for acquiring MSO population trend data). (Doc. 50 at 9-15.)  Plaintiff also argues that the adaptive management plan and 1996 S&Gs became mandatory upon their incorporation into the Forest Plan. *Id*. at 16. Because, Plaintiff asserts, Defendants never had any intention of following the Forest Plan, the 2012 BiOps are unfounded, arbitrary and capricious. *Id*. at 19.

Defendants retort that Plaintiff's argument mischaracterizes the 1996 S&Gs, is not supported by the administrative record, and baselessly concludes that the FWS' "no jeopardy" conclusions were predicated on an assurance that USFS had or would engage in range-wide population trend monitoring. (Doc. 58 at 4-10.) First, according to Defendants, the 1995 RP is merely advisory. (Doc. 52-1 at 3; Doc. 56 at 31.) Next, Defendants contend that range-wide monitoring of the MSO population was not required for compliance with the adaptive management plan. (Doc. 52-1 at 5-6.) This is purportedly because range-wide population data is not a helpful way to evaluate the local effect of USFS' actions on MSOs. *Id*. Moreover, Defendants say, USFS cannot be held accountable for the failure to monitor, because it was only required to collaborate about possible monitoring measures. *Id*. at 6-7. Furthermore, FWS states that range-wide monitoring is used to determine whether a species should be delisted, not to determine jeopardy. To evaluate jeopardy, FWS only needed to analyze the extent to which management actions were in line with the Forest Plans' protective measures. *Id*. at 10. These protective measures were aimed at resolving the problems which led to the MSOs' listing: the threat of severe wildfire and harmful

timber management. *Id*. at 8. USFS asserts that its actions comply with Section 7 requirements because they (1) implement monitoring before and after agency management projects; (2) conduct uneven-age timber management; (3) form management projects that reduce landscape-altering wildfire; and (4) determine incidental take at site-specific projects. *Id*. at 6.

### 1.   <u>Whether 1996 S&Gs are Mandatory</u>

Recovery Plans by themselves are merely advisory. *See Fund for Animals*, 85 F.3d at 548; *Or. Nat. Res. Council v. Turner*, 863 F. Supp. 1277, 1284 (D. Or. 1994). "However, where an otherwise advisory document has been clearly incorporated into a Forest Plan or other binding document, its requirements become mandatory." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 660 (9th Cir. 2009). By incorporating the 1995 Revised RP and the 1996 S&Gs into the Forest Plan, FWS made these documents mandatory. But to determine whether either required range-wide MSO population monitoring, the Court enquires into whether the plain language in the provision is cast in mandatory language such as "must" or "shall" rather than "may" or "can." *Ecology Ctr. v. Castaneda*, 574 F.3d 652, 661 (9th Cir. 2009); *cf*. Doc. 79-7 at 203 (1996 S&Gs state "[t]he terms 'should' and 'best' [in the Guidelines] imply some discretion on the part of the person implementing the guideline").

The 1996 S&Gs, found within the 1995 RP, state that "the Standards contain no discretionary elements." USFS 466. One of the Standards requires a "[s]urvey of all potential [MSO] areas including protected, restricted, and other forest and woodland types within an analysis area plus the area ½ mile beyond the perimeter of the proposed treatment area." *Id*. Another Standard indicates the person implementing the Guidelines is to "[m]onitor changes in owl populations and habitat *needed for delisting*." USFS 467 (emphasis added).

The language in the S&Gs suggests its surveys and monitoring provisions are mandatory. This monitoring appears to be utilized for two purposes: (1) to evaluate the presence of MSOs surrounding an USFS treatment area, and (2) to obtain overall population information for delisting. With these dual purposes in mind, the Court turns to

the history of FWS' compliance with the 1996 S&Gs.

### 2. <u>Prior Litigation: Adaptive Management Consistent with 1996 S&Gs.</u>

Defendants claim that Plaintiff's arguments are simply a reconstituted version of prior litigation wherein the District Court determined that USFS actions were in line with the 1996 S&Gs. (Doc. 58 at 7 (citing *WildEarth Guardians v. USFS/FWS* ("*WildEarth I*"), Doc. 81 at 20, No. 10-385-DCB (D. Ariz. Oct. 11, 2011)).)

In *Center for Biological Diversity v. U.S. Forest Serv.*, 820 F.Supp.2d at 1029, District Judge David C. Bury issued a preliminary injunction against Defendants because FWS had failed to designate critical habitat for the MSO as required in the FWS Forest Plan and excluded unoccupied MSO habitat from consideration, therefore violating the ESA. Concomitant with this ruling and based on the same administrative record, the judge issued an opinion in *WildEarth I*, No. CV-10-385-DCB, Doc. 81. As in the instant case, Plaintiff argued there that agency actions were not in compliance with the 1996 S&Gs. *Id.* at 8, 10. When formulating the 2005 BiOp, Plaintiff claimed FWS knew it would not implement the rigorous population monitoring required by RPM3 of the ITS. *Id.* RPM3 directed that the action agency must "monitor [MSO] occupancy on National Forest System lands, pursuant to the most current approved [MSO] Recovery Plan." USFS 2341.

First, Judge Bury concluded that there was enough evidence in the record to find that "the MSO [adaptive] management approach implemented by the USFS [was] consistent with the S&Gs, as amended in 1996." *Wildearth I*, No. CV-10-385-DCB, Doc. 81 at 20. He decided that, in addition to data that indicated the MSO population "seems not only to be stable, but possibly expanding," the increase in PACs was evidence that the FWS management approach was "effective in protecting the MSO and its habitat." (*Id.* at 20; Doc. 83 at 2.) However, the District Judge made no conclusions about the *recovery* of the MSO, partially because the only relief he could have granted would be to send Defendants back to formal consultation, which they were already doing, and so any measures he took would be moot. *Wildearth I*, No. CV-10-385-DCB, Doc. 81 at 18. This formal consultation was supposed to address the monitoring problems and "the superseding BiOp and its ITS

could change substantially or do away with [the monitoring] RPM altogether." *Id.*

The 2012 BiOps did replace the language from RPM3; the RPM in the newer 2012 BiOps limits monitoring to "site-specific projects implemented under the [Forest Plan] on the MSO." USFS 6978.

