1  JEAN E. WILLIAMS,
   Deputy Assistant Attorney General
2  SETH M. BARSKY, Chief
3  S. JAY GOVINDAN, Assistant Chief
   RICKEY D. TURNER, Senior Trial Attorney
4  U.S. Department of Justice
   Environment and Natural Resources Division
5  Wildlife and Marine Resources Section
   999 18th Street
6  South Terrace, Suite 370
7  Denver, Colorado 80202
   (303) 844-1373
8  rickey.turner@usdoj.gov
9
10 Attorneys for Defendants

11          **UNITED STATES DISTRICT COURT**
12          **FOR THE DISTRICT OF ARIZONA**

13

14 | WILDEARTH GUARDIANS,                          | CASE NO. 4:13-cv-151-RCC
15 |          Plaintiff,
16 |          v.                                    | **DEFENDANTS' MOTION TO ALTER THE COURT'S DECISION AND TO CLARIFY OR MODIFY THE COURT'S INJUNCTION**
17 |
18 | UNITED STATES FISH AND
   | WILDLIFE SERVICE and UNITED
19 | STATES FOREST SERVICE,                        | **[EXPEDITED REVIEW REQUESTED]**
20 |          Defendants.

21

22

23

24

25

26

27

28

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure ("Rule") 59(e), Defendants respectfully move the Court to alter its September 12, 2019 judgment regarding recovery in a Section 7(a)(2) analysis or, in the alternative, clarify or modify the scope of its injunction. *See* ECF No. 89. On the merits, with all due respect, the Court erred in creating a standard that the U.S. Fish & Wildlife Service's ("FWS") jeopardy analysis under Section 7(a)(2) of the Endangered Species Act ("ESA") must "provide a route to recovery [for the Mexican spotted owl ("owl")] or a way to accurately assess it." This judgment appears to hold – erroneously – that FWS cannot adequately address the owl's recovery unless or until it has reliable population trend data – data that, under the 2012 owl Recovery Plan, will not be available until 2023 *at the earliest*. This judgment not only misapplies the law but it results in ***manifest injustice*** in two important respects: (1) it provides no way for FWS, in reinitiated Section 7 consultation, to correct the alleged error found in the six 2012 biological opinions ("BiOps") until at least 2023; and (2) it results in the injunction of all the U.S. Forest Service's ("USFS") "timber management activities" in the Lincoln, Santa Fe, Cibola, Carson, Tonto, and Gila National Forests – management activities designed primarily to mitigate the risk of catastrophic wildfire to the owl and nearby communities until at least 2023, or potentially longer. To correct this legal error and resulting manifest injustice, Defendants respectfully ask this Court to alter its judgment to apply the appropriate legal standards and hold that FWS, using the best scientific data available at the time of its decision, appropriately addressed the owl's prospects for recovery. In the alternative, if the Court declines to alter its judgment on the merits, Defendants respectfully request that the Court modify its current injunction – enjoining all "USFS timber management actions" on the six affected National Forests, pending further consultation – and instead enter an injunction that addresses only specific irreparable harm that Plaintiff has demonstrated.

## STANDARD FOR FED. R. CIV. P. 59(e)

"In general, there are four basic grounds upon which a Rule 59(e) motion may be

granted: (1) if such motion is necessary to correct manifest errors of law or fact upon which the judgment rests; (2) if such motion is necessary to present newly discovered or previously unavailable evidence; (3) if such motion is necessary to prevent manifest injustice; or (4) if the amendment is justified by an intervening change in controlling law." *Allstate Ins. Co. v. Herron*, 634 F.3d 1101, 1111 (9th Cir. 2011) (citation omitted). "A court considering a Rule 59(e) motion is not limited merely to these four situations, however." *Id*. (citation omitted) (noting that under unusual circumstances an amendment outside the listed situations may be appropriate). "Since specific grounds for a motion to amend or alter are not listed in the rule, the district court enjoys considerable discretion in granting or denying the motion." *Id*. (citation omitted). Here, Defendants assert that alteration of the Court's judgment on the merits is necessary in order to correct errors of law and fact which currently result in manifest injustice.

## ARGUMENT

**I.      The Court's standard regarding recovery in a Section 7(a)(2) analysis is a misapplication of the Endangered Species Act, its implementing regulations, and governing case law which results in manifest injustice.**

The Court erred in creating a standard that FWS's jeopardy analysis under Section 7(a)(2) must "provide a route to recovery or a way to accurately assess it." *See* ECF No. 89 at 24. This judgment appears to hold – erroneously – that FWS cannot adequately address the owl's recovery unless or until it has reliable population trend data – data that, under the 2012 owl Recovery Plan, will not be available until 2023 *at the earliest*. This judgment not only misapplies the law but results in manifest injustice in two important respects: (1) it provides no way for FWS, in reinitiated Section 7 consultation, to correct the alleged error found in the six 2012 BiOps until at least 2023; and (2) it results in the injunction of all USFS "timber management activities" in the Lincoln, Santa Fe, Cibola, Carson, Tonto, and Gila National Forests – management activities designed primarily to mitigate the risk of catastrophic wildfire to the owl and nearby communities until at least 2023 (and maybe longer).

