1   Steven Sugarman
    New Mexico Bar No. 5717
2   appearing *pro hac vice*
    347 County Road 55A
3   Cerrillos, New Mexico 87010
    (505) 672-5082
4   stevensugarman@hotmail.com

5   Attorney for WildEarth Guardians

6

7

8

9

10              IN THE UNITED STATES DISTRICT COURT

11                FOR THE DISTRICT OF ARIZONA

12                      TUCSON DIVISION

13

14

15

    WILDEARTH GUARDIANS,                )
16                                       )        No. 13-151-RCC
           Plaintiff,                    )
17                                       )
    vs.                                  )
18                                       )
    UNITED STATES FISH AND WILDLIFE      )
19  SERVICE and UNITED STATES FOREST     )   **PLAINTIFF'S OPPOSITION TO**
    SERVICE,                             )   **FEDERAL DEFENDANTS'**
20                                       )   **RULE 59 MOTION**
           Defendants.                   )
21  _____ )

22

23

24

25

26

27

28

1

2

# TABLE OF CONTENTS

3    I.    This Court's decision correctly applies relevant ESA requirements . . . . . . . . . . . 1

4    II.   The 2012 BiOps make no "rational conntection" between
5          facts and conclusions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

6          A.    The relationship between Recovery Plans and Biological
                 Opinions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

7          B.    Different types of monitoring serve different purposes . . . . . . . . . . . . . . . 5

8          C.    Evolution of BiOps, and excision of the monitoring
9                requirement in 2012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

10         D.    The fatal "disconnect" between the Revised RP and the 2012
                 BiOps . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

11         E.    Red herrings and recycled arguments do not save the
12               Defendants' case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

13   III.  An injunction is necessary to prevent irreparable harm. . . . . . . . . . . . . . . . . . . . 15

14   IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  **I.     This Court's decision correctly applies relevant ESA requirements**

2         The Endangered Species Act ("ESA") reflects a policy of "institutionalized

3  caution," and the statutory scheme is intended to "give the benefit of the doubt to

4  preserving endangered species."  *Arizona Cattle Growers' Association v. Salazar*, 606

5  F.3d 1160, 1166-67 (9th Cir. 2010) *see also WildEarth Guardians v. U.S. Fish and

6  Wildlife Service ("WEG 2019")*, 2019 WL 4345333 at * 1 (D. Ariz. 2019).  The core

7  provision of the ESA is the prohibition on jeopardy.  That provision provides that all

8  federal agencies "shall . . . *insure* that any action [implemented by the agency] is not

9  likely to jeopardize the continued existence of [a listed species] or result in the

10  destruction or adverse modification" of formally designated critical habitat for that

11  species.[1]  16 U.S.C. § 1536(a)(2) (emphasis added).  The term "insure" – as used in the

12  ESA – means "to make certain" or "to guarantee."  *Defenders of Wildlife v. U.S.*

13  *Environmental Protection Agency*, 420 F.3d 946, 963-64 (9th Cir. 2005) *rev'd on other*

14  *grounds sub nom. National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S.

15  644 (2007).  This definition provides heavy ballast to the ESA's no jeopardy duty, and

16  dovetails with the requirement that agencies approach their solemn ESA duty to protect

17  biodiversity with "institutionalized caution."  *WEG 2019* at *10 (holding that agencies are

18  not permitted to base their ESA compliance "on speculation or surmise").

19         Plaintiff WildEarth Guardians ("Guardians") alleges that the 2012 Biological

20  Opinions ("BiOps") that the U.S. Fish and Wildlife Service ("FWS") prepared to assess

21  the effects of forest treatments on the Mexican spotted owl ("MSO") are arbitrary and

22  capricious.  One of Guardians' claims is that the 2012 BiOps' failure to require long-term

23

24         [1]     "An action that jeopardizes a species is one that 'reduce[s] appreciably the

25  likelihood of both the survival and recovery of a listed species in the wild by reducing the
reproduction, numbers, or distribution of that species.'" *WEG 2019* at *2 *quoting* 50

26  C.F.R. § 402.02.  The Ninth Circuit construes the term "jeopardize" as follows for
purposes of the ESA: "to expose to loss or injury or to imperil."  *National Wildlife*

27  *Federation v. National Marine Fisheries Service*, 524 F.3d 917, 930 (9th Cir. 2008)

28  (quotations omitted).

range-wide population monitoring of the MSO fatally flaws the BiOps.[2]  This Court held

for Guardians on this claim and entered a partial judgment in its favor.  *WEG 2019* at

*10-12.  This Court's decision on this issue is based on a detailed and comprehensive

analysis of the pertinent facts and law which led this Court to the following conclusion:

> The failure to monitor population not only stifles delisting, but
> fundamentally hampers the ability to assess recovery.
>
> . . . .
>
> [The USFS's argument that] it does not bear the responsibility for finding a
> solution to monitoring . . . provides no accountability.  In twenty-three
> years, this method has failed to bring the MSO closer to being delisted.  In
> allowing the effort to be "collaborative" there is no one entity that is
> committing an ESA violation.  The failure to monitor MSO populations gets
> a pass, and neither the USFS nor FWS are responsible for specific measures
> to quantify the MSO population or ensure that current Forest Plans are
> making strides towards delisting the MSO.  The Court agrees with Plaintiff
> that this shirking of responsibility is impermissible.
>
> . . . .
>
> The BiOps simply do not provide a route to recovery or a way to accurately
> assess it.  The no-jeopardy determination is unsupported, arbitrary, and
> capricious because the finding failed to account for recovery of the MSO.