In this case, Plaintiff makes similar yet distinguishable arguments. Plaintiff attempts to force compliance with the monitoring recommendations in the 1996 S&Gs by asserting that incorporating the 1995 RP into the Forest Plan means that the 1996 S&Gs were mandatory. Further, Plaintiff contends that the 1996 S&Gs and the adaptive management plan require range-wide population monitoring. Therefore, Defendants failure to conduct such monitoring makes the BiOps noncompliant with the mandatory terms, and Defendants' reliance on these BiOps arbitrary and capricious. Judge Bury has already determined that the adaptive management plan aligns with the 1996 RP and S&Gs; the Court will not reassess this issue. However, since Judge Bury did not directly address the issue, the Court will now look at whether FWS violated the ESA when coming to a "no jeopardy" conclusion in the subsequent 2012 BiOps.

## C. "No Jeopardy" Determination and Survival of MSO

Plaintiff takes issue with the evidentiary basis underlying FWS' "no jeopardy" determinations and complains that they were premised upon an "irrational" finding that the MSO population has not declined since it was listed. (Doc. 50 at 22.) According to Plaintiff, such finding was unsupported because (1) it relied on an increase of known PACs rather than an increase in MSOs, and (2) it disregarded available scientific data showing an MSO population decline. (*Id.*)

FWS contends that the jeopardy determination was not dependent "on the assumption of a fully funded and implemented population trend monitoring program." (Doc. 58 at 10, n.2.) Instead, it looked at a variety of concerns, including the major issues leading to the MSOs' listing, and determined USFS programs would not adversely affect the MSO and its habitat. (*Id.* at 8; Doc. 52-1 at 10.) Moreover, FWS considered the data

available—both positive and negative—and determined that it was not dependable. (Doc. 58 at 11.) Because the data was flawed in various respects, the best evidence about population was the known increase in PACs. (*Id.*)

An action causes jeopardy to a species when it negatively impacts survival and recovery "by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02. When determining jeopardy "the consulting agency evaluates 'the current status of the listed species or critical habitat,' the 'effects of the action,' and 'cumulative effects.'" *Nat. Wildlife Fed'n v. Nat. Marine Fisheries Serv.*, 524 F.3d 917, 924 (9th Cir. 2008) (quoting 50 C.F.R. § 402.14(g)). An agency must base its actions on "the best scientific . . . data available." 50 C.F.R. § 402.14(g)(8); 16 U.S.C. § 1536(a)(2). What constitutes the "best scientific data available" is left to the agency's "special expertise." *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983). The agency "may not base its listings on speculation and surmise." *Alaska Oil & Gas Ass'n v. Jewell*, 815 F.3d 544, 555 (9th Cir. 2016). In addition, "FWS cannot ignore available biological information." *Ctr. for Biological Diversity v. Salazar*, 804 F. Supp. 2d 987, 1008 (D. Ariz. 2011) (quoting *Connor v. Burford*, 848 F.2d 1441, 1454 (9th Cir. 1988)). However, where the information is not readily available, courts cannot insist on perfection: "[T]he 'best scientific . . . data available,'" does not mean "the best scientific data possible." *Building Indus. Ass'n v. Norton*, 247 F.3d 1241, 1246 (D.C. Cir. 2001).

Defendants conducted a Section 7(a)(2) consultation to determine whether the enactment of the Forest Plans would jeopardize or adversely modify MSO habitat. FWS 8938. The conclusion was no. *Id.* To address the timber management and severe wildfire concerns that resulted in the MSOs' listing, FWS previously suggested: engaging in uneven-aged silviculture and other timber management methods, creating PACs and restricted areas for MSOs, producing replacement habitat, and surveying and monitoring before and after USFS action, among others. USFS 466-470. When deciding jeopardy, FWS looked at whether the Forest Plans implemented these measures and determined that because agency actions were addressing these concerns and proposed solutions, the Forest

Plans were not likely to appreciably reduce the MSO population or impact its habitat. FWS 7811, 8938-39.

Furthermore, the jeopardy determination acknowledged the current limitations of monitoring and found that without credible data on population, it was assumed that "an increase in the number of areas considered to be occupied to be a positive indicator regarding MSO population numbers." USFS 7806. FWS admitted that the current population is ultimately unknown because the MSO is secretive and current survey data is not reliable. USFS 5641, 5650. But since 2005, there was an increased number of known PACs, though FWS conceded that the increase in PACs was likely due to MSO surveys in new areas. FWS 8939; USFS 7806.

FWS considered both positive and negative MSO population data. Plaintiff contends that FWS ignored the best available evidence indicating a 30 percent decline in population since listing. USFS 9770 SUP. Yet, the studies Plaintiff mentions also included indications of a stable population. USFS 9771 SUP ("generally stable or slightly declining"); USFS 9772 ("results suggest current management practices . . . have been adequate for protecting owls"). In addition, these citations express the same sentiment as the 2012 BiOps that data was simply inconclusive: the study methods differed, and surveys were too few and of too limited a duration to elicit reliable population trend data. USFS 9770 SUP. These issues constrained FWS' ability to "quantify trends in [MSO] abundance and population change." *Id*.

FWS also admitted that the historic lack of population monitoring limited its ability to accurately estimate the current population. In an earlier draft of the 2012 BiOp, FWS admitted it was impossible to know conclusively the current status of the MSO without range-wide population monitoring. FWS 7816. But, FWS believed monitoring of site-specific projects before and after agency action may permit assessment of how agency action directly affects the PACs in the specific action area. *Id*.

Contrary to Plaintiff's contention, the BiOps did not say the jeopardy analysis was based on an increase in population, but rather "no decline." FWS 8939. There is substantial

evidence supporting this assertion. In short, FWS' determination that USFS' actions would not jeopardize the *continued existence* of the MSO or adversely affect its habitat was not dependent upon a finding that the MSO population was increasing, or a requirement that USFS conduct range-wide population monitoring. The Court finds the determination was not arbitrary or capricious. This does not, however, answer whether the jeopardy analysis adequately assessed recovery.