1    Defendants respectfully request that the Court reconsider law and facts under the

2    applicable standard. Instead of requiring that FWS "provide a route to recovery or a way

3    to accurately assess it," it should analyze the requirements mandated by law and conduct

4    the following analysis: (1) whether FWS appropriately analyzed if the programmatic

5    forest plans for the six National Forests would appreciably reduce the owl's prospects for

6    recovery; and (2) whether FWS used the best scientific data available in conducting that

7    analysis. As explained in more details below, FWS appropriately addressed the owl's

8    prospects for recovery and did so using the best scientific data available.

9
      **A. The agencies are not required to "provide a route to recovery" in a
10         Section 7(a)(2) analysis.**

11        The Court's ruling that a lawful jeopardy analysis must "provide a route to

12   recovery" does not apply the relevant legal inquiry under Section 7(a)(2) of the ESA. It

13   did so in two important respects.

14        First, the Court added its own requirement into the Section 7(a)(2) process. There

15   is no requirement in the operative statutory provision, regulations, or controlling case law

16   that requires to FWS to "provide a route to recovery." *See* 16 U.S.C. § 1536(a)(2)

17   ("insure that any action authorized, funded, or carried out . . . is not likely to jeopardize

18   the continued existence of any endangered species . . ."); 50 C.F.R. § 402.02 (prohibiting

19   an agency action that would "reduce appreciably the likelihood of both survival and

20   recovery of a listed species in the wild"). The requirement to actually "provide a route to

21   recovery" is an additional element that the Court imposed onto the consultation process.

22   The Ninth Circuit has explained that courts should not graft into the statute requirements

23   that do not otherwise exist. *The Lands Council v. McNair*, 537 F.3d 981, 993 (9th Cir.

24   2008) (courts may not graft into the statute their "own notion of which procedures are

25   'best' or most likely to further some vague, undefined public good").

26        Second, there is no requirement that FWS's BiOps provide a "route to recovery"

27   in order for a "no jeopardy" determination to pass legal muster. Such an interpretation

28   would effectively mean that only proposed actions with potential beneficial effects can

move forward under the ESA. This is a mistaken interpretation, which is not supported by the statute or regulations.

Section 7(a)(2) is concerned with whether the action causes imminent harm; not whether it improves a species' status by providing a route to recovery. 16 U.S.C. § 1536(a)(2) (focusing on "continued existence"); *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.* ("*NWF v. NMFS*"), 524 F.3d 917, 929-30 (9th Cir. 2008) ("To 'jeopardize'—the action ESA prohibits—means to 'expose to loss or injury' or to 'imperil.' Either of these implies causation, and thus *some new risk of harm*.") (emphasis added). While Section 7(a)(2) places obligations on Federal agencies, achieving a species' recovery is not one of them. Neither the terms "recovery" nor "conserve" appear in Section 7(a)(2). 16 U.S.C. § 1536(a)(2). Instead, other ESA sections such as Section 4(f) address "recovery" of species. *Id*. § 1533(f)(4); *NWF v. NMFS*, 524 F.3d at 936 (stating that it is improper to import the "ESA's separate recovery planning provisions into the section 7 consultation process").

The Court's view is also inconsistent with the regulatory definition of "jeopardize", which is "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild *by reducing the reproduction, numbers, or distribution of that species*." 50 C.F.R. § 402.02 (emphasis added). By definition, even a neutral action, never mind a largely beneficial proposed action like the programmatic forest plans here, is not a reduction in "the reproduction, numbers, or distribution of that species." Likewise, it is axiomatic that an increase in the likelihood of recovery, even if small, cannot at the same time "reduce appreciably" the likelihood of recovery. The Court's construct mistakenly re-writes the regulatory definition to replace "appreciably reduce" with "must provide a route to recovery."