*WEG 2019* at *11-12.

The Federal Defendants have filed a Rule 59 motion challenging the Court's

reasoning.  ECF Doc. No. 104.  The motion is a desperate grasp at a straw that doesn't

exist in the law.  The Federal Defendants argue that this Court erred because – in their

telling of the requirements of the ESA – they have no obligation to "provide a route to

recovery."  The Federal Defendants' quibble with this Court's decision has no basis in

law, and Guardians respectfully submits that it should be denied.

This Court's comprehensive analysis cites to the exhaustive record evidence

regarding the critical importance of long-term range-wide population monitoring to the

"adaptive management" ("AM") approach which the FWS endorses for conservation and

---

[2]      Guardians argues that the flaw leads ineluctably to a finding that the FWS
violated the ESA by preparing arbitrary and capricious BiOps, and to an associated
finding that the USFS's reliance on the illegal BiOps constitutes a separate violation of
the ESA by the U.S. Forest Service ("USFS").

1   recovery of the MSO. *WEG 2019* at *4 (finding that the AM plan will fail in the absence

2   of population monitoring). This Court also discusses the fact that the USFS has failed to

3   commit to this long-term range-wide monitoring in the twenty-three year period since the

4   1995 Recovery Plan ("RP") was issued. *Id.* at *11.  And crucially (Guardians

5   respectfully submits that this is the dispositive fact), this Court finds that the 2012 BiOps

6   fail to incorporate any long-term range-wide population monitoring requirement – thereby

7   dooming the success of the AM approach. *Id.* at *5, *12 (holding that the inclusion of

8   monitoring recommendations in a non-enforceable RP does not "show compliance with

9   the ESA" since the FWS did not "incorporate those measures into the BiOp").

10      The Court's decision evidences a clear understanding that the "route to recovery"

11  for the MSO – which indisputably requires the implementation of a long-term range-wide

12  population monitoring plan – exists independently of the 2012 BiOps.  That "route to

13  recovery" has existed in largely the same fashion since development of the 1995 RP: it is

14  an AM program with a strong reliance on long-term range-wide population monitoring to

15  test and validate assumptions regarding specific forest treatments on national forest lands.

16  The fatal flaw in the 2012 BiOps – as expressly and correctly found by the Court – is that

17  they fail to incorporate any requirement for such monitoring, and thereby veer wildly off

18  the well-established route to recovery.

19  **II.    The 2012 BiOps make no "rational conntection" between facts and conclusions**

20      The narrow legal issue now before this Court is whether there is a "rational

21  connection" between (1) the FWS's decision to relieve the USFS of any and all obligation

22  to conduct long-term range-wide population monitoring in the 2012 BiOps and (2) the

23  "no jeopardy" conclusion of those BiOps.  *Turtle Island Restoration Network v. U.S.*

24  *Dep't of Commerce*, 878 F.3d 725, 737, 739 (9th Cir. 2017) (holding that a challenged

25  BiOp was arbitrary and capricious because the consulting agency failed to "articulate a

26  rational connection between [its population modeling] and its no jeopardy conclusion" or

27  "a rational connection between the best available science and its conclusion"), *see also*

28  *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 526-28 (9th Cir. 2010) (same).  This

1    case does *not* require the Court to assess the adequacy or the merits of the MSO RPs

2    issued by the FWS, which Recovery Plans are not challenged in this case.  Rather, the

3    narrow and precise legal issue before the Court is whether – in the 2012 BiOps at issue

4    here – the FWS articulated a rational connection between its decision to forego a

5    requirement for long-term range-wide population monitoring and the BiOps' no jeopardy

6    conclusions.  The answer to this question is clearly no, as this Court correctly held.

7           **A.**     **The relationship between Recovery Plans and Biological Opinions**

8           This Court correctly characterized the purpose of an RP which is to "promote the

9    conservation of [listed] species" by describing "such site-specific management actions as

10   may be necessary to achieve the plan's goal for the conservation and survival of the

11   species" and by identifying "objective, measurable criteria which, when met, would result

12   in a determination" that the species can be delisted.  *WEG 2019* at *2 *citing* 16 U.S.C. §

13   1533(f)(1).  RPs "serve as guidance for recovery but do not create legally enforceable

14   duties." *WEG 2019* at *2 *see also Cascadia Wildlands v. Bureau of Indian Affairs*, 801

15   F.3d 1105, 1114 n. 8 (9th Cir. 2015) (stating that "generally, [RPs] are not mandatory").

16          BiOps, on the other hand, *are* binding and enforceable.  In *Bennett v. Spear*, 117

17   U.S. 1154 (1997), the Supreme Court discussed the essential nature of BiOps, and held

18   that "in reality [BiOps have] a coercive effect on the action agency":

19          A Biological Opinion . . . alters the legal regime to which the action agency
        is subject . . . . [A] Biological Opinion's Incidental Take Statement
20      constitutes a permit authorizing the action agency to "take" the endangered
        or threatened species so long as it respects the [FWS's] "terms and
21      conditions."  The action agency is technically free to disregard the
        Biological Opinion and proceed with its proposed action, but it does so at
22      its own peril.