**D. Impact of USFS' Forest Plans on MSO's Recovery**

Plaintiff contends that FWS' jeopardy determination failed to account for MSO recovery. (Doc. 50 at 21-23.) Defendants say that the BiOps consider recovery because the Forest Plans confronted the threats to the MSO and compliance would help increase habitat which in turn helps the MSO recover. (Doc. 58 at 18.)

The jeopardy analysis must consider both survival and recovery. *Nat'l Wildlife Fed'n*, 524 F.3d at 931; 50 C.F.R. § 402.02. "Recovery means more than just improved status; it means improvements to the point where the species may be delisted." *Ctr. for Biological Diversity v. Provencio*, 2012 WL 966031, at *12 (D. Ariz. 2012); *see Gifford Pinchot*, 378 F.3d at 1070. Moreover, USFS is not permitted to base its compliance with the ESA "on speculation or surmise." *Bldg. Indus. Assoc. of Superior Calif. v. Norton*, 247 F.3d 1241, 1247-48 (D.C. Cir. 2001) (citing *Bennett v. Spear*, 520 U.S. 154, 176 (1997)). And, although generally given respect, "[d]eference to an agency's decision has not come so far that we will uphold regulations whenever it is possible to conceive a basis for administrative action." *Minn. Ctr. for Envtl. Advocacy v. U.S. Forest Serv.*, 914 F. Supp. 2d 957, 964 (D. Minn. 2012) (citing *Bowen v. Am. Hosp. Ass'n*, 476 U.S. 610, 626, (1986) (plurality) (quotation marks omitted)).

1.  **Range-Wide Monitoring Essential to Delisting the MSO**

Defendants concede that "the main purpose [of range-wide population monitoring] is for FWS to conduct a future delisting analysis." (Doc. 58 at 6.) Even FWS admits in the 1995 RP that delistment "depends on providing clearly specified evidence that the

population is stable or increasing" and to do so there must be range-wide population monitoring. USFS 130, USFS 133, USFS 140; *see also* USFS 109 ("[R]ecommendations are not meant to stand alone without [population and habitat] monitoring."); USFS 60 (same). The 2012 BiOps reflect this sentiment. *See e.g.*, USFS 7816.  Likewise, in the 2012 Revised RP FWS confirmed that the proposed monitoring methods must be strictly followed for delisting. USFS 9540 SUP ("Without careful and rigorous application of the proposed population monitoring, there would be no objective basis for delisting the owl.").

This failure to monitor population not only stifles delisting, but fundamentally hampers the ability to assess recovery. Both the FWS Regional Director and the MSO Recovery Team acknowledged that population monitoring, as illustrated in the 1996 RP, was integral to obtaining information about the effects of any agency action on the MSO. USFS 1008, 1011, 8467. So, by FWS' own admission, delisting and therefore recovery is wholly dependent upon accurate range-wide population data, and no reliable data exists.

While FWS argues that the Forest Plan measures taken to protect habitat sufficiently addressed recovery, habitat monitoring is a sufficient way to assess MSO population and is not an adequate measure of recovery. FWS has distinguished management measures that measure habitat from those that monitor population:

> [M]onitoring assesses the efficacy of management actions. Thus, it is critically important to monitor owl populations *and* habitat to determine whether both are stable or improving. *Monitoring population trends provides a real-time assessment of the owl's status, whereas habitat monitoring allows us to predict if there will be adequate habitat to support a viable owl population in the future*.

USFS 9542 SUP (emphasis added). Here, the FWS makes clear that two objectives must be met prior to delisting: an improvement in habitat conditions, *and* a quantifiable increase in MSO population. USFS 9540 SUP. Protecting habitat is only one part of this equation. Stand-alone Forest Plan measures protecting habitat do not reasonably address recovery because even if *all* national forest land was preserved for the MSO, it will never provide enough information about population trends to allow for delisting nor an accurate

assessment of whether the population range-wide is recovering.  Therefore, it cannot be a basis for a no jeopardy determination.

Defendants next assert that the BiOps requirement of pre- and post-treatment monitoring provides for recovery. (Doc. 52-1 at 10.) However, they also admit that any monitoring for recovery would need to be done over a period of around 15 years "to generate any meaningful data on population trends." *Id*. at 18. A monitoring period of one year before and two to three years after treatment is insufficient to provide population trend data for delisting. Again, this does not provide adequate information to guide a jeopardy analysis about recovery.

USFS next claims it does not bear the responsibility for finding a solution to monitoring. USFS asserts that it need only collaborate about ideas to perform population monitoring range-wide. (Doc. 58 at 7.) USFS contends that it has fulfilled this obligation by participating in pilot projects and consistently collaborating about possible methods of population monitoring. *Id*.

This argument provides no accountability. In twenty-three years, this method has failed to bring the MSO closer to being delisted. In allowing the effort to be "collaborative" there is no one entity that is committing an ESA violation. The failure to monitor MSO population gets a pass, and neither USFS nor FWS are responsible for specific measures to quantify the MSO population or ensure that current Forest Plans are making strides towards delisting the MSO. The Court agrees with Plaintiff that this shirking of responsibility is impermissible. *See, e.g.*, *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1153-54 (D. Ariz. 2002) (concluding that, by basing its no-jeopardy ruling on future development of a long-term plan, the agency "admi[tted] that what is currently on the table . . . is inadequate to support the FWS's "no jeopardy" decision").

Also, claims that the range-wide monitoring is not feasible because of budgetary concerns do not relieve Defendants from finding a solution. The 2012 BiOps illustrate that population monitoring, as described in the 1996 RP, was logistically and financially

impossible. USFS 6144, 6146. Defendants have had over 20 years to find a workable way to monitor MSO occupancy to measure progress towards delisting. Budget complications are no excuse. *Nat. Wildlife Fed'n*, 524 F.3d at 929 (explaining that compliance with the ESA's no jeopardy requirements are mandatory "regardless of the expense or burden the application might impose"); *Ctr. for Biological Diversity v. Norton*, 304 F. Supp. 2d 1174, 1179-80 (D. Ariz. 2003).

Defendants also assert that the proposed alternative monitoring method in the 2012 Revised RP adequately resolves the range-wide population monitoring dilemma. (Doc. 52-1 at 18.) They claim that this new monitoring was to be put through a pilot run in 2013 range-wide, and was to be implemented between 2014 and 2016. *Id*. at 18.