Ninth Circuit case law comports with the plain reading of the regulation. *NWF v. NMFS*, 524 F.3d at 936 (the recovery prong inquiry asks whether NMFS properly determined that the reasonable prudent alternative "will not *appreciably* reduce the odds

of success for *future recovery planning*, by tipping a listed species too far into danger") (emphasis added); *Ctr. for Biological Diversity v. FWS*, 807 F.3d 1031, 1051–52 (9th Cir. 2015) (plaintiff's "objections to the BiOp . . . in this case can appropriately be characterized as claiming that the [action] does not do enough to ensure the survival . . . Adopting this position, however, would impermissibly broaden FWS's obligations, both as the action agency and as the consulting agency"); *Cascadia Wildlands v. Thrailkill*, 806 F.3d 1234, 1244 (9th Cir. 2015) ("The purpose of the Recovery Plan is evident—promote recovery of the spotted owl. Although they are not necessarily mutually exclusive, recovery and jeopardy are two distinct concepts."); *Salmon Spawning & Recovery All. v. NMFS*, 342 F. App'x 336, 338 (9th Cir. 2009) (Section 7(a)(2) therefore does not require that an action promote or otherwise "boost the [species'] chances of recovery."); *Southwest Center for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 522-23 (9th Cir. 1998) (holding that under the ESA a federal agency is "not . . . required to pick the best alternative or the one that would most effectively protect the [listed species] from jeopardy," especially to the exclusion of all other management and policy goals of the agency, but may pick any alternative that "complied with the jeopardy standard and which could be implemented by the agency").

Finally, it is important to fully appreciate that the proposed agency actions themselves – the six 2012 programmatic forest plans – are a net positive for the owl, even without population trend monitoring, and are likely to increase the owl's chances of survival *and recovery*. Indeed, USFS's forest management program activities taken pursuant to the 1996 standards and guidelines are designed primarily for the benefit and recovery of the owl. FWS concluded that USFS's continued implementation of the forest plans' protective management measures effectively addressed the primary threats that led to the owl's "threatened" listing and improved (and would continue to improve over time) the owl's pre-1996 habitat by protecting and recruiting old-growth, multilayered canopy forests. In other words, while expected to have minimal short-term adverse effects, USFS's continued commitment to implement an uneven-aged timber

1    management regime and to design projects to minimize the risk of high-severity,

2    landscape-altering wildfire would not only avoid jeopardizing the owl and adversely

3    modifying its habitat but would also likely result in long-term conservation benefits for

4    the owl and move the owl closer to recovery. *See, e.g.*, FWS 8737-38 (Lincoln BiOp).

5        FWS properly applied the ESA, its implementing regulations, and applicable case

6    law, and made the reasonable conclusion that the six programmatic forest plans are

7    consistent with the owl's 1995 Recovery Plan and, even without population trend data,

8    will *increase – i.e.*, not appreciably reduce – the owl's chances for survival *and recovery*

9    and therefore the six 2012 programmatic forest plans do not jeopardize the owl's

10    "*continued existence*." 16 U.S.C. § 1536(a)(2) (emphasis added). Therefore, the Court

11    should alter its judgment to find that FWS appropriately determined that the six forest

12    plans would not appreciably reduce the owl's prospects for recovery.

13        **B. FWS appropriately used the "best available science."**

14        The Court's ruling that a lawful jeopardy analysis must provide "a way to

15    accurately assess" recovery in a Section 7(a)(2) – *i.e.*, must have population trend data –

16    does not correctly apply the law as it elides the ESA's "best available science" standard.

17        Section 7 consultations, including FWS's analysis of recovery regardless of the

18    particular species involved, must use the best data "available." 16 U.S.C. § 1536(a)(2).

19    Rather than mandating population trend monitoring, this provision "'merely prohibits [an

20    agency] from disregarding available scientific evidence that is in some way better than

21    the evidence [it] relies on.' Essentially, [an agency] 'cannot ignore available biological

22    information.'" *Kern County Farm Bureau v. Allen*, 450 F.3d 1072, 1080--81 (9th Cir.

23    2006); *see also Nw. Ecosystem Alliance v. FWS*, 475 F.3d 1136, 1147 (9th Cir. 2007)

24    ("[A] rigorous, large-scale study . . . would be preferable, but in [its] absence . . .,

25    credible anecdotal evidence represents the 'best scientific . . . data available' . . . ."); *Ctr.*

26    *for Biological Diversity v. Babbit*, 215 F.3d 58, 60-61 (D.C. Cir. 2000) (Also, the "best

27    available science" standard makes clear that consulting agencies are under no obligation

28

1    to create scientific data).

2         Here, the agencies did not ignore any data and have made clear that no reliable

3    data exist regarding population trends. But, even in the face of this absence, the agencies

4    must nonetheless make determinations relying on the best scientific and commercial data

5    available. Without population trend data, the best available data was the following:

6    1. In 1993, due to a lack of population data, FWS listed the owl based *entirely*[1] on the

7         loss of vast amounts of old-growth, multilayered canopy habitat (and the continuing

8         threat of habitat loss) due to USFS' pre-1996 even-aged (shelterwood) timber

9         management and catastrophic wildfire, USFS 20;

10   2. In 1995, FWS issued a recovery plan with specific protective management

11        recommendations (*i.e.*, to manage for protected, restricted, and other woodland

12        habitats) to protect and recruit old-growth, multilayered canopy habitat by

13        eliminating the threat of even-aged timber management and designing projects to