23   *Id.* at 1164-65.  For this reason, the Supreme Court holds that BiOps have a "virtually

24   determinative effect" on agency action.  *Id.* at 1165 *see also San Luis & Delta-Mendoza*

25   *Water Authority v. Salazar*, 638 F.3d 1163, 1170 (9th Cir. 2011) (recognizing that BiOps

26   have "a powerful coercive or determinative effect" on agency action), *Wild Fish*

27   *Conservancy*, 628 F.3d at 530 (holding that an action agency is "required to comply"

28   with the provisions of a BiOp's Incidental Take Statement).

1    It is clear that the FWS understands the critically important role that its BiOps play

2  in assuring the conservation and recovery of the MSO through "coerced" implementation

3  of the RPs' recommendations.  The FWS made this connection between the RP and its

4  BiOps clear in the 2012 Revised RP for the MSO:

5     Maintaining and restoring forest health to reduce the threat of stand-
       replacing Wildlands fire, while creating a mosaic of suitable Mexican
6      spotted owl habitats and protecting existing populations, *will be achieved by
       land use management, facilitated by Section 7 consultations and
7      agreements.*

8  AR-FS 9623 (emphasis added).  It is clear that the FWS's guiding assumption in

9  preparing the MSO RPs is that the *recommendations* set out therein would be converted

10  into mandatory and enforceable *requirements* as they were incorporated into BiOps.  The

11  FWS failed to take this crucial step to connect its RPs to the 2012 BiOps, thereby

12  relieving the USFS of population monitoring obligations.  *WEG 2019* at * 11 (finding that

13  the 2012 BiOps  give the agencies a "pass").  As this Court correctly found, the FWS *did*

14  *not* include any requirement for long-term range-wide population monitoring in the 2012

15  BiOps, *WEG 2019* at *5, *12, despite the FWS's determination that "it is critically

16  important to monitor owl populations and habitat to determine whether both are stable or

17  improving."  AR-FWS R450 *see also id.* at R546 ("[w]ithout careful and rigorous

18  application of monitoring, there would be no objective basis for delisting the owl").

19     **B.    Different types of monitoring serve different purposes**

20     For purposes of ths motion, it is important to distinguish between three different

21  types of monitoring, each of which serves a separate objective.  First, and most

22  importantly for purposes of this case, there is "population monitoring."  This type of

23  monitoring – which can be pursued through demographic studies (as contemplated by the

24  1995 RP and the 1996 BiOp) or through a streamlined approach called "occupancy

25  monitoring" (as contemplated by the Revised RP and the 2005 BiOp) – is utilized to

26  determine long-term range-wide populations trends of MSO.  Population monitoring "is

27  conducted at a large enough scale (typically range-wide) to provide information regarding

28  population trend (i.e., is the species increasing, decreasing, or stable)."  AR-FWS 7578.

1    Second, there are "owl surveys" which "can provide information regarding the presence

2    of absence of MSOs in a specific area . . . but *do[] not* provide population level indicators

3    of the species' general population trend." *Id.* (emphasis added).  Third, and finally, there

4    is "implementation monitoring" which is project-related site-specific monitoring that

5    includes information "such as when or if a project is implemented, whether the project

6    was implemented as analyzed in the site-specific BiOp . . ., breeding season(s) over

7    which the project occurred, relevant MSO survey information, and any other pertinent

8    information about the project's effects on the species." AR-FWS 7601.  As with owl

9    surveys," "implementation monitoring" does not provide information as to long-term

10   range-wide population trends of the MSO or the status of the species.

11        To be absolutely clear on this point, the FWS stresses that population trend data

12   *cannot* be acquired through "implementation monitoring."  The 2012 BiOps admit that

13   "implementation monitoring" can provide information regarding "the incidental take

14   associated with [a] site-specific action," but *not* the information necessary "to assess the

15   status of the MSO."  AR-FWS 7601 *see also WEG 2019* at *11 (finding that

16   implementation monitoring "does not provide adequate information to guide a jeopardy

17   analysis about recovery").

18        **C.    Evolution of BiOps, and excision of the monitoring requirement in 2012**

19        The FWS has issued three programmatic BiOps to assess the impacts of USFS

20   forest treatments on the MSO: the 1996 BiOp, AR-FS 697, the 2005 BiOp, AR-FS 2150,

21   and the 2012 BiOps at issue in this case.  The 1996 BiOp was prepared pursuant to an

22   order of Judge Muecke of this district.  *Silver v. Thomas*, 924 F.Supp. 976, 984-85

23   (D.Ariz. 1995). That BiOp – like all other analyses of the MSO prepared since that time –

24   conceded (1) that the available data made it impossible to make a "reliable estimate" of

25   the MSO's population and (2) that "[h]istorical data about distribution of the owls lacks

26   sufficiency to allow the Mexican Spotted Owl Recovery Team to estimate changes in the

27   number or distribution of the species from historical to present time."  AR-FS 705.