The 2012 Draft and Revised RPs proposed "a surrogate for evaluating trends in actual owl numbers, owl occupancy will be monitored at a sample of fixed sites randomly selected throughout the U.S. range of the [MSO]." USFS 9542 SUP; FWS R 451.  The 2012 Revised RP is a prospective document, issued after the 2012 BiOps. Although a draft was referred to in the 2012 BiOp, it cannot be relied upon for the no-jeopardy finding. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1245 (9th Cir. 2001) (explaining that reliance upon records not in existence at the time of the determination "would allow the consulting agency to produce far reaching and unsupported [BiOps] knowing that it could search for evidentiary support if circumstances change or new facts are discovered"). The Revised RP raises a surrogate monitoring program for surveying random areas, but it is unclear whether this was intended to be implemented at the time of the 2012 BiOps, whether USFS is responsible for its implementation, or whether the surrogate can result in the delisting of the MSO.

Moreover, referencing a Draft Recovery Plan to show compliance with the ESA is not reasonable, nor does it incorporate those measures into the BiOp. Future measures that are considered for the jeopardy analysis "have to be identified and included in the Final [BiOp], either as RPAs or incorporated into the [action agency's] proposed action, to support a 'no jeopardy' decision. Without these measures, there is no factual basis and no

rational basis for the opinion." *Ctr. for Biological Diversity v. Rumsfeld*, 198 F. Supp. 2d 1139, 1154 (D. Ariz. 2002).

Defendants point to no evidence that these protective measures have led the MSO toward recovery. The PAC increase, as the 2012 BiOps demonstrate, cannot lead to the inference of an increase in abundance. FWS 7806. In addition, while taking protective measures to secure habitat is promising, as FWS has stated, it takes both habitat and population increase to lead to delisting. *See, e.g.*, *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 839 F. Supp. 2d 1117, 1125 n.3 (D. Or. 2011) (questioning whether the court should give deference to jeopardy opinion based on habitat improvement without "scientific support for specific survival predictions"). Drawing the conclusion that simple habitat protection and increased PACs from new survey areas will lead to recovery is not reasonable because neither method is a supported means for assessing recovery for delisting.

Finally, FWS argues that the range-wide monitoring is for delisting—not for the jeopardy analysis. However, the two are interconnected because jeopardy must consider recovery, recovery must be geared towards eventual delisting, and delisting is dependent upon range-wide monitoring. FWS concluded the Forest Plan did not jeopardize the MSO because it was protective to MSO habitat and because there were increased PACs. But, as noted above, these are not sufficient indicators of recovery. The BiOps simply do not provide a route to recovery or a way to accurately assess it. The no-jeopardy determination is unsupported, arbitrary, and capricious because the finding failed to account for recovery of the MSO.

**E.  FWS' Decision to Issue Eleven Forest-Specific BiOps**

Plaintiff claims that management across national forests is crucial, and FWS' decision to release eleven separate BiOps was inexplicable and therefore arbitrary and capricious. (Doc. 50 at 23-24.) Plaintiff asserts that at minimum, Defendants needed to provide a reasoned analysis supporting the policy change, but all they gave were unsupported, post-hoc rationalizations. (*Id.* at 24; Doc. 62-1 at 20.)

FWS responds that there were valid reasons for shifting from one BiOp for Region 3 to eleven individual BiOps. (Doc. 58 at 12.) The change: (1) eased the workload on staff; (2) permitted a better accounting of incidental take occurring at specific projects; and (3) allowed more localized and individualized coverage under the ESA. *Id.*  FWS adds that even if these reasons are insufficient, the change was not in policy, but rather a change in process; as such, the move did not require a reasoned explanation. *Id.* at 13 (citing *Cloud Found. v. Kempthorne*, No. CV–06–111–BLG–RFC, 2008 WL 2794741, at *2 (D. Mont. Jul. 16, 2008).)

"A settled course of behavior embodies the agency's informed judgment that, by pursuing that course, it will carry out the policies committed to it by Congress." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41-42 (1983) (internal citation and quotation marks omitted). As the Ninth Circuit recently stated, "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change. . . . However, an agency may not depart from a prior policy *sub silentio.*" *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1100 (9th Cir. 2019). Furthermore,

> [A] policy change complies with the APA if the agency (1) displays an "awareness that it is changing position," (2) shows that "the new policy is permissible under the statute," (3) "believes" the new policy is better, and (4) provides "good reasons" for the new policy, which, if the "new policy rests upon factual findings that contradict those which underlay its prior policy," must include "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy."

*Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 966 (9th Cir. 2015) (en banc) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515-16 (2009)).

FWS met this four-pronged test. First, the parties agree that a unified assessment of the effects of agency actions from all national forests on the MSO population is crucial to recovery. (Doc. 51 at 18; Doc. 52-1 at 22.) But Plaintiff argues that the eleven BiOps lose sight of the overarching effects of agency action throughout all national forests. Defendants retort, "[t]he analysis of each Forest Plan has not and will not occur in a vacuum; the

impacts of implementation of all the Forest Plans in the region will continue to be considered in the environmental baseline of the jeopardy analysis for the owl as well as the destruction or adverse modification analysis for its designated critical habitat." (Doc. 52-1 at 22-23.)

This overarching approach is present in the 2012 BiOps. The eleven BiOps explain how the region-wide considerations contained in the 1996 S&Gs and Amended Forest Plan extend to an individual BiOp. To do so, national-forest action is guided by the "long-range management strategies" contained in the 1996 Amended Forest Plan for all national forests in Region 3, but the local BiOps provide "site-specific decisions" about how these regional strategies will be carried out. USFS 5584; USFS 5584 ("[A]ll site-specific activities must conform to the programmatic framework set up in the Forest Plans (S&Gs) and they must meet . . . ESA requirements."); USFS 5587 ("The S&Gs in the [Forest Plans] will be followed when selecting, planning, and executing site-specific management actions" or else the action "must be modified or the Forest Plan must be amended and subject to another § 7(a)(2) consult.").