14        minimize risk of catastrophic wildfire, FWS 7918, FWS R 1;

15   3. In 1996, USFS amended its Forest Plans to incorporate, among other things, the

16        1995 recovery plan's protective forest management recommendations (*i.e.*, to

17        manage for protected, restricted, and other woodland habitats) to protect and recruit

18        old-growth, multilayered canopy habitat by implementing uneven-age, multiple-

19        species silvicultural timber management and designing projects to minimize risk of

20        catastrophic wildfire, FWS 7918, USFS 466-70;

21   4. USFS had implemented these protective management recommendations for 16 years

22        (from 1996 to 2012) and would continue to do so, FWS 7918; and

23   5. Additional owl surveys have resulted in the discovery of more known owl nesting

24        sites across a wider area throughout the owl's range, FWS 7905.

25   _____

[1] No population trend data was available when FWS listed the owl as "threatened" under the

26    ESA. While Plaintiff continually insists that a proper jeopardy analysis cannot occur without
      range-wide monitoring data, it has no problem with FWS having initially listed the owl based

27    *purely* on the loss old-growth, multilayered canopy habitat – *i.e.*, no range-wide monitoring
      data.

28

After considering this, the best available data, FWS concluded that USFS's continued implementation of the Forest Plans' protective management measures (1) effectively addressed the primary threats that led to the owl's "threatened" listing in the first instance and (2) improved (and would continue to improve over time) the owl's pre-1996 habitat by protecting and recruiting old-growth, multilayered canopy forests. In other words, while expected to have minimal short-term adverse effects, USFS's continued commitment to implement an uneven-aged timber management regime and to design projects to minimize the risk of high-severity, landscape-altering wildfire would not only avoid jeopardizing the owl and adversely modifying its habitat but would also likely result in long-term conservation benefits for the owl and move the owl closer to recovery. *See, e.g.*, FWS 7865-66 (Cibola BiOp). Given the best available data at the time, FWS's conclusions were reasonable. Therefore, Defendants respectfully request that the Court alter its judgment in light of the fact that FWS appropriately considered the best scientific data available at the time of its decision, and modify its determination requiring FWS to provide accurate population trend data for its 2012 BiOps.

### C. The Court's recovery standard creates manifest injustice.

To be clear, USFS is able to meet their Section 7 obligations to protect and conserve the owl without population trend data. This type of monitoring, as explained in the 1995 recovery plan, must be implemented for a period *of at least 15 years* to be able to generate any meaningful data on population trends. FWS R 135. And, even after 15 years, there was still no guarantee that 1995 population trend monitoring regime would produce reliable and defensible data. Defs.' Exh. A, Shaula Hedwall Declaration ("Hedwall Decl.") ¶¶ 7-10. However, the recovery standard set forth in the Court's opinion would result in manifest injustice as it is entirely unworkable. Taking the Court's position to its logical extreme would mean that, even if the 1995 population monitoring regime was practical and implemented, USFS could not meet their Section 7 obligations with respect to the owl for 15 years. In other words, under the Court's decision, all post-

1   1996 USFS projects affecting the owl would be enjoined *for at least 15 years* – until the

2   year 2011 (or longer, should the monitoring regime not end up providing reliable data) –

3   because, without reliable population trend data, FWS cannot "provide a route to recovery

4   or a way to accurately assess it" in its BiOps. That simply cannot be the case.

5           The Court's decision similarly affects the agencies' population trend monitoring

6   efforts under the 2012 revised Recovery Plan for the owl. In 2012, FWS created a new

7   population trend monitoring regime. Hedwall Decl. ¶¶ 7-10; Defs.' Exh. B, Karl Malcolm

8   Declaration ("Malcolm Decl.") ¶ 26. FWS anticipated that this new effort would need to

9   be implemented for at least 10 years to provide information that could be used with a

10  reasonably high level of confidence (but could take longer if assumptions built into the

11  monitoring regime are not met, such as a change in detection probabilities over time).

12  Hedwall Decl. ¶¶ 7-10; Malcolm Decl. ¶¶ 26-27. USFS has now funded and conducted

13  six years of region-wide occupancy surveying and will begin year seven in spring of

14  2020. Malcolm Decl. ¶ 24. USFS anticipates completing 10 years of monitoring in 2023.

15  Malcolm Decl. ¶ 29. Again, taking the Court's position to its logical extreme would mean

16  that the agencies cannot meet their Section 7 obligations with respect to the owl's future

17  recovery until 2023. In other words, it appears that under the Court's decision, all USFS

18  projects affecting the owl should be enjoined until 2023 (or longer should the 2012

19  Recovery Plan's monitoring regime not provide reliable data) because, without long-term

20  population trend data, FWS cannot "provide a route to recovery or a way to accurately

21  assess it" in its BiOps. This results in manifest injustice.