28   Nonetheless, based on the AM program set out in the 1995 RP and incorporated into the

1   relevant Forest Plans by the 1996 Standards and Guidelines, the FWS reached a no

2   jeopardy conclusion in the 1996 BiOp.  Significantly, that no jeopardy conclusion was

3   made expressly conditional on a mandatory requirement for implementation of the long-

4   term range-wide population monitoring described in the 1995 RP[3]:

5   > Population monitoring is required to determine that the anticipated
   > incidental take, along with the other consequences of implementation of the
6   > proposed action, is not causing a detectable decline in the population of the
   > owl.
7
   > Population monitoring will follow the design in the proposed action and
8   > beginning on page 107 of the Recovery Plan [AR-FS 157].

9   > The Forest Service will initiate the pilot study for the population monitoring
   > program within one year of the date of this biological opinion, and make
10  > timely progress thereafter towards full implementation.

11  AR-FS 730.

12       The FWS's 2005 BiOp also resulted in a no jeopardy conclusion for the MSO.

13  Just like the 1996 BiOp that it replaced, the 2005 BiOp's no jeopardy conclusion was

14  conditioned on these mandatory and enforceable long-term range-wide population

15  monitoring requirements that were incorporated into the Incidental Take Statement:

16  > Monitor Mexican Spotted Owl occupancy on National Forest System lands,
   > pursuant to the most current approved Mexican Spotted Owl Recovery
17  > Plan.

18  > . . . .

19  > [M]onitor Mexican Spotted Owl PAC occupancy pursuant to the most
   > recent version of an approved Recovery Plan for this species.  This
20  > monitoring scheme will assess the changes in owl site occupancy rates so
   > that management actions can be adjusted if changes in owl population
21  > occur.

22  AR-FS 2341-42.

23       In stark contrast to the 1996 and 2005 BiOps, the 2012 BiOps entirely dispensed

24  with the requirement for long-term range-wide population monitoring.  The population

25

26       [3]       This requirement was imposed as part of the BiOps' Incidental Take
   Statement.  As discussed above, the Supreme Court's decision in *Bennett* and that
27  decision's progeny hold that such provisions have "determinative effect" and are
   mandatory and enforceable.
28

1   monitoring requirements of the 1996 and 2005 BiOps – which had been incorporated into

2   the previous BiOps' Incidental Take Statements – were replaced in the 2012 BiOps by an

3   entirely dissimilar "implementation monitoring" requirement that will provide no

4   information on MSO population trends or the species' status.  AR-FWS 7600-01.

5          The excision of the long-term range-wide population monitoring requirement from

6   the 2012 BiOps appears to have been the result of political pressure from USFS

7   "executives," and was contrary to the advice and recommendations of FWS biologists

8   working on the BiOps.  By the time that the 2012 BiOps were being prepared, the FWS

9   had already developed a new approach to the long-term range-wide population

10  monitoring conundrum.  The Draft Revised RP endorsed a streamlined approach to this

11  crucial monitoring task which required long-term monitoring of a randomly selected

12  subset of MSO Protected Activity Centers ("PACs") across the species' range, instead of

13  monitoring *all* PACs.  AR-FWS R568-71.

14         The USFS balked at the FWS's plan to incorporate a requirement for this

15  streamlined population monitoring into the BiOps as a condition to a no jeopardy

16  opinion.  A draft of the 2012 BiOps contained a paragraph in which the FWS states that

17  the USFS had committed to participate in the population trend monitoring program:

18         As part of the proposed action, the USFS Region 3 has agreed to participate
       in the population occupancy monitoring pursuant to the procedures
19     provided by the Mexican Spotted Owl Recovery Team and outlined in the
       Draft Revised Recovery Plan . . . [T]he USFS has agreed to assist with
20     monitoring owl occupancy within a . . . framework pursuant to procedures
       provided by the Mexican Spotted Owl Recovery Team in order to evaluate
21     trends in the overall population.

22  AR-FWS 1639. This proposed language was reviewed by the USFS, where it triggered

23  the firmest possible rebuke. One USFS reviewer wrote: "At this time, Region 3 has not

24  agreed to participate in population occupancy monitoring." *Id.*  A second USFS reviewer

25  wrote: "The FS did not agree to this. The FS offered to initiate discussions regarding this

26  new approach in the revised Recovery Plan." *Id.* A third USFS reviewer was less

27  restrained than her colleagues in her categorical rejection of any notion that the USFS had

28  committed itself to participate in the implementation of a population monitoring program

1   – even the streamlined version developed to facilitate implementation:

2       ABSOLUTELY NOT. FS HAS NOT SUGGESTED THAT WE WANT TO
        INCLUDE THE MSO RECOVERY PLAN OCCUPANCY MONITORING
3       AS PART OF THE [FOREST PLAN] PROPOSED ACTION. *FS WANTS*
        *THIS MONITORING SEPARATED FROM THE ESA § 7 PROCESS OR*
4       *PLACE [sic] IN THE CONSERVATION RECOMMENDATIONS AT*
        *MOST.*
5

6   *Id.* (capital letters in original and emphasis added).[4]  Ultimately, as this Court found, the

7   FWS decided *not* to condition the 2012 BiOps on a long-term range-wide monitoring

8   requirement.  *WEG 2019* at *5 (finding that the BiOps "did not . . . specifically

9   incorporate" a population monitoring requirement), *12 (finding that a population

10  monitoring requirement is not incorporated into the BiOps).