These individual BiOps are not as isolated as Plaintiff claims, and the analysis for the BiOp has not changed from previous iterations: recommendations are still drawn from the Forest Plans. Because the BiOps incorporate the overarching concerns of the former singular BiOp, the factual findings do not contradict the previous unified version. These BiOps were simply separated in a different manner, but address the same issues as in the previous BiOps. If anything, the change allowed for more detailed analysis of the effect of each national forest's Forest Plans, which is the underlying purpose of the BiOps.

Second, Defendants announced the shift to eleven Biological Assessments (and as a result, eleven BiOps) in their December 2010 Consultation Agreement, therefore demonstrating an awareness of the changing position. USFS 4451.

Third, Defendants believed the new policy improved on the previous iteration. The meeting minutes with the FWS Regional Office issued prior to the 2012 BiOps show that FWS and USFS had participated in discussions about the advantages of separating the

BiOps by national forest. USFS 4316. The minutes state Defendants "agreed that the [BiOps] would be by forest and could come one by one, instead of all at once . . . . This approach will make it easier at both the Regional and field office levels for both agencies." USFS 4316.

Also, Defendants assert that focusing on individual national forests would allow for easier assessment by dividing the BiOps into smaller, staggered, manageable subdivisions, rather than one overarching, all-encompassing BiOp. (Doc. 58 at 12.) This assertion is supported by the record. *See* USFS 4316. The spacing permits more time for individualized national forests BiOps, and delegates efforts for each national forest at staggered intervals.

Finally, both parties argue about whether the Northern Spotted Owl or the Canada lynx have separate or unified BiOps, but Plaintiff never challenges FWS' contention that the ESA does not demand that FWS produce one BiOp for Region 3. (Doc. 52-1 at 22.) The matter of whether the BiOps for either of these species have similar delineations is inconsequential when there is no evidence that individualized BiOps are impermissible.

The Court finds that Defendants have provided valid reasons for the change to eleven BiOps. Therefore, the Court cannot grant Plaintiff's request to direct Defendants to issue a single BiOp for Region 3. As such, the Court need not address Defendants' procedural-versus-policy argument.

**F. Cumulative Effects of Climate Change on the MSO**

Plaintiff asserts that the coverage of the effects of climate change in the 2012 BiOps was too general and, given the potentially devastating threat to the MSO, should have been evaluated more in depth. (Doc. 50 at 24.) Furthermore, the BiOps failed to analyze the effects of climate change as it relates specifically to the MSO population. *Id.* If done properly, Defendants would have recommended conserving land that is not currently reserved for the MSO in climates both warmer and cooler than that currently utilized by MSOs. *Id.* Defendants respond that the 2012 BiOps included information about how climate change will affect the MSO. (Doc. 58 at 15.) To help the MSO population survive

in the face of these changes, the 2012 BiOps recommended cultivating the multilayered canopies that MSOs prefer. *Id*.

FWS noted in the 2011 Biological Assessment that, in the Southwest, climate change will manifest in increased temperatures and aridity, intensified flooding, and delayed monsoons. USFS 4717. Plainly, FWS recognized, these differences may result in more wildfires. USFS 4717. But, FWS noted, "[m]ost global climate models are not yet precise enough to apply to land management at the . . . [national forest] scale. This limits the [national forest] specific analysis of potential effects of climate change." USFS 4719; *see also* USFS 9221 SUP (stating that because the science on climate change is in the developmental stage "assessments of the effects of climate change on the [MSO] at this time necessarily are speculative, [and] based on circumstantial information"). Furthermore, these changes were not anticipated to be measurable within the time the 2011 assessment was to be in effect. USFS 4740; *see also* USFS 7579.

Nevertheless, FWS stated, "[c]limate variability combined with unhealthy forest conditions may [] synergistically result in increased negative effects to habitat from fire," FWS 7806; USFS 6136, insects, and disease. USFS 4740; USFS 7579. To decrease the threat of landscape-altering fires, FWS concluded that continued implementation of fuels reduction and forest restoration pursuant to the 1995 RP would suffice, and that without these measures "existing forest conditions, climate change, and extended droughts will continue to impact forest sustainability." FWS 6796.

Plaintiff would like a different approach to climate change but fails to show that Defendants did not consider the effects on the MSO. The BiOps include information that increased fires due to warmer, drier temperatures could ruin habitat and increase disease. FWS recommended utilizing fuels management and forest restoration measures to protect multilayered, dense canopies amenable to the MSO population. This Court must be deferential to Defendants' predictions about the possible effects of climate change. *See FG v. USFS*, 329 F.3d 1089, 1099 (9th Cir. 2003).

FWS acknowledges that due to the shorter timeline (approximately 10 years), the

effects need not be given much detail. FWS 194. But, just because Defendants addressed the impact on the MSO population generally does not mean they "failed to consider an important aspect of the problem," and Plaintiff fails to articulate what FWS failed to consider. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 658. Where a plaintiff fails to point to data omitted from consideration, the claim fails. *Kern Cnty. Farm Bureau*, 450 F.3d at 1081. The climate analysis was neither arbitrary nor capricious.

## G. Cumulative Effects of the Tribal Timber Management Programs

Plaintiff next claims that the 2012 BiOps failed to detail the potential effects of tribal timber management programs because this section is lifted directly from the 2005 BiOp and was so inconsequential to FWS that they inadvertently omitted it from the draft 2012 BiOps. (Doc. 50 at 25; FWS 756). FWS asserts that its handling of tribal cumulative effects was sufficient. (Doc. 58 at 15.) First, FWS states it was limited to information provided by the tribes. *Id*. at 16. Second, FWS notes, there was individualized analysis of cumulative effects in several national forest BiOps, including the Lincoln, Santa Fe, and Tonto national forests. *Id*. at 16.

Agencies must assess the cumulative effects of their actions on a listed species during formal consultation and within a BiOp. 50 C.F.R. § 402.14(g)(3)-(4). "Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation." 50 C.F.R. § 402.02(d).

The 2012 BiOps concluded that "Tribes are sovereign governments with management authority over wildlife and other Tribal land resources." FWS 7595. In the Revised RP, FWS also indicates that "[m]ost tribes consider their wildlife information to be proprietary" and therefore FWS necessarily limited the cumulative effects discussion to the information disclosed by the tribes. USFS 9921 SUP; USFS 9595.