22          It is also unclear how the results of population trend data would help inform FWS

23  decisions regarding jeopardy as it relates to the implementation of land management

24  decisions on the six National Forests. Increasing, decreasing, or stable trends in owl

25  population may be driven by factors outside of the control of FWS or USFS and

26  independent of habitat manipulation (*e.g.*, climate change and drought). Malcolm Decl. ¶

27  27. Regardless of long-term trends in owl population, it remains clear based on current

28  science that safeguarding and promoting habitat features needed to support the owl

1   through uneven-aged stand management is a priority for the conservation of the species.

2   Therefore, even if long-term population trends reveal declining trends (which would

3   preclude delisting), such results should not be construed as grounds for foregoing habitat

4   management actions (*i.e.*, mechanical and managed fire treatments which mitigate risk of

5   catastrophic wildfire) needed to safeguard key habitat elements for the owl.

6          In summary, the recovery requirement for a Section 7(a)(2) jeopardy analysis as

7   set forth in the opinion represents an unworkable and impossible standard which would

8   have the result of enjoining all USFS timber management projects until at least 2023 (or

9   longer, if the population trend monitoring regime indicates a need to require more data).

10  During this time, with the intensification of high-severity, landscape altering wildfires,

11  USFS projects designed specifically to reduce the risk of wildfire appear to remain

12  enjoined further endangering the owl and public health and safety.[2] This situation,

13  resulting from a misapplication of law and fact, is manifest injustice. The Court,

14  therefore, should revisit its judgment and uphold FWS's reasonable determination that,

15  based on the best available science, the six programmatic forest plans at issue do not

16  appreciably reduce the owl's prospects for recovery.

17  **II.      Plaintiff has not demonstrated irreparable injury necessary for an injunction.**

18         In the alternative, if the Court declines to alter its judgment on the merits,

19  Defendants respectfully request that the Court modify its current injunction – enjoining

20  all "USFS timber management actions" on the Lincoln, Santa Fe, Cibola, Carson, Tonto,

21  and Gila National Forests, pending further consultation – and instead enter an injunction

22  that addresses only specific irreparable harm that Plaintiff has demonstrated. Plaintiff has

23  made no showing of irreparable harm to its specific interests in the owl, and is not

24  entitled to injunctive relief. *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139,

25  156–57 ("[A] plaintiff seeking a permanent injunction . . . must demonstrate: (1) that it

26

27  [2] This result also unnecessarily harms the local economy that also depend on forest resources.
        Malcolm Decl. ¶¶ 4, 30-32.

28

1  has suffered an irreparable injury . . . .") (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547

2  U.S. 388, 391 (2006)).

3      The Court's reasoning for entering a broad injunction was based largely on

4  *Cottonwood Envt'l Law Center v. USFS*, 789 F.3d 1075, 1088 (9th Cir. 2015), and *NWF*

5  *v. NFMS*, 886 F.3d 803, 818 (9th Cir. 2018). In those cases, however, the Ninth Circuit

6  acknowledged that a plaintiff "must show irreparable injury to justify injunctive relief" in

7  ESA cases. *Cottonwood*, 789 F.3d at 1091. That requirement may be satisfied by showing

8  irreparable harm to a listed species, if sufficiently connected to the plaintiff's own

9  interests. *NWF*, 886 F.3d at 820. But even then, the "irreparable harm must be causally

10 connected to the activity to be enjoined." *Id.* at 819. An injunction must be "no more

11 burdensome to the defendant than necessary to provide complete relief to the plaintiffs."

12 *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (quoting *Califano v.*

13 *Yamasaki*, 442 U.S. 682, 702 (1979)). The Court abuses its discretion if it enters an

14 injunction that is overly broad. *NWF*, 886 F.3d at 823; *see also Cottonwood*, 789 F.3d at

15 1091 (the district court should "craft[] an injunction to remedy the precise harm").

16      Importantly, the Court does not have jurisdiction to grant relief based on

17 "generalized harm to the forest or the environment," but may only grant relief based on

18 the particular interest and potential harm to the parties before it. *Summers v. Earth Island*

19 *Institute*, 555 U.S. 488, 494 (2009). In its evaluation of irreparable harm, the Court stated

20 that "Courts in this district have found that timber harvesting 'constitutes *per se*

21 "irreversible and irretrievable" commitment of resources' preventing further agency

22 action until the completion of consultation." ECF No. 89 at 37-38 (quoting *Silver v.*

23 *Babbitt*, 924 F. Supp. 976, 986, 989 (D. Ariz. 1995)). But the statement that "timber

24 harvesting" constitutes a "*per se* irreversible and irretrievable commitment of resources"

25 does not establish irreparable harm to the owl, let alone to Plaintiff's interests in the owl,

26 as required by *Cottonwood*, based on more recent Supreme Court precedent. *See*