11      The record is clear that the FWS biologists had serious misgivings regarding the

12  excision of the long-term range-wide population monitoring requirement, and resisted the

13  move as a violation of the ESA.  Notes of an August 18, 2010[5] meeting between the FWS

14  and the USFS show that the USFS argued that "monitoring should assess the effects of

15  the action as the result of the implementation of projects on the ground, *not involve*

16  *monitoring of species occupancy.*"  AR-FWS 4317 (emphasis added). Subsequent intra-

17  FWS e-mail correspondence of August 23 and 24, 2010 demonstrates the FWS's concern

18  with the USFS's intransigence.  AR-FWS 6713-16.  In that correspondence, the FWS

19  sought its solicitor's opinion as to the USFS's proposal to "say something quite different"

20  from the 1996 and 2005 BiOps insofar as MSO monitoring is concerned.  AR-FWS 6714.

21  To its solicitor, the FWS described the impasse with the USFS as follows:

22      [T]hey only want to monitor implementation of the proposed action.  In
        other words, they would be reporting back whether the project occurred and
23      if the take that we anticipated occurred.  *They would not be doing any*

24      ⁴       As opposed to the provisions of an Incidental Take Statement,
25  "conservation recommendations" incorporated into a BiOp are discretionary – *not*
26  mandatory and enforceable requirements.  50 C.F.R. § 402.02.

27      ⁵       These 2010 communications were convened when it became apparent that
28  the USFS was *not* complying with the population monitoring requirement of the 2005
    BiOp, and that the issuance of a superceding BiOp would be a legal necessity.

> *monitoring to determine what the effects of the project were to the species or [critical habitat]. According to the regs, we need to do both.*

AR-FWS 6715 (emphasis added). As of August 26, 2010, the FWS was still standing its ground on the necessity of a long-term range-wide population monitoring requirement. In a USFS "Briefing Paper" of that date, the USFS stated that "we have been notified by the FWS that their solicitor (Justin Tade) is advising that they **do not** amend the BiOp" by deleting the population monitoring requirement, and that "executive level discussions" would be needed to resolve the impasse. AR-FS 4319 (emphasis in original).

Ultimately, the USFS prevailed in this dispute – presumably as a result of the matter being taken out of the hands of the expert FWS biologists who had been working on this issue for years and being referred to the relevant "executives." The result: the first programmatic BiOp on national forest management that fails to include a long-term range-wide population monitoring requirement for MSO – which monitoring is the very heart of the AM approach for conservation and recovery of the MSO. *WEG 2019* at *9 *citing* AR-FS 6978 (finding that the 2012 BiOps "replace" the population monitoring required by the 1996 and 2005 BiOps and "limit[] monitoring to 'site-specific projects'").

### D.    The fatal "disconnect" between the Revised RP and the 2012 BiOps

AM is an iterative process requiring a flow of information feedback from robust monitoring in order to validate management assumptions and verify the appropriateness of forest treatments:

> The [FWS] has defined [AM] as a structured process for learning by doing and a method for examining alternative strategies for meeting measurable biological goals and objectives, and then, if necessary, adjusting future conservation management actions according to what is learned.

*Greater Yellowstone Coalition v. Servheen*, 665 F.3d 1015, 1029 n.5 (9th Cir. 2011) (internal quotations and citation omitted). In a 2012 paper entitled "Putting Science into Action on Forest Service Lands," Dr. William Block – who was the USFS's principal MSO biologist and the Leader of the MSO Recovery Team in 2012 – discussed how this approach is intended to work: the Federal Defendants' plan was to act in a "staged" or iterative fashion where the population effects of the recommended forest treatments

1    "would be assessed [through monitoring] to identify the next course of action."  AR-FS

2    9372.  "Depending on the outcome of these assessments, treatments could continue,

3    discontinue, or be adjusted."  *Id. see also WEG 2019* at * 4 (discussing the iterative

4    process of the MSO AM approach).