Plaintiff is correct that the cumulative analysis was missing entirely from the draft BiOps. FWS 756. And Plaintiff's description of that analysis as "boilerplate" may be

accurate in the sense that the language reflected earlier language from the 2005 BiOps. However, Plaintiff's argument fails because it never questions the validity of the 2005 analysis. Nor does Plaintiff allege that FWS was provided further information from tribal populations that would mandate a revision of its analysis, or challenge FWS' contention that it could only use information provided by the tribes.

In the 2012 BiOps, FWS looked at the cumulative effects of tribal actions according to the tribes' disclosed timber management programs. USFS 9921 SUP1. For instance, the Tonto Forest BiOp found that the San Carlos Apache Tribe's MSO Conservation Plan took measures to protect the MSO population including: deferring timber harvesting around MSO habitats, practicing uneven-aged silviculture, "maintaining sufficient suitable habitat," and reducing the risk of wildfire through fire-management programs. FWS 8988. FWS also found that the White Mountain Apache forest management plan was protective of the MSO because its timber management took the back seat to MSO protection in areas with four or more MSO populations, it prevented timber harvest around MSO PACs, and it seasonally limited activities that may disturb the MSO. FWS 8988. FWS found these programs "wholly beneficial to the [MSO]" in 2005. USFS 2336: *see also* FWS 8737 (Mescalero Apache Tribe's forest plan paralleled RP and therefore protective of MSO).

Plaintiff does not indicate what "important aspects of the problem" were omitted from the cumulative effects of tribal management. (*See* Doc. 50 at 26.) There is no claim that additional information subsequent to the 2005 BiOps was made available by the tribes to the FWS. Furthermore, in 2005, FWS provided detailed analysis of the cumulative effects of tribal timber management plans by describing known tribal management actions and comparing them to FWS timber management recommendations for the protection of the MSO. Many of the tribal programs were found to be in line with FWS' timber management recommendations and therefore not cumulatively detrimental. FWS is not required to reanalyze the cumulative effects when there was no additional information to analyze and the information known was consistent with MSO recovery measures. FWS utilized the best information available (the data provided by the tribes) to determine the

cumulative effects of tribal timber management. The analysis is as relevant in 2012 as it was in 2005. Therefore, it was not arbitrary or capricious.

## H. Relationship Between the MSO and Wildfire

In the 2012 BiOps, there was concern over the effects of landscape-changing wildfire on the MSO population. FWS 7807, 8453. But Plaintiff contends that FWS inconsistently found that severe wildfire "was the greatest threat to the MSO within the action area," while contemporaneously claiming that FWS was unable to gage how wildfires effected MSO population. *Id.* Plaintiff asserts FWS' conclusion failed to use the best available evidence and lacked support, making it arbitrary and capricious. (*Id.* at 26; Doc. 62-1 at 23.)

To Plaintiff, the best available evidence came from sources indicating that MSOs can thrive post-wildfire. (Doc. 51 at 33, ¶¶ 106-09.) Plaintiff cites to a critique which asserts that MSOs "tolerate some degree of moderate to high-severity fire" and may be amenable to foraging in burned areas. (*Id.* (citing USFS 9363 SUP1).) Plaintiff also cites to a 2011 survey of MSOs in the Chiracahua Mountains, which contains anecdotal evidence that MSOs can survive in areas subjected to high-intensity fire and, in certain instances, exhibit increased birth rates. (*Id.* (citing USFS 9299-9300).) Likewise, a survey including MSOs in the Pinaleno Mountains noted an increase in births seven years after a high-severity wildfire.[9] (*Id.* (citing USFS 9323 SUP1).) Finally, Plaintiff points to evidence indicating that MSOs were attracted to burned areas due to the increased availability of rodents. USFS 9158 SUP.

In refute, FWS argues that Plaintiff relies on surveys where the wildfires burn in a haphazard burn pattern, which leaves survey areas with some old-growth, multilayered canopies for MSOs to live. (Doc. 58 at 17.) However, if there were no habitat available,

---

[9] The Court recognizes that the Chiracahua and Pinaleno Mountains are within the Coronado national forest, and this BiOp has been found moot. The Court refers to this survey to acknowledge the information available of increased birth rates in forests that have been modified by severe fire and does not draw any conclusions about the Coronado national forest BiOps.

due to a high-severity, landscape-altering wildland fire, then there would be nowhere for MSOs to roost, reproduce, or forage. *Id*. With no habitat to occupy, the MSO cannot survive. *Id*. Because FWS' concern was from landscape-annihilating wildfires, and Plaintiff sites to instances where there was merely mosaic-pattern burning of forest land, Defendants contend the cited data is not in conflict with the findings in the 2012 BiOps. *Id*. In addition, Defendants claim the longest data collected was limited to seven years post-fire and this cannot adequately assess the long-term effects. *Id*. Therefore, FWS reasonably concluded that given the lack of long-term, reliable data, the best way to protect MSOs was to protect their habitat. *Id*. at 16.

The 2012 BiOps observed that MSOs depend on old-growth forests with uneven canopies. USFS 5929. It also stated that the primary threat to MSO PACs was catastrophic wildfire. USFS 5933, 6137. FWS noted that "[w]ildland fire has resulted in the greatest loss of PACs and [critical habitats] relative to any other actions" FWS 7907; *see* USFS 9751 SUP, and that "[s]outhwestern forests have experienced larger and more severe wildland fires from 1995 to the present than prior to 1995," USFS 7806; *see* USF 9749 SUP (stating forests are now more frequently exposed to increased intensity, stand-replacing wildfires and the loss of habitat "can be detrimental to [MSOs], even if they are able to persist in burned areas over the short term.").

However, FWS also admitted that there was limited information about the extent to which wildfires effected the MSO population, *see, e.g.*, FWS 7859, or the long-term effects of wildland fire on the MSO, *see e.g.*, USFS 9586, 9759, 9817 SUP. In the 2012 BiOps, it stated that there was some indication that even after wildfires, MSOs have "return[ed] to their nesting and roosting areas . . . and have bred successfully." USFS 6146. FWS also conceded in the 2012 BiOps that fuels-reduction measures may cause temporary, short-term disturbances to MSOs, but the short-term harassment was outweighed by the importance of avoiding wildfires that cause long-term loss of old, multi-canopied forest in which MSOs prefer to live. USFS 5939, 6137.