27 *Cottonwood*, 789 F.3d at 1089-91 (analyzing *Monsanto* and *Winter v. Natural Resources*

28 *Defense Council, Inc.*, 555 U.S. 7 (2008), to conclude that "there is no presumption of

irreparable injury where there has been a procedural violation in ESA cases," but

"plaintiff must show irreparable injury to justify injunctive relief"). Indeed, since *Silver*,

and based on *Winter*, the Ninth Circuit has expressly rejected the notion that "logging is

*per se* enough to warrant an injunction because it constituted irreparable harm." *Earth

Island Institute v. Carlton*, 626 F.3d 462, 474 (9th Cir. 2010) (citing *The Lands Council

v. McNair*, 537 F.3d 981, 1005 (9th Cir. 2008) (*en banc*)).[3]

      Rather than just presume that timber harvesting causes irreparable harm to the

owl, and in turn to Plaintiff, *Cottonwood* establishes that Plaintiff must demonstrate –

through competent evidence – that each timber harvesting activity that it seeks to enjoin

harms its cognizable interests in the owl. *See Cottonwood*, 789 F.3d at 1092 (upholding

the district court's denial on injunctive relief in an ESA case because the plaintiff had

"failed to make an evidentiary showing that specific projects will likely cause irreparable

damage to its members' interests"). Plaintiff has not offered any evidence that any

specific projects will likely irreparably harms its members' interests. Therefore, as in

*Cottonwood*, Plaintiff is not entitled to any injunction in this case, and this Court's

judgment should be amended accordingly.

## III.    Plaintiff cannot show that several categories of activities cause Plaintiff irreparable harm, and therefore should be excluded from any injunction.

      As discussed above, the Ninth Circuit has rejected the proposition that "timber

harvesting" – let alone the much broader "timber management actions" – constitute *per

se* irreparable harm to endangered species, based on recent Supreme Court and Ninth

Circuit *en banc* decisions on the proper analyses for determining the proper scope of

---

[3] The reason why "timber management actions" are no longer considered *per se* irreparable harm is because these actions have advanced in recent years to significantly improve wildlife habitat conditions in the long run, as compared to the types of "timber harvests" in the 1990s, as cited by this Court in the *Silver* case. *See, e.g., Swan View Coal. v. Weber*, No. CV 13-129-M-DWM, 2019 WL 952329, at *1–2 (D. Mont. Feb. 27, 2019) (rejecting general claims of *per se* irreparable harm due to timber harvest when Plaintiffs failed to identify specific harms to their members, especially in light of the fact that the project at issue was aimed at benefitting protected species, improving forest health, and mitigating risk of catastrophic wildfire).

1  injunctive relief. In addition, before an injunction can issue for an ESA violation, Plaintiff

2  must also show that the relief they seek is "narrowly tailored to avoid the irreparable

3  harm that the district court identifie[s]" based on Plaintiff's evidentiary showing of "a

4  'sufficient causal connection' between the alleged irreparable harm and the activity to be

5  enjoined." *NWF v. NMFS*, 886 F.3d 803, 823 (9th Cir. 2018).

6      And, under *Winter* and *Cottonwood*, Plaintiff must "demonstrate that irreparable

7  injury [to its interests in the owl] is *likely* in absence of an injunction." *Cottonwood*, 789

8  F.3d at 1089 (quoting *Winter*, 555 U.S. at 22; emphasis added). Thus, even if Plaintiff

9  could establish that some injunction is warranted here, that injunction must exclude

10  projects and activities that will have "no effect" or are "not likely to adversely affect" the

11  owl or its critical habitat.[4] Plaintiff acknowledged as much in asking this Court to exclude

12  the timber management activity of personal fuelwood cutting and gathering – without

13  specificity to owl critical habitat or recovery habitat – from the Court's injunction. *See*

14  ECF No. 99 at 2 (citing *Cottonwood*, and stating that Plaintiff "does not believe that

15  personal firewood cutting and gathering on national forest lands is associated with any

16  possibility of irreparable harm to the Mexican spotted owl or its habitat").

17      While it is not Defendants' burden to demonstrate a lack of likely irreparable

18  harm, the agencies have compiled a list of categories of projects and activities that could

19  fall under the injunction's "timber management activities" but that are not likely to

20  irreparably harm the owl (and, hence, any interest that Plaintiff may establish in the owl).