5           This Court recognizes that the MSO AM approach envisioned population

6    monitoring as one of the legs of a three-legged stool, and that the approach would fail in

7    the absence of that population monitoring.  *Id.*  There is no dispute about the fact that

8    long-term range-wide MSO population monitoring was required by the 1996 and 2005

9    BiOps.  Accurate information provided by rigorous monitoring is the *sine qua non* of

10   scientifically defensible AM. And there is no dispute that such monitoring had not

11   occurred – and that the USFS resolutely refused to commit to such monitoring – at the

12   time the FWS issued the 2012 BiOps.  Finally, there is no dispute that the 2012 BiOps are

13   a sharp departure from the 1996 BiOp and the 2005 BiOp, in that the 2012 BiOps contain

14   no requirement for long-term range-wide population monitoring.  The omission of this

15   monitoring requirement kicked out one of the legs of the conceptual three-legged stool of

16   the AM program, and condemned the program to certain failure.  *See* Exhibit 1 at ¶ 3-7

17   (wildlife population biologist Derek E. Lee states that the FWS cannot render "an

18   informed opinion" regarding jeopardy "[w]ithout robust population monitoring," and that

19   the absence of monitoring "is a fatal flaw to the AM program that precludes "informed

20   decisions as to [] impacts" of forest treatments).

21          The FWS offered no explanation whatsoever in the 2012 BiOps – not even a hint

22   of a suggestion – as to how the AM approach to MSO conservation and recovery can be

23   accomplished in the absence of the population monitoring which *all* parties (outside of

24   litigation) admit is crucial to the approach's success.  The absence of any rationale for

25   this crucial omission in the BiOps is dispositive.  The last paragraph of the BiOps' no

26   jeopardy conclusion makes the FWS's irrational action pellucidly clear.  It states:

27          Across the range of the MSO, the population monitoring described within
            the 1995 Recovery Plan was never implemented because it was not
28          economically or operationally feasible.  A revised population monitoring

procedure has been outlined in the Draft Recovery Plan which aims at assessing MSO population trends[6] . . . . *[S]ome level of range-wide MSO population monitoring is needed in order for us to assess the status of the MSO.*

AR-FWS 7597 (emphasis added).  Irrationally, the BiOps go on to relieve the USFS of all responsibility for population monitoring in the accompanying Incidental Take Statements – even after expressly acknowledging the necessity for that monitoring in the BiOps' no jeopardy conclusions.  There is no scientifically defensible way to justify the omission of the population monitoring requirement, and the omission of that requirement was a fatal blow to the AM program.  *See* Exhibit 1 at ¶¶ 4-6, 12-16 (without population monitoring "the FWS has absolutely no scientific basis" to support a no jeopardy BiOp).  The FWS's failure to establish any sort of rational connection between its decision to excise the population monitoring requirement from the 2012 BiOps and the BiOps' no jeopardy conclusions was arbitrary and capricious, and correctly led this Court to hold that the BiOps are invalid for this reason.

In light of the "institutionalized caution" required by the ESA, courts and commentators acknowledge "the extent to which overly flexible adaptive management schemes do not fit neatly within the ESA's existing regulatory structure."  *Natural Resources Defense Council ("NRDC") v. Kempthorne*, 506 F.Supp.2d 322, 352-53 (E.D. Cal. 2007) *see also Greater Yellowstone Coalition*, 665 F.3d at 1028 n. 5 (stating that "while adaptive management has become the dominant agency response to scientific uncertainty, it can be difficult to evaluate against the substantive requirements of environmental laws such as the ESA").  In "Adaptive Management to Protect Biodiversity: Best Available Science and the Endangered Species Act," O. Odom Green at al. (U.S. Environmental Protection Agency Papers 2012), the authors state that "[t]he legal criticisms of [AM] have centered on agencies using the term [AM] *as a means to*

---

[6]     That revised monitoring procedure is based "on monitoring occupancy rates as an index of population size," and was proposed as a feasible and cost-saving approach for MSO population monitoring. AR-FWS R782-83.

1   *allow for informal management or to shirk management responsibility altogether*."

2 Another commentator notes that "[AM] *can be used as a smokescreen to conceal political*

3 *accommodations that sacrifice the protection of species or natural systems*."  H.

4 Doremus, "Adaptive Management, the Endangered Species Act, and the Institutional

5 Challenges of New Age Environmental Protection," 41 Washburn L.J. (2001).

6 Unfortunately, the 2012 BiOps make clear that, in the case of the MSO, AM is serving

7 just these nefarious purposes.

8       Despite the uneasy fit between an adaptive management approach and the

9 "institutionalized caution" required by the ESA, it is true that "[AM] can be beneficial

10 and that flexibility is a necessary incident of [AM]."  *NRDC*, 506 F.Supp.2d at 356.

11 However, the ESA imposes limits on that flexibility, and – as this Court correctly held –

12 those limits were passed in this case where the USFS took full advantage of all the

13 benefits offered by AM (through the implementation of forest treatments with unknown

14 impacts) but steadfastly refused to shoulder the concomitant burden to monitor the impact

15 of those treatments on the species' range-wide population trend.  The 2012 BiOps were,

16 at their core, "structurally flawed" by the FWS's failure to account for this simple reality

17 in the their jeopardy analysis.  *Turtle Island*, 878 F.3d at 739.  The federal government's

18 carping about three words in this Court's decision – "route to recovery" – is a tempest in

19 a teapot: because the FWS failed in the 2012 BiOps to offer any sort of explanation as to

20 how it can accomplish AM in the absence of crucial population monitoring, there is

21 simply no rational basis for the 2012 BiOps' no jeopardy conclusions.  *See* Exhibit 1 at ¶¶

22 3, 7, 9.  This Court correctly ruled for Guardians on this issue.