Defendants' reasoning is rational and supported by adequate data. The best available

evidence is that MSOs have lost the greatest amount of habitat and PACs from wildland fires. It is logical to conclude that the long-term effect on MSOs from loss of habitat is negative, and that reducing the likelihood of landscape-annihilating wildfire would protect current and future MSO PACs. Further, evidence exists supporting FWS' contention that severe, stand-replacing wildfires would negatively impact MSO population. One survey indicated that MSOs "continued to occupy burned areas . . . except in the territory that experienced the highest burn severity." USFS 9756 SUP; USFS 9758 SUP. Others found that in these high-severity fire areas there were fewer coupled MSOs. *See* USFS 9218, 9756-58 SUP. And, even in instances noting the beneficial effect of wildfires, it is conceded that data is sparse, methods were varied, or the connection between cause and effect was hypothetical. *See, e.g.*, USFS 9768 SUP; USFS 9755 SUP; USFS 9759-60 SUP.  Moreover, nearly all of the surveys Plaintiff cites to include areas in which only certain percentages of the land were burned, not complete destruction. The conclusion that holocaustic wildfire would negatively impact MSOs does not contradict evidence of MSOs' survival after lower-grade wildfires.

Plaintiff argues that a seven-year study on births should be sufficient to demonstrate that severe wildfires are beneficial in the long-term. But FWS explains that MSOs live for extended periods, and any population trend studies must be over ten years to provide any reliable connections between an action and the effect on MSOs. USFS 9585 SUP; USFS 7324. There is no data available about the effects of catastrophic wildfires over a period of ten years. USFS 9751. FWS' explanation for why it would not rely on a survey of shorter length is not implausible and does not "run[] counter to the evidence before the agency." *Nat'l Ass'n of Home Builders*, 551 U.S. at 658. The Court understands this lack of long-term data is frustrating, especially because long-term, range-wide monitoring needs to occur to delist the MSO. However, this does not mean that better evidence was available, or that FWS' conclusions were arbitrary or capricious.

FWS did not fail to consider evidence of MSOs success post-fire; rather FWS did not give it the weight that Plaintiff would like. There is simply not enough data to ensure

landscape-altering fires positively effect MSOs in the long run. There appears to be some indication that MSOs can survive and reproduce after mosaic-pattern, severe-intensity wildfire. But to interpret the data in the manner Plaintiff suggests would require this Court to ignore the evidence in its entirety, blindly focusing only on the statements that support Plaintiff's conclusions. In addition, the Court would have to ignore the surveys' admitted limitations: limited data, differing survey methods, and questionable causal connections.

## I. FWS' Incidental Take Statements

Plaintiff confusingly asserts that the ITS in the 2012 BiOps are arbitrary and capricious because they "allow for open-ended and limitless take *so long as a certain amount is not exceeded each year*." (Doc. 50 at 29, 30 (emphasis added).) In the 2012 BiOps, take is determined by PACs instead of an individual MSO count, and Plaintiff claims the number of PACs can be altered by USFS management actions. *Id*. at 30. Plaintiff also believes that the ITSs fail to account for take outside of PACs. *Id.* at 29. Defendants' explanation of the one-year time limit for incidental take is equally perplexing. They appear to assert that any agency action would exceed permissible take if it were measured by a longer time frame, but somehow the same action would not violate incidental take in one year. (Doc. 58 at 18-19.)  They state that the take was limited to one year "because otherwise the agencies would be reinitiating Section 7 consultation after the first landscape-level project due to an exceedance of the incidental take limit." *Id*. at 19.  Nevertheless, Defendants counter, FWS sets take limits that are quantifiable and therefore not arbitrary. *Id*. at 18. Furthermore, FWS considered the MSOs outside PACs because take was limited by national forest, not just PACs, and the BiOps require surveys to discover MSOs prior to implementation of projects outside PACs. *Id.*

"Where possible, [an ITS] should be specified in terms of a numerical limitation on the Federal agency." *Or. Nat. Res. Council v. Allen*, 476 F.3d 1031, 1037-38 (9th Cir. 2007). An ITS that "contains no numerical cap on take and fails to explain why not" violates the ESA. *CBD v. USBLM*, 698 F.3d 1101, 1126-27 (9th Cir. 2012). In general, quantified take should be the number of individuals in the species lost, not the loss of

habitat. *Allen*, 476 F.3d at 1037-38; *see also Gifford Pinchot*, 378 F.3d at 1066. A surrogate number is valid only if "no number may be practically obtained" and there is a verifiable level at which, if surpassed, would require reinitiating consultation. *Allen*, 476 F.3d at 1037-38.

The Court finds that the ITSs' use of a surrogate was reasonable. The BiOps provided a valid reason for why a measurable number of MSOs could not be obtained. For instance, the Santa Fe Forest ITS stated:

> [I]t is difficult to quantify the number of individual owls taken because (1) dead or impaired individuals are difficult to find and losses may be masked by seasonal fluctuations in environmental conditions;  (2) the status of the species could change over time through immigration, emigration, and loss or creation of habitat; and (3) the species is secretive and we rarely have information regarding the number of owls occupying a PAC and/or their reproductive status.

USFS 6147; USFS 6797. Plaintiff also acknowledges that MSOs often leave PACs (Doc. 50 at 29), which would make individual monitoring more difficult. FWS' solution was to track incidental take by measuring PACs rather than individuals. USFS 6147; USFS 6797. FWS explains in the BiOps:

> [Measuring PAC levels] fits well with our current Section 7 consultation policy which provides for incidental take if an activity compromises the integrity of an occupied PAC to the extent that we are reasonably certain that incidental take occurred. . . . Actions outside PACs will generally not result in incidental take because we are not reasonably certain the owls are nesting and roosting in areas outside of PACs. We may modify this determination in cases when areas that may support owls have not been adequately surveyed and we are reasonably certain owls may be present.

USFS 6147.