21  Malcolm Decl. ¶¶ 3-23. For example, many areas affected by the Court's injunction have

22  no biological significance for the owl. In 2004, FWS designated *critical habitat* for

23

---

24  [4] These terms are part of the overall Section 7(a)(2) consultation process. If an action agency first
determines that a proposed action will have "no effect" on an endangered or threatened

25  species, the consultation requirements are not triggered. *Pac. Rivers Council v. Thomas*, 30
F.3d 1050, 1054 n.8 (9th Cir. 1994). Also, as part of the informal consultation process, if the

26  agencies reach a "not likely to adversely affect" determination, the consultation process is
concluded and no further action is necessary. *See* 50 C.F.R. §§ 402.13(a), 402.14(b)(1). The

27  important point here is that both of these bars – "no effect" and "not likely to adversely
affect" – are significantly lower and nowhere near the "likelihood of irreparable harm" bar.

28

1  Mexican spotted owl. The 2012 revised Recovery Plan further defines additional

2  *recovery habitat*. Protected Activity Centers ("PACs") outside of critical habitat have

3  also been identified. While "timber management actions" within these habitat areas may

4  affect the owl, actions outside these areas will have no effect and are therefore not likely

5  to irreparably harm the owl. Thus, even if the Court's injunction remains in place, the

6  Court should modify its injunction to exclude all areas outside recognized owl habitat

7  areas.

8      Likewise, many projects and other activities that occur in, or partially in, owl

9  habitat areas are not likely to irreparably harm the owl and should be excluded from any

10  injunction, for the same reason Plaintiff sought to exclude personal fuelwood cutting and

11  gathering. Indeed, many actions in owl habitat areas are designed to protect or improve

12  habitat conditions for the owl, such that enjoining them under the current injunction

13  actually harm the owl. The Court should modify any injunction to exclude activities that

14  are not likely to irreparably harm the owl, including any actions that may adversely affect

15  the owl in the short-term while protecting or enhancing conditions in the long-term.

16      The need to narrow the scope of the injunction is particularly important where the

17  Court is apparently considering, and has ordered, long-term programmatic restraints on

18  activities across six National Forests, which, as discussed above, might not be resolved to

19  the Court's satisfaction until several more years (or more) of population trend data are

20  available (approximately 2023). Apart from the detrimental effect on the owl's

21  conservation and the safety of nearby communities, an overbroad injunction is

22  particularly problematic here because it unnecessarily harms economically repressed and

23  depressed communities that depend on the National Forests. Malcolm Decl. ¶¶ 4, 30-32.

24  Therefore, even if the Court believes that such programmatic restraints are necessary to

25  protect Plaintiff's interest here, it should also be wary of shackling USFS's ability to

26  carry out its statutory mission of administering and protecting the National Forests.

27      **A. Timber management activities outside owl habitat.**

28      Timber management activities outside owl habitat should be allowed to continue.

USFS's timber management activities, like mechanical thinning, are designed to reduce wildfire effects, provide vibrant habitat for native wildlife species, protect water sources, and safeguard communities. Malcolm Decl. ¶ 4. The long-term outcomes of these treatments benefit the owl by reducing forest stocking to improve tree vigor and restore stand resiliency. *Id*. In turn, these goals proactively address uncharacteristic disturbance from insects, disease, wildfire, invasive vegetation, and changing climate. *Id*. In general, Plaintiff appears amenable to allowing these activities to proceed.

There are no adverse effects from these types of timber management activities outside owl habitat – *i.e.*, designated critical habitat, recovery habitat, and protected activity centers. Hedwall Decl. ¶ 4; Malcolm Decl. ¶ 8. In fact, Section 7 consultation is not required for projects that occur outside owl habitat. Hedwall Decl. ¶ 4. In the six enjoined forests, USFS has 22 timber management projects spanning 12,553 acres entirely outside of owl critical habitat, recovery habitat, and known PACs. Malcolm Decl. ¶ 5. There are an additional 5 timber management projects which are partially outside of owl critical habitat, recovery habitat, and PACs. Malcolm Decl. ¶ 6. These specific projects span 3,252 acres in total, of which 2,240 acres are outside of owl habitat. The Court should allow timber management activities to proceed in portions of project areas outside of owl habitat and outside of PACs where project-level consultation has occurred.

**B. Timber management activities involving small-scale, incidental cutting.**

Timber management activities involving small-scale, incidental tree cutting should be allowed to continue. These types of activities include, but are not limited to, the following: (1) the cutting of hazard trees; (2) routine maintenance for infrastructure (e.g., power lines, recreation sites, trails, etc.) (3) the cutting of the U.S. Capitol Christmas tree; (4) personal Christmas tree cutting; (5) the harvest and removal of personal use forest products; and, (6) special product collections by tribes for ceremonial purposes. Malcolm Decl. ¶ 9. In general, with perhaps the exception of certain hazard tree removals, Plaintiff appears amenable to allowing these activities to proceed.