23       **E.**     **Red herrings and recycled arguments do not save the Defendants' case**

24       The Federal Defendants argue that they have implemented the streamlined

25 population monitoring plan described in the Revised RP for six years and "anticipate"

26 conducting further monitoring.  Motion at 9.  This statement is irrelevant and has no legal

27 weight.  First, this Court correctly held that "future measures" must be incorporated into a

28 BiOp as *requirements* "to support a 'no jeopardy' decision."  *WEG 2019* at *12 *citing*

1    *Center for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1154 (D.Ariz. 2002)

2    *see also National Wildlife Federation*, 524 F.3d at 935-36 (holding no jeopardy

3    conclusions must be premised on "specific and binding plans" and a "definite

4    commitment of resources").  Second, the USFS has *still* not committed to implementation

5    of the long-term range-wide population monitoring program specified in the Revised RP.

6    It funds the monitoring on an annual basis, and has not committed resources to funding

7    that monitoring over the long-term.  *See* Exhibit 2.

8         The Federal Defendants also argue that the results of long-term range-wide

9    population data cannot be used to establish a population trend without ten years of data.

10   Motion at 2, 9.  This is simply incorrect.  Only three data points are necessary to establish

11   a trend.  *See* Exhibit 1 at ¶ 20.  Indeed, even the contractor currently performing the

12   streamlined MSO population monitoring began reporting a trend in the range-wide MSO

13   population after having acquired three years of data.  *See* Exhibit 3.  The contractor's

14   latest report is attached to the Federal Defendants' motion, and reports a current

15   downward trend in the range-wide MSO population.  *See* ECF Doc. 104-2 at 52 of 87.  It

16   is true that the RP's "recovery criteria" do not permit delisting until after ten years of data

17   are acquired, but this is a different issue entirely: as explained above, the MSO AM

18   approach contemplates the acquisition of population trend data on an on-going basis in

19   order to validate assumptions about the impacts of forest treatment actions.[7]

20        The Federal Defendants also contend – without any cite to the record in this case –

21   that the Forest Plans which are the subject of the 2012 BiOps are "largely beneficial" for

22

23

24        [7]     The Federal Defendants' argument that this Court's decision means that "all
     USFS projects affecting the owl should be enjoined until 2023" (which is the earliest that

25   the MSO can be delisted *if* the recovery criteria are met) is patently absurd and a gross
     misinterpretation of this Court's order.  Motion at 9, 14.  The only reason that the Court

26   entered *any* injunction in this case is because the 2012 BiOps failed to establish a rational
     connection between the omission of the population monitoring requirement and the

27   BiOps' no jeopardy conclusion.  When that flaw is corrected, and the FWS issues BiOps

28   that comply with the ESA in all respects, the injunction will presumably dissolve.

the MSO.  Motion at 4.  This egregious assertion is inconsistent with the evidence in the

record which acknowledges that – at the time that the 2012 BiOps issued – the FWS and

the USFS had failed to conduct any analyses at all to determine the *actual* impacts of

forest treatments in MSO habitat.  The Revised RP is clear on this point:

> Empirical data on the effects of thinning and other mechanical forest treatments on [MSO] are nonexistent.  This is unfortunate, because thinning and other mechanical forest treatments are emphasized heavily in plans for landscape-restoration of southwestern forests, and these activities could affect large areas of [MSO] habitat. Consequently, understanding how these treatments affect [MSOs] is one of the major questions faced in integrating recovering this owl with plans for restoring southwestern forests. Although this has been clearly noted for years, no studies on this topic have been funded to date.

> As noted earlier, empirical data on effects of forest treatments on spotted owls are sparse and difficult to interpret.  Although all of the studies discussed above individually present limits to interpretation, collectively they suggest that at least some kinds of mechanical forest treatments may negatively impact spotted owls. No clear guidance emerges from these studies relative to types, extents, or spatial arrangement of treatment that might minimize impacts to owls. Such information is badly needed if management is to proceed in owl habitat. Some treatments may have beneficial or neutral effects, but we do not know which types and intensities of treatments may be beneficial, neutral, or harmful.

AR-FS at 9759, 9761 *see also* Exhibit 1 at ¶¶ 21-22.  To be clear, Guardians is *not*

arguing in this case that all forest treatments are presumptively bad for the MSO, and

Guardians concedes that some treatments may be beneficial.  However, the evidence in

the record simply fails to support the Federal Defendants' astonishingly reckless assertion

regarding the effects of the Forest Plans.  *See Wild Fish Conservancy*, 628 F.3d at 528

(holding that a valid jeopardy analysis of an action's impact on listed requires a balancing

of both its positive and negative effects).

## III.    An injunction is necessary to prevent irreparable harm

The Ninth Circuit's decision in *Cottonwood Environmental Law Center v. U.S.