Not only do the 2012 BiOps limit take to a certain number of PACs, they also limit the amount of time harassment can occur. *See, e.g.*, Carson Forest BiOp, FWS 7817 (of the 2 designated PACs, incidental take of 1 PAC permissible per year from harassment lasting no longer than 3 breeding seasons); Santa Fe Forest BiOp, USFS 6148 (of the 48 designated

PACs, incidental take of 2 PACs permissible per year from harassment for no more than 3 breeding seasons); Tonto Forest BiOp, USFS 6798 (of the 72 designated PACs, incidental take of 4 PACs permissible per year from harassment lasting no more than 3 breeding seasons, and from long-term disturbance of 2 PACs per year); Gila Forest BiOp, USFS 6978 (of the 286 designated PACs, incidental take of 14 PACs permissible per year from harassment lasting no longer than 3 breeding seasons, and 2 PACs from "long term or chronic disturbance, or habitat degradation or loss over the life of the [BiOp].")

Furthermore, FWS considered possible MSOs outside of designated areas in the BiOps by requiring surveys prior to any agency action. USFS 466; USFS 6148. In the event MSOs were detected during the surveys, the BiOps provided for the addition of new PACs. USFS 6150; FWS 7919-22. FWS even allowed for modification in instances where MSO are likely present but not yet known and protected. USFS 6147. Moreover, FWS also suggested protective fuels reduction and forest restoration measures for areas outside of PACs and possible MSO habitat to reduce the risk of forest fires that could destroy MSO habitat. USFS 6150.

The Court finds that the use of a surrogate was appropriate in this instance because an accurate measure of MSOs cannot be "practically obtained." *Allen*, 476 F.3d at 1038. Nor can the extent of incidental take on individual MSOs be ascertained with "reasonable certainty." *See* 80 Fed. Reg. 26, 832 (May 11, 2015). The surrogate provided limited take that, if surpassed, would require reinitiation of Section 7 consultation. In addition, FWS accounted for take outside of PACs. The ITS was neither arbitrary nor capricious.

## J.  USFS' Reliance on the 2012 BiOps and their Subparts

Finally, Plaintiff believes that USFS has violated its independent, substantive duty to avoid jeopardy through arbitrary reliance upon invalid BiOps.  Under Section 7 of the ESA, USFS has a substantive duty to "ensure that its operations are not likely to jeopardize the continued existence" of the MSO. (Doc. 50 at 30-31.) An action agency "may not rely solely on a FWS [BiOp] to establish conclusively its compliance with its substantive obligations." *Pyramid Lake*, 898 F.2d at 1415. When reviewing an agency's reliance on a

BiOp, courts examine whether that reliance was arbitrary and capricious. *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1162 (9th Cir. 1999).

For the reasons stated within this Order, FWS' no-jeopardy opinion is arbitrary and capricious and USFS' reliance upon the jeopardy opinion in the 2012 BiOps constitutes a substantive violation of its Section 7(a)(2) duties. Because the Court finds that the 2012 BiOps are not compliant with the ESA, the Court must decide the proper relief.

Plaintiff seeks an injunction preventing "all USFS management action in Region 3 national forests that involve actions that are inconsistent with the adaptive management approach adopted by the USFS in the 1996 S&Gs pending the FWS's issuance of BiOps that comply with all the requirements of the ESA." (Doc. 10 at 35.) "The traditional preliminary injunction analysis does not apply to injunctions issued pursuant to the ESA." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2003). Typically, a plaintiff seeking a permanent injunction must show:

> (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

*Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv*., 789 F.3d 1075, 1088 (9th Cir. 2015) (citation and quotations omitted). However, when considering an injunction under the ESA, courts presume that the latter three factors are satisfied. *See id.* at 1090. Courts nonetheless retain their equitable discretion to decide whether the plaintiff seeking injunctive relief has suffered an irreparable injury. *Id.* Moreover, a plaintiff must demonstrate that irreparable injury "is *likely* in the absence of an injunction." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv*., 886 F.3d 803, 818 (9th Cir. 2018) (emphasis in original) (citing *Winter*, 555 U.S. at 22). There must be "a definitive threat of future harm," not just "speculation." *Id.* at 819. The also courts enjoy "broad discretion" when deciding the appropriate remedy. *Id.* Courts in this district have found that timber harvesting

1   "constitutes *per se* 'irreversible and irretrievable' commitment of resources" preventing

2   further agency action until the completion of consultation.  *Silver v. Babbitt*, 924 F. Supp.

3   976, 986, 989 (D. Ariz. 1995) (citing *Lane Cty. Audubon Soc. v. Jamison*, 958 F.2d 290,

    295 (9th Cir. 1992); *Pacific Rivers Council v. Thomas*, 30 F.3d 1050, 1057 (9th Cir. 1994)).

4        The Court finds that USFS timber management actions (including timber

5   harvesting) causes irreparable harm which cannot proceed during a Section 7 consultation

6   addressing occupation monitoring of the MSO for recovery. It has been demonstrated

7   over the past 20 years that "the status quo will not lead to recovery of the listed species."

8   *See Nat'l Wildlife Fed'n*, 422 F.3d 782, 796 (9th Cir. 2005).

9        When a court finds that irreparable harm is likely to occur and the reigning BiOps

10  are invalidated, it must tailor injunctive relief to remedy the specific harm alleged. *Nat'l*

11  *Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, No. 3:01-cv-0640-SI, 2017 WL 1829588,

12  at *2 (D. Or. Apr. 3, 2017) (citing *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir.

13  2015)). The Court finds that halting the USFS timber management actions under the 2012

14  BiOps until the conclusion of a formal consult and  the issuing of superseding BiOps is

15  appropriate. The Court will therefore grant an injunction of USFS timber management

    actions in Region 3 National Forests and order Defendants to reinitiate formal consultation.

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26

27

IT IS ORDERED:

1. Plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part to the extent provided herein.

2. Defendants Cross-Motion for Summary Judgment is GRANTED in part and DENIED in part to the extent provided herein.

3. USFS timber management actions in Region 3 national forests must cease pending formal consultation.

4. The USFS and FWS must reinitiate a formal Section 7(a)(2) consultation and formulate superseding BiOps that conform with the terms of this Order.

5. The formal consultation must reassess the jeopardy analysis and the effect of Forest Plans on the recovery of the MSO.

6. This case is DISMISSED.

Dated this 11th day of September, 2019.


_____
Honorable Raner C. Collins
Senior United States District Judge