There are no adverse effects from these types of timber management activities to

owl habitat. These activities are limited in their scope, scale, and timing as to have virtually no effect on the owl. Malcolm Decl. ¶ 10. Additionally, these activities occur outside of the spring / summer owl breeding season within owl habitat, have broadly dispersed effects throughout the National Forest System, and are often outside of owl habitat. Malcolm Decl. ¶ 10. In contrast to larger scale commercial timber harvesting projects, these activities affect small numbers of trees in limited spatial extents. Malcolm Decl. ¶ 9. The products harvested are generally small diameter, and do not constitute key habitat elements for owl (i.e., large and old trees). Malcolm Decl. ¶ 10. The Court, therefore, should allow these activities to proceed.

### C. Timber management activities – prescribed burns.

Timber management activities, such as prescribed fire, should be allowed to continue. Prescribed fire is vital to the owl's conservation and specifically designed to address the owl's primary threat – catastrophic (high-severity, stand-replacing) wildfire. Malcolm Decl. ¶ 11; Hedwall Decl. ¶ 6. The use of managed low to moderate intensity fire, including prescribed burning, is an important tool available to USFS to improve habitat quality for frequent-fire forests that the owl occupies and to protect owl habitat from catastrophic, stand-replacing wildfires. Malcolm Decl. ¶ 12. In general, with certain conditions, Plaintiff appears amenable to allowing these activities to proceed.

The long-term benefits and protections are vital. There are currently 33 prescribed fire projects partially or completely within owl habitat halted in the region, and another 30 located entirely outside of owl critical habitat. Malcolm Decl. ¶ 13. Delaying these projects increases the threat of future large and severe fires which undermines USFS's conservation efforts – not to mention the health and safety benefits to surrounding communities. Malcolm Decl. ¶ 13. The Court should allow these projects to proceed.

### D. Timber management projects with project-specific forest plan amendments and supporting, stand-alone Section 7 consultation.

Timber management projects with project-specific forest plan amendments and supporting, stand-alone Section 7 consultation should be allowed to continue. These

1 independent projects have or will have project-specific Forest Plan amendments that

2 contain updated owl standards and guidelines that align with the 2012 Recovery Plan.

3 Malcolm Decl. ¶ 14. These specific projects also have their own stand-alone Section 7

4 consultation – *i.e.*, the consultations are not tiered to the now invalidated 2012

5 programmatic BiOps. Malcolm Decl. ¶ 15. Currently there are two signed projects falling

6 under this category – the Rio Tusas-Lower San Antonio Landscape Restoration Project

7 (Carson National Forest) and Southwest Jemez Mountains Landscape Restoration Project

8 (Santa Fe National Forest). These projects contain project-specific forest plan

9 amendments for the protection and management of the owl. Malcolm Decl. ¶ 18. The

10 Court should allow these projects (and others that follow this model) to proceed. Plaintiff

11 has not yet provided a position on these particular activities.

**E. Timber management activities – commercial fuelwood gathering.**

13 Finally, commercial fuelwood cutting and gathering on the six enjoined forests

14 should be allowed to continue. This timber management activity is vitally important to

15 communities as they prepare for the upcoming winter season. Malcolm Decl. ¶ 23. This

16 particular activity will not adversely affect the owl. By and large, commercial firewood

17 cutting occurs in pinyon/juniper woodland types, outside of mixed-conifer, pine-oak, and

18 riparian forest types (primary constituent elements for the owl). Malcolm Decl. ¶ 22.

19 Although termed "commercial," this designation is used to distinguish the type of permit

20 issued. Malcolm Decl. ¶ 22. These operators tend to be small scale, single truck cutters

21 that service local communities and cater to those unable to gather firewood on their own

22 accord (*e.g.* the elderly, disabled, and others who do not have the means to gather their

23 primary source of wood for heating and cooking). Malcolm Decl. ¶ 22. Plaintiff opposes

24 this activity in owl habitat. But, given the explanation above, the Court should allow this

25 activity to proceed regardless of location.

**CONCLUSION**

27 For the reasons outlined above, the Court should alter and modify its judgment.

28

Dated: October 10, 2019

Respectfully Submitted,

JEAN E. WILLIAMS,
Deputy Assistant Attorney General
SETH M. BARSKY, Section Chief
S. JAY GOVINDAN,
Assistant Section Chief

*/s/ Rickey D. Turner, Jr.*
RICKEY D. TURNER, JR.
Senior Trial Attorney
U.S. Department of Justice
Env't. & Natural Resources Division
Wildlife & Marine Resources Section
999 18th Street
South Terrace, Suite 370
Denver, CO 80202
Telephone: (303) 844-1373

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

WILDEARTH GUARDIANS,

      Plaintiff,

        v.

UNITED STATES FISH AND
WILDLIFE SERVICE and UNITED
STATES FOREST SERVICE,

      Defendants.

CASE NO. 4:13-cv-151-RCC

**CERTIFICATE OF SERVICE**

    I hereby certify that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such to the attorneys of record.


                        */s/ Rickey D. Turner, Jr.*
                        RICKEY D. TURNER, JR.