Forest Service*, 789 F.3d 1075 (9th Cir. 2015), sets out the standard for injunctive relief in

an ESA case.  "[W]hen evaluating a request for injunctive relief to remedy an ESA

procedural violation, the equities and public interest factors *always* tip in favor of the

protected species."[8] *Id.* at 1091 (emphasis added).  A plaintiff must still "show irreparable injury to justify injunctive relief," but this is not a heavy burden.  *Id.*  The Ninth Circuit instructs that "[i]n light of the stated purposes of the ESA in conserving endangered and threatened species and ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs."  *Id.*

The only actions that remain enjoined by this Court's Order are actions in MSO habitat.  Guardians respectfully submits that all such actions should remain enjoined pending issuance of BiOps that comply with the ESA in all respects.  As Guardians discusses above, the Revised RP leaves no doubt about the fact that the federal government's failure to study the effects of forest treatments on MSO populations has created a situation in which there is no "[e]mpirical data on the effects of thinning and other mechanical forest treatments on [MSO]."  AR-FS 9759.  The Revised RP admits "that at least some kinds of mechanical forest treatments may negatively impact spotted owls," but that "we do not know which types and intensities of treatments may be beneficial, neutral, or harmful."  AR-FS 9761.  The Revised RP expressly states long-term range-wide population monitoring (identified as "Recovery Action 7") is a "Priority 2 action," meaning that it is "necessary to prevent extinction or a significant decline in population."  AR-FS 9632, 9636, 9644.  According to Dr. Lee, the failure of the Federal Defendants to implement AM's crucial population monitoring is especially alarming "[b]ecause a small population has an inherently high probability of extinction," and by the time that the USFS learns the *actual* effects of its forest treatments "it may be too late to assure the continued survival and recovery of the MSO."  Exhibit 1 at ¶ 10, 17, 25.

The Federal Defendants have had twenty-three years to validate their assumption

---

[8]       Despite this admonition, the Federal Defendants make irrelevant and unsubstantiated equities arguments in their Rule 59 motion, citing to declarations of USFS and FWS biologists who are in no way qualified to offer an opinion on the injunction's economic impact.  Furthermore, the equities are *not* one-sided as discussed in an editorial published in the Santa Fe New Mexican, *see* Exhibit 4, but Guardians will not further discuss this issue in light of its legal irrelevance.

1    that the forest treatments authorized by the Forest Plans do not have a *net* negative impact

2    on the MSO, but they have chosen not to fund any studies to accomplish this critical task.

3    AR-FS 9759.  The Revised RP acknowledges that the USFS's forest treatments in MSO

4    habitat have some – as yet unquantified – degree of "negative[] impact [on] spotted

5    owls," but the government has not troubled itself to undertake a full, comprehensive, and

6    scientifically defensible analysis to assess the quantum of that impact.  They have had

7    that same amount of time to develop and commit to a feasible population monitoring

8    program, and similarly failed to perform that task.  Their reckless approach to the

9    conservation and recovery of the MSO constitutes irreparable injury to Guardians'

10    interests in the survival and recovery of the MSO, and clearly passes the threshold for

11    injunctive relief set out by the Ninth Circuit in its *Cottonwood* decision.

12    **IV.    Conclusion**

13        With respect to the issue *sub judice*, this Court's September 12, 2019 decision was

14    compelled by the requirements of the ESA and Guardians respectfully submits that it

15    should not be altered on the merits.  Insofar as injunctive relief is concerned, Guardians

16    respectfully submits that all treatments in PACs and MSO Recovery Habitat[9] should

17    remain enjoined pending issuance of BiOps that comply with the ESA – subject to the

18    exceptions previously made by this Court.  The Revised RP makes it clear that the

19    survival and recovery of the MSO depend on the identification and careful management

20    of PACs and Recovery Habitat across the MSO's range, and classifies such identification

21    and management as a Priority 2 action "necessary to prevent extinction or a significant

22    decline in population."  AR-FS 9629-30, 9636, 9638-39.

23

24        [9]    Recovery Habitat "occurs in forest types and in rocky canyons used by owls

25    for roosting, foraging, dispersal, and other life history needs, but outside of PACs.
      Recovery Habitat is intended to: 1) provide protection for areas that may be used by owls;

26    2) foster creation of roost/nest habitat; 3) simultaneously provide managers with greater
      management flexibility than is allowed in PACs; and, 4) facilitate development and

27    testing of management strategies that could be applied in PACs."  AR-FS 9812 *see also*

28    AR-FS 9834 (depicting the extent of PAC and Recovery Habitat in an example situation).

1 | Dated:          October 28, 2019.

2

3 |                              Respectfully submitted,

4 |                                   /s/   Steven Sugarman
   |                              Steven Sugarman
5 |                              347 County Road 55A
   |                              Cerrillos, New Mexico 87010
6 |                              (505) 672-5082
   |                              stevensugarman@hotmail.com
7

8

9 |                    **CERTIFICATE OF SERVICE**

10

11 |       I hereby certify that a true and correct copy of this Plaintiff's Opposition to
    | Federal Defendants' Rule 59 Motion was served on counsel of record on October 28,
12 | 2019 through the Court's electronic CM-ECF system.

13 |                              /s/ Steven Sugarman
    |                              Steven Sugarman
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28