Steven Sugarman
New Mexico Bar No. 5717
appearing *pro hac vice*
347 County Road 55A
Cerrillos, New Mexico 87010
(505) 672-5082
stevensugarman@hotmail.com

Attorney for WildEarth Guardians

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

TUCSON DIVISION

| | |
|---|---|
| WILDEARTH GUARDIANS,<br><br>　　Plaintiff,<br><br>vs.<br><br>UNITED STATES FISH AND WILDLIFE SERVICE and UNITED STATES FOREST SERVICE,<br><br>　　Defendants. | No. 13-151-RCC<br><br>**PLAINTIFF'S OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISSOLVE INJUNCTION**<br>**[ECF DOC NO. 112]** |

## I. Introduction

Lamentably, there appears to be no bottom to the lack of accountability and the shirking of responsibility that led this Court to issue its September 12, 2019 decision and injunction in this matter. *WildEarth Guardians v. U.S. Fish and Wildlife Service* ("*WEG 2019*"), 2019 WL 4345333 at *11 (D.Ariz. 2019). As things stand now – with a remand order directing reassessment of jeopardy and recovery and an associated injunction in place against certain forest treatments – this Court is all that stands between continuation of the Federal Defendants' haphazard implementation of an adaptive management approach to Mexican spotted owl ("MSO") conservation and recovery on one hand, and the *actual* conservation and recovery of the species on the other hand.

In its September 12, 2019 decision, this Court provided the following crystal clear instructions to the Federal Defendants:

> The USFS and FWS must reinitiate a formal Section 7(a)(2) consultation and formulate superceding BiOps that conform with the terms of this Order.
>
> The consultation must reassess the jeopardy analysis and the effect of Forest Plans on the recovery of the MSO.

*WEG 2019* at *21. In their pending Motion to Dissolve the Injunction pursuant to Federal Rule of Civil Procedure 60, the Federal Defendants ("FDs") brazenly assert that the superceding Biological Opinion ("BiOp") for the Cibola National Forest ("NF") that they produced in a "lightening" Section 7 consultation "fully complie[s] with this Court's order [of September 12, 2019]." ECF Doc. No. 112 at 1.

As Plaintiff WildEarth Guardians ("WEG") explains below, nothing could be further from the truth. The no jeopardy conclusion of the superceding BiOp for the Cibola NF – which is clearly intended as a "test balloon" to probe the willingness of the Court to dissolve the injunction on the basis of meaningless and superficial conclusory assertions as to conservation and recovery – is premised on (1) an unenforceable statement of intention with respect to future long-term range-wide population monitoring, (2) unsubstantiated and misleading representations as to the FDs' *actual* survey and habitat mapping and management practices, (3) a breathtaking *sub rosa* repudiation of the

underpinnings of the adaptive management approach to MSO conservation and recovery, and (4) a defiant reassertion of arguments previously rejected by this Court.

In short, the superceding BiOp *does not* fully comply with this Court's September 12, 2019 remand instructions because it does not reassess the jeopardy and recovery analysis of the 2012 BiOps in a rational manner that passes muster under the arbitrary and capricious standard of review, and it is based on speculation and surmise rather than evidence in the record. "The institutionalized caution mandated by section 7 of the ESA requires" that an agency to refrain from taking any action "until it *insures*" that the action will not jeopardize a species. *Sierra Club v. Marsh*, 816 F.2d 1376, 1388 (9th Cir. 1987) (emphasis added), 16 U.S.C. § 1536(a)(2). That high bar has not been cleared here. WEG respectfully submits that the Motion to Dissolve must be denied.

## II. Legal standards applicable to the Federal Defendants' Motion to Dissolve

"An injunction issued by a court acting within its jurisdiction must be obeyed until the injunction is vacated or withdrawn." *W.R. Grace & Co. v. Local Union 759, International Union of United Rubber*, 461 U.S. 757, 766 (1983). "A party seeking modification or dissolution of an injunction bears the burden of establishing that a significant change in facts or law warrants revision or dissolution of the injunction." *Sharp v. Weston*, 233 F.3d 1166, 1170 (9th Cir. 2000). Rule 60 relief is improperly granted to an enjoined party that merely revisits and relies upon arguments already raised and dismissed, as the Federal Defendants do here. *Van Skiver v. United States*, 952 F.2d 1241, 1244 (10th Cir. 1991). Indeed, in essence the FDs' Motion to Dissolve is nothing more than a *third* attempt – after the merits stage and the Rule 59 proceedings – to convince this Court to accept arguments that the Court has already rejected.

The pending Motion to Dissolve requires this Court to determine whether the FDs' reassessment of the jeopardy and recovery analysis of the 2012 BiOp satisfies the arbitrary and capricious standard of review set by the Administrative Procedure Act ("APA"). 5 U.S.C. § 706(a)(2). This Court must inquire whether the FDs "considered the relevant factors and articulated a rational connection between the facts found and the

WildEarth Guardians v. USFWS, et al.  
Civil No. 13-151-RCC

Plaintiff's Opposition to Motion to Dissolve  
Page 2

1     choice made." *Natural Resources Defense Council v. Dept. of the Interior*, 113 F.3d

2     1121, 1124 (9th Cir. 1997). The Court is required to undertake a "thorough, probing, in-

3     depth review" of that administrative record to determine whether the remand decision is

4     the product of rational decision-making. *Native Ecosystems Council v. U.S. Forest*

5     *Serv*ice, 418 F.3d 953, 960 (9th Cir. 2005). The Court should not defer to conclusions that

6     are unsupported by the evidence or that run counter to the evidence before it. *Western*

7     *Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 493 (9th Cir. 2010). This Court must

8     not merely "rubber-stamp" the new analysis. *Ocean Advocates v. U.S. Army Corps of*

9     *Engineers*, 402 F.3d 846, 859 (9th Cir. 2005).

10          With specific reference to these Rule 60 proceedings, the Court should "not lift its

11    injunction without first finding that [the FDs' reassessment] passes muster under the

12    relevant environmental statutes," and should "direct the submission of a new

13    Administrative Record" that facilitates the court's review of that issue. *Colorado*

14    *Environmental Coalition v. Office of Legacy Mining*, 2016 WL 11548224 at *1 (D.Colo

15    2016). "Equity would not be achieved if the Court decided simply to rubber-stamp [the

16    FDs'] unsupported self-assessment of its compliance with a court order." *National Law*

17    *Center on Homelessness & Poverty v. United States Veterans Administration*, 842

18    F.Supp.2d 127, 131 (D.D.C. 2012) *see also Swan View Coalition. v. Barbouletos*, 2010

19    WL 11530904 at *1, 3, 5 (D. Mont. 2010) ("the completion of the new biological opinion

20    does not automatically lift the injunction"). If the FDs' reassessment does not correct the

21    legal deficiencies that led the Court to impose the injunction, the Court should leave the

22    injunction in place. *See for example Public Service Co. of Colorado v. Batt*, 67 F.3d 234,

23    237 (9th Cir. 1995) (rejecting the notion that an injunction automatically dissolves upon

24    issuance of a superceding environmental document since such a practice "would leave the

25    injunction . . . toothless"), *Colorado Environmental Coalition v. Office of Legacy Mining*,

26    2018 WL 684761 at *1, 19 (D. Colo. 2016). The FDs' bald and unsupported assertion

27    that it has "fully complied" with the Court's remand instructions is not a sufficient basis

28    for dissolving the associated injunction.

A corollary of the foregoing standards and principles is the bedrock rule that a movant must make arguments – with points and authorities – that entitle the movant to the relief that it seeks. Conclusory assertions of ultimate facts and law – or of entitlement to relief – are not sufficient. This rule is reified in Local Rule 7.2(b) of the District of Arizona: "the moving party shall serve and file with the motion's papers a memorandum setting forth the points and authorities relied upon in support of the motion." Failure to support a motion with a memorandum that complies with this requirement "in all substantial respects . . . may be deemed a consent to the denial . . . of the motion and the Court may dispose of the motion summarily." Local Rule 7.2(i).

This common-sense principle – that a movant must provide argument to the Court as to why the requested relief is appropriate and should be granted – has deep roots in case law. Indeed, earlier this year, this Court refused to "formulate" arguments for a movant or to search the record for tidbits that might tend to support the movant's position. *Bramlett v. Ryan*, 2019 WL 2744837 at *1 (D. Ariz. 2019). As this Court aptly held in that case, "[j]udges are not like pigs, hunting for truffles buried in briefs." *Id.* (citation omitted) *see also U-Haul Co. of Nevada v. Kamer*, 2013 WL 4505800 at *2 (D. Nev. 2013) ("the Court reminds the parties that the burden of representation lies upon them, and not upon the Court"), *AGA Shareholders v. CSK Auto, Inc.*, 2009 WL 113569 at *2 (D. Ariz. 2009) (in a summary judgment context, holding that a court "has no obligation to scour the record in search of a genuine issue of triable fact").

### III. The Federal Defendant's Motion to Dissolve is nothing more than a conclusory assertion that this Court must reject

The FDs' Motion to Dissolve consists of four paragraphs. The first paragraph is an introduction. The second paragraph sets out the standard of review. The third paragraph is the "argument." And the fourth paragraph is the conclusion. The heart of the brief – the so-called "argument" contained in the third paragraph – is nothing other than the FDs' conclusory assertion that "[t]he circumstances that originally necessitated injunctive relief are no longer present," that "Defendants have fully complied with the

terms of the Court's [September 12, 2019] order," and that "[t]he injunction is no longer warranted and should be dissolved." ECF Doc. No. 112 at 2-3. However, the Motion to Dissolve does not discuss the substance of the superceding BiOp, does not discuss how the superceding BiOp for the Cibola NF differs from the 2012 BiOp at issue in this case in any way that is relevant to the judge's remand instructions, and certainly does not even endeavor to explain – in any way, shape, or form – how the superceding BiOp "fully complies" with this Court's instructions, or insures against jeopardy and the diminution of recovery prospects for the MSO.

Apparently, the FDs expect that this Court – upon its review of the superceding BiOp – will "formulate" the arguments that they might have made themselves in support of the Motion to Dissolve, if indeed any such valid arguments exist. WEG respectfully submits that this Court, in line with the governing Local Rules of the District of Arizona and in line with the unanimous case law on this issue, should refuse to act as the FDs' counsel by hypothesizing as to what arguments the FDs might have made if they had discharged their obligation to make their arguments themselves. This is not the way that litigation works, and this approach is simply inconsistent with well-settled requirements of motion practice. In the first instance, the FDs – who bear the burden of proof on their Motion to Dissolve – must make their arguments with respect to their compliance with this Court's remand instructions, and WEG should be given an opportunity to respond to those arguments. Instead, the FDs apparently expect that both the Court and WEG will act as the proverbial "pigs" who will snuffle through the record in this case in search of some truffely morsel that might tend to support their conclusory assertion as to "full compliance." This Court should decline this invitation, and should hold the FDs to their burden.

And even if this Court were inclined to take on the role of FDs' counsel in this case, there is simply not an adequate basis upon which this Court could conceivably discharge its obligation to give the record the "thorough, probing, in-depth review" that is required by the relevant standard of review. Indeed, there is no record at all. The

superceding BiOp itself sets out the following "consultation history":

- September 12, 2019: In response to litigation (i.e., court order 4:13-cv-00151-RCC), the [Fish and Wildlife] Service began to re-analyze the effects of the proposed action and our analysis of the proposed actions' effect on owl recovery to address the Court's findings.

- October 20, 2019: We [the Fish and Wildlife Service] received the updated BA from the Forest Service.

- October 28, 2019: We [the Fish and Wildlife Service] sent a draft BO to the Forest Service for your [the Forest Service's] review.

- October 29, 2019: We received your [the Forest Service's] comments on the draft BO and incorporated comments.

ECF Doc. No. 112-1 at 2. While the superceding BiOp references various analyses and communications which supposedly took place in connection with its development, not a single shred of that material has been compiled into an administrative record for the review of the Court and WEG. Even the Forest Service's October 20, 2019 Biological Assessment – which is the foundational document that sets the stage for the U.S. Fish and Wildlife Service ("FWS") in the preparation of a superceding BiOp pursuant to ESA Section 7(a)(2), and which describes the action that is the subject of the Section 7(a)(2) consultation – has not been produced to the Court.

In the complete absence of (1) any effort by the FDs to articulate even a single argument in support of their assertion that they have fully complied with this Court's remand instructions and (2) any administrative record that would provide the Court with an opportunity to review the FDs' assertion as to that full compliance, the Motion to Dissolve must be denied. WEG respectfully submits that any other result would be nothing more than a "rubber-stamp [on] an enjoined party's unsupported self-assessment of its compliance with a court order." *National Law Center*, 842 F.Supp.2d at 131.

**IV. The superceding BiOp does *not* demonstrate full compliance with this Court's remand instructions**

Based on its review of the superceding BiOp, WEG has endeavored to discern what the FDs might have argued in support of their Motion to Dissolve – if they had many any arguments at all. It appears that FDs would likely attempt to carry their burden

WildEarth Guardians v. USFWS, et al.  
Civil No. 13-151-RCC

Plaintiff's Opposition to Motion to Dissolve  
Page 6

with a two-pronged approach. First, they would likely argue that they are insuring against jeopardy by conducting the long-term range-wide MSO population monitoring that was a condition of the 1996 and 2005 BiOps, but that was not required by the 2012 BiOps or the superceding BiOp. Second, they would likely argue that even if they were not conducting that monitoring, the omission would be immaterial since they are taking other measures to insure against jeopardy and the diminution of the MSO's prospects for recovery, and that these other measures support a rational no jeopardy conclusion. These hypothetical arguments would fail on both accounts.

### A. There is still no requirement for long-term range-wide population monitoring

In the superceding BiOp for the Cibola NF, the FDs attempt to straddle a line with respect to the core issue that led this Court to decide two of WEG's claims in its favor. On one hand, in the superceding BiOp the FWS lauds the U.S. Forest Service ("USFS") for conducting long-term range-wide population monitoring as an "encouraging conservation measure" "which will contribute to recovery of the species by allowing the Service to assess the status of MSOs on NFS lands and evaluate the effectiveness of the [2012 Revised] Recovery Plan management recommendations on those lands."[1] ECF Doc. No. 112-1 at 24. On the other hand, the FDs state that the FWS's omission of a mandatory requirement for the funding and implementation of such monitoring from the superceding BiOp for the Cibola National Forest is not material to its jeopardy and recovery analysis. *Id.*

These statements present two problems for the FDs, and they do support either a

---

[1] The superceding BiOp's characterization of the Cibola NF's population monitoring as a "conservation measure" is a serious misrepresentation. "Conservation measure" is a term of art under the ESA, and refers to component parts of a federal action that are "pledged in the project description," and "their implementation is required under the terms of the consultation." Exhibit 1, *Center for Biological Diversity v. U.S.B.L.M.*, 698 F.3d 1101, 1113-14 (9th Cir. 2012). As this Court know, the USFS strenuously refuses to make any "pledge" with respect to the funding and implementation of long-term range-wide MSO population monitoring.

WildEarth Guardians v. USFWS, et al.  
Civil No. 13-151-RCC  
Plaintiff's Opposition to Motion to Dissolve  
Page 7

rational no jeopardy conclusion or a determination that the FDs have reasonably reassessed their prior jeopardy analysis. First, it is *still* the case that the USFS has not affirmatively and definitely committed to long-term funding and implementation of the population monitoring program specified in the 2012 Revised Recovery Plan ("RP"). Instead, it funds the monitoring on an annual basis and could terminate funding and/or participation in the monitoring program at any time. ECF Doc. No. 112-1 at 22 (the superceding BiOp states that the USFS "intends to fund" the monitoring in the future, but does not require it), Exhibit 2 (counsel for the USFS acknowledges that there is no long-term funding commitment). This Court has already held that statements of intention like this are not sufficient to support a no jeopardy BiOp. *WEG 2019* at *12 *citing Center for Biological Diversity v. Rumsfeld*, 198 F.Supp.2d 1139, 1154 (D.Ariz. 2002) *see also National Wildlife Federation v. National Marine Fisheries Service*, 524 F.3d 917, 935-36 (9th Cir. 2008) (holding that no jeopardy conclusions must be premised on "specific and binding plans" and a "clear, definite commitment of resources," and further holding that even a "sincere general commitment" to take some future measure is an insufficient basis for a no jeopardy BiOp). Without a firm and definite requirement that the USFS fund and implement long-term range-wide MSO population monitoring as part of the adaptive management program for MSO conservation and recovery, there is no insurance against jeopardy.

Second, the FDs' position – insofar as it can be gleaned from the superceding BiOp and without actual argument – is that long-term range-wide MSO population monitoring is simply not essential to the implementation of the adaptive management program for MSO conservation and recovery that the FDs purport to implement. As WEG has previously demonstrated to the Court, and as this Court has previously held, this approach does not insure against jeopardy. Furthermore, this position reflects a marked departure from the FWS's position in the 1996 and 2005 BiOps which both required range-wide population trend monitoring as a condition of the no jeopardy conclusion. This significant change has not been adequately explained by the FDs. When

1  an agency changes a position on an issue, a "reasoned explanation for its action would
2  ordinarily demand that it display awareness that it is changing position." *F.C.C. v. Fox
3  Television Stations, Inc.*, 556 U.S. 502, 515 2009).  The FDs are not acting with this sort
4  of transparency and candor here.  To the contrary, at oral argument on their Rule 59
5  motion, counsel for the FDs represented to the Court – contrary to the record and prior
6  judicial decisions on the issue – that the 1996 and 2005 BiOps did *not* contain a
7  requirement for long-term range-wide population monitoring.  This is hardly the start of a
8  "reasoned explanation;" instead it is further obfuscation and lack of accountability.

      **B.**    **The Cibola NF's informal owl surveys do not stand in for long-term range-wide population monitoring**

In part, the superceding BiOp for the Cibola National Forest states that the FWS's no jeopardy conclusion is rational – despite the absence of a requirement for long-term range-wide population monitoring – because the USFS "conducts surveys for individual owls."  ECF Doc. NO. 112-1 at 23. This Court already addressed this issue in its September 12, 2019 decision, and held that MSO detections resulting from surveys cannot reasonably lead to any conclusions about jeopardy and recovery. *WEG 2019* at *11.  If the FDs nonetheless persist in making the argument that owl surveys correct the defect that led the Court to its September 12, 2019 decision, the argument would fail for two reasons.

First, and as WEG has previously explained to this Court, pre-project surveys for individual owls in discrete planning areas can – if the surveys are rigorously conducted pursuant to a detailed protocol developed by the FWS – detect resident MSOs in a project area.  However, such surveys do not provide any useful information that would help the FDs insure against jeopardy and the diminution of the MSO's recovery prospects.  In the 2012 BiOps, the FWS was clear on this point when it stated that MSO surveys "can provide information regarding the presence or absence of MSOs in a specific area (and is used to establish PACs, etc.), but does not provide population level indicators of the species general population trend."  AR-FWS at 7578.  The BiOps go on to acknowledge

that MSO survey data does not provide any useful information as to MSO "abundance," which is the key metric that must be monitored if the FDs are to succeed in their purported plan to insure MSO conservation and recovery through implementation of an adaptive management program. *Id.* (the FWS states that "an increase in abundance in the species range-wide cannot be inferred from these data") *see also* AR-FS 9855 (the FWS states the MSO survey does not capture MSO population trends).

Second, even if pre-project MSO surveys did provide information that is useful to the jeopardy and recovery analysis – which is *not* the case, as explained above – the survey data acquired by the Cibola National Forest is largely unscientific and unreliable. The FDs have failed to disclose to the Court the important limitations of their data. The 2012 Revised RP confronts head-on some of the difficulties in making successful detections during MSO surveys, and sets out a detailed "Survey Protocol" which "expresses the FWS' scientific opinion on adequate owl survey methods."[2] The Protocol provides specific guidelines on such issues as the number and spacing of "calling points" needed to assure full coverage of a survey area, the timing interval and seasonality of surveys, the number of visits that should be made to each "calling point," and so forth. AR-FS 9855-67. The most recent version of the Cibola NF Annual Monitoring and Evaluation Report makes it apparent that MSO surveys in the Cibola NF – to the extent they are are conducted at all – fall far short of these standards. Exhibit 3 (admitting that most MSO surveys on the Ciboa NF are "informal" and/or limited in geographic scope and coverage). The Cibola NF's owl surveys are not conducted to the level recommended

---

[2] To be clear, WEG is *not* suggesting that the FWS must incorporate into its BiOps a requirement that the USFS conduct MSO surveys according to Protocol. WEG's specific and limited point on this issue is that insofar as MSO surveys – and the data acquired thereby – are to serve any useful purpose at all, they must be conducted according to the Protocol. The results of less rigorous surveys are unreliable and cannot be counted on to detect the presence of all MSOs in the survey area. For this reason, the 2012 Revised RP – in every instance in which it discusses MSO surveys – specifically cautions that MSO surveys should be conducted to Protocol if and when they are used to guide management decisions. AR-FS 9629, 9816-17, 9829, 9842, 9848.

by the FWS Protocol, and cannot support a no jeopardy BiOp.

      **C.     PAC designation and protection does not cure the deficiency**

The FDs might argue that their designation and protection of 600 acres of nest/roost habitat around known MSO sites is an adequate substitute for implementation of the adaptive management program, and therefore supports a rational no jeopardy conclusion in the superceding BiOp and insures against diminution of the MSO's recovery prospects. ECF Doc. No. 112-1 at 23. This argument would fail.

First, the 2012 Revised RP plainly states that the protection of known MSO nest sites in PACs is not adequate to assure the survival and the recovery of the MSO for three reasons: (1) the home ranges of individual MSOs are "considerably larger" than 600 acres, (2) MSOs use areas outside of their usual home ranges during certain periods of their life cycle, and (3) recovery of the species will require the protection of non-PAC nesting/roosting habitat to support an increasing population. AR-FS 9820-21. It is simply not the case that jeopardy can be avoided and recovery prospects maintained by protecting PACs, in the absence of the designation and management of Recovery Habitat at a landscape scale.

Second, and as explained above, the MSO survey effort on the Cibola National Forest is largely "informal," ad hoc, and incomplete. It does not rise to the level of MSO surveys recommended by the 2012 Revised RP. This means that many MSOs on the Cibola NF are likely to evade detection during pre-project surveys, and are therefore susceptible to harassment and/or mortality because their existence and whereabouts are unknown at the time that the USFS implements forest treatments.

      **D.     Recovery Habitat has not been identified and managed on a landscape-level scale**

Another argument that the FDs would likely make in support of their Motion to Dissolve is that the no jeopardy conclusion of the superceding BiOp is rational because the USFS "identified and is managing for future Mexican spotted owl nest/roost habitat" on the Cibola NF. ECF Doc. No. 112-1 at 23. Again – as with the MSO survey data

justification – this Court has already specifically addressed this issue, and has found it wanting. In its September 12, 2019 decision, this Court addresses at length the FDs' contention that habitat management justifies the FWS's decision to excise a long-term range-wide MSO population monitoring requirement from BiOps associated with forest management in Arizona and New Mexico. This Court held that "habitat monitoring . . . is not an adequate measure of recovery," and that "the conclusion that simple habitat protection . . . will lead to recovery is not reasonable." *WEG 2019* at *11, 12.[3]

Furthermore, even if habitat management was a sufficient way in which to insure against jeopardy and the diminution of recovery prospects for the MSO – which is not the case, as this Court has previously held – the superceding BiOp for the Cibola National Forest omits a crucial fact. The 2012 Revised RP urgently recommends the identification and mapping of nest/roost Recovery Habitat so that the USFS can manage MSO habitat on a landscape scale. AR-FS 9629, 9821-22 (stating that "landscape modeling and analysis [of Recovery Habitat] are critical" and that "the landscape should be managed to sustain owl nesting/roosting habitat that is well-distributed spatially"). The intent of this guideline is "to maintain and develop nesting and roosting habitat now and into the future." AR-FS 9821. However, the USFS did not create landscape-level MSO Recovery Habitat maps until October 24. In response to an e-mail inquiry of September 16, 2019 from the undersigned to counsel for FDs, WEG learned of this crucial failure. Exhibit 4. To make sure that there was no misunderstanding as to the *non-existence* of the Recovery Habitat maps which are deemed crucial by the FWS, the undersigned sought confirmation

---

[3] In an effort to preempt further semantic sniping on the "route to recovery" issue upon which the FDs have been hanging their hat in post-merit proceedings, WEG points out here that Section 7(a)(2) of the ESA requires the FDs to "insure" against jeopardy, and that this requirement means that the FDs are prohibited by the ESA from taking any action that impairs a listed species' prospects for recovery. "An agency's failure to adequately consider recovery needs in its adverse modification or jeopardy analysis renders the agency's determination arbitrary and capricious." *Northwest Environmental Advocates v. U.S.E.P.A.*, 855 F.Supp.2d 1159, 12232 (D.Ore. 2012).

on October 7, 2019 as to the maps' status. Exhibit 5. Counsel for the USFS confirmed that the Recovery Habitat maps "are still in development and not available." *Id.*

The superceding BiOp's assertion that the no jeopardy conclusion is in part justified on the Cibola NF's on-going identification and management of MSO habitat is a blatant misrepresentation of fact. In actual reality, the USFS did not prepare *any* MSO Recovery Habitat maps (at least to the specifications recommended by the 2012 Revised RP) until October 24, 2019. On that date – and apparently because the FDs perceived a vulnerability in this litigation after the issue was raised by WEG, and *not* because of any regard for the MSO's conservation needs or the recommendations of the 2012 Revised RP – the USFS prepared a map entitled "Potential MSO Habitat Areas" for the Cibola National Forest. Exhibit 6. Such a belated and half-baked effort at mapping and managing crucial Recovery Habitat for the MSO on a landscape-level scale cannot reasonably support a no jeopardy conclusion.

### E. The superceding BiOp is tantamount to a repudiation of adaptive management and relies on untested assumptions as to impacts

As WEG has previously explained to the Court, any claims that the FDs make regarding the "net beneficial" effect of forest treatments on the population trend of MSOs and MSO habitat are sheer speculation and surmise, and cannot reasonably stand in for implementation of a rigorous and robust adaptive management program based on population monitoring. The superceding BiOp sets the stage for such an argument. ECF Doc. No. 112-1 at 27 (speculating and surmising as to the impacts of "restoration" treatments and asserting without any corroborating scientific evidence that such treatments will "protect[] and maintain[]" MSOs and their habitat). On this point, WEG again directs this court to the 2012 Revised RP:

> **Empirical data on the effects of thinning and other mechanical forest treatments on [MSO] are nonexistent. This is unfortunate, because thinning and other mechanical forest treatments are emphasized heavily in plans for landscape-restoration of southwestern forests, and these activities could affect large areas of [MSO] habitat.** Consequently, understanding how these treatments affect [MSOs] is one of the major questions faced in integrating recovering this owl with plans for restoring southwestern forests. **Although this has been clearly noted for years, no**

> **studies on this topic have been funded to date.**
>
> As noted earlier, empirical data on effects of forest treatments on spotted owls are sparse and difficult to interpret. **Although all of the studies discussed above individually present limits to interpretation, collectively they suggest that at least some kinds of mechanical forest treatments may negatively impact spotted owls.** No clear guidance emerges from these studies relative to types, extents, or spatial arrangement of treatment that might minimize impacts to owls. **Such information is badly needed if management is to proceed in owl habitat. Some treatments may have beneficial or neutral effects, but we do not know which types and intensities of treatments may be beneficial, neutral, or harmful.**

AR-FS at 9759, 9761 (emphasis added). The FDs appear to believe that this Court will (1) simply gloss over the fact that there is no empirical data that validates their assumptions as to the net beneficial effect of so-called "restoration treatments," and (2) simply rubber-stamp their unsubstantiated assertion that the implementation of such forest treatments insure against jeopardy and do not impair recovery.

The 2012 Revised RP is candid as to the cause of the "unfortunate" lack of information regarding the impacts of "restoration treatments": while the lack of information "has been clearly noted for years," "no studies on this topic have been funded to date." *Id.* If this Court were to blindly accept the FDs' bald assertion as to the net effect of "restoration treatments" and dissolve the injunction on that basis, the FDs would reap an undeserved windfall from their decades of institutional negligence that would ultimately redound to the harm of the MSO and its habitat. WEG urges this Court to avoid this result, and to instead send the opposite message to the FDs: that Congress meant what it said when it stated that Section 7(a)(2) "give[s] the benefit of the doubt to the species" and that an action agency bears the burden "to demonstrate that . . . its action will not violate" the jeopardy and recovery requirements of that statute. H.R. Conf. Rep. No. 697, 96th Cong., 2nd Sess. 12 (1979) (reprinted in 1979 U.S.Code Cong. & Admin.News 2572, 2576).

What is truly disheartening about the current state of affairs is that the FDs appear ready to jettison – kit and caboodle – the entire MSO adaptive management program *sub rosa*. The superceding BiOp brazenly states that "the results of population trend data

would not likely inform our decisions . . . as it relates to the continued implementation of the Cibola NF [Forest Plan]." ECF Doc. No. 112-1. This statement is striking, as acquiring and applying information from long-term range-wide population monitoring to inform management decisions is precisely the point of adaptive management.[4] Indeed, even the superceding BiOp states that the results of a long-term range-wide population monitoring program would "contribute to recovery of the species by allowing the Service to assess the status of MSOs on NFS lands and evaluate the effectiveness of the [2012 Revised] Recovery Plan management recommendations on those lands." ECF Doc. No. 112-1 at 24. The inconsistency of these two positions in the same BiOp concerning the utility, purpose, and crucial importance of MSO population trend monitoring is head-spinning and irrational. WEG respectfully submits that the FDs' effort to disavow the essential underlying logic of the adaptive management approach – which is depressingly and plainly apparent in the superceding BiOp for the Cibola NF – should be denounced and rejected by this Court. Such institutionalized *incaution* is impermisisble.

### V. WildEarth Guardians should be permitted to conduct discovery prior to responding to any future Motion to Dissolve filed by Federal Defendants

As discussed above at the outset of this memorandum, the FDs' Motion to Dissolve must be denied for three simple reasons: the FDs (1) have failed to carry their burden of proof, (2) have failed to provide this Court with any argument in support of their motion that goes beyond a conclusory assertion of "full compliance," and (3) have failed to compile and lodge an administrative record that would facilitate this Court's review of the claimed compliance. That said, WEG appreciates the fact that the FDs will presumably – at some future point – file another Motion to Dissolve that will comply with basic bedrock principles of motion practice. Of course, WEG will not resist the FDs' effort to take another bite at the apple on the sole basis that their effort failed to come up

---

[4] WEG's recently filed surreply in opposition to the FDs' Rule 59 motion explains how the FDs expected that the results of long-term range-wide population monitoring would test assumptions as to the impacts of forest treatments, and ultimately lead to changes and refinements in those treatments. ECF Doc. No. 120 at 4-5.

1 to the mark on their first go-around.

2 However, the FDs' pending Motion to Dissolve – together with the irrational
3 justifications incorporated into the superceding BiOp's no jeopardy conclusion – is
4 compelling evidence of the profundity of the problem detected here by the Court: an
5 astonishing lack of accountability and shirking of responsibility that has played out for
6 decades, despite various orders from judges of the District of Arizona (including this one)
7 that were specifically intended to force the FDs into compliance with their obligations
8 under the ESA. *See for example Center for Biological Diversity v. Norton*, 304
9 F.Supp.2d 1174, 1180-81 (D. Ariz. 2003) (holding the FWS in contempt, stating that "this
10 Court cannot ignore the incredible amount of time that has been spent compelling
11 Defendant to properly perform [its] duties under the ESA," and that "Defendant's
12 dismissive attitude toward the [ESA which] . . . created Defendant's current
13 predicament"). WEG submits that this Court should take this context into account in
14 connection with future proceedings on a subsequent Motion to Dismiss filed by the FDs.

15 Most importantly, WEG urges the Court to allow it to conduct discovery as to all
16 relevant factual representations made by the FDs in their future superceding BiOps and
17 legal memoranda in support of any subsequent Motion to Dissolve before it responds to
18 any such motion. Discovery is appropriate for two reasons in this case. First, the Ninth
19 Circuit holds that the "record review rule" of the APA does not apply to ESA citizen's
20 suit claims like the claim against the USFS in this case. *Western Watersheds Project*, 632
21 F.3d at 497, *Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2007).
22 In line with these decisions, various district courts have allowed discovery in ESA
23 citizen's suits. *Institute for Fisheries Resources v.* Burwell, 2017 WL 89003 at *1 (N.D.
24 Cal. 2017), *Natural Resources Defense Council v. Kempthorne*, 2016 WL 8678051 at *17
25 (E.D. Cal. 2016), *Conservation Congress v. U.S. Forest Service*, 2013 WL 2457481 at *3
26 (E.D. Cal. 2013). Second, the Ninth Circuit holds that discovery may be taken in support
27 of claims brought pursuant to the jurisdictional provision of the APA (such as the claim
28 against the FWS) under certain circumstances, including "when . . . supplementation is

1 necessary to determine if the agency has considered all relevant factors and explained its
2 decision . . . or . . . plaintiffs have shown bad faith on the part of the agency." *San Luis &
3 Delta-Mendota Water Authority v. Jewell*, 747 F.3d 581, 603 (9th Cir. 2014), *Public
4 Power Council v. Johnson*, 674 F.2d 791, 795 (9th Cir. 1982) (holding that courts will
5 allow discovery in an APA case if the party seeking discovery "into the thought processes
6 of administrative decisionmakers" "makes a strong showing of bad faith or improper
7 behavior"). WEG respectfully submits that the circumstances of this case support a
8 finding of bad faith. It is clear that this Court is unable to rely on the FDs'
9 representations in further proceedings, and that WEG should have an opportunity to test
10 the veracity of all relevant representations through discovery so as to assure that the
11 Federal Defendant have, in fact, faithfully complied with their duty to prepare a rational
12 reassessment of the 2012 BiOps' jeopardy and recovery analysis.

**VI. Conclusion**

14 The FDs have failed to comply with this Court's remand instructions to prepare a
15 rational reassessment of the jeopardy and recovery analysis of the 2012 BiOps. The
16 superceding BiOp carries forward the same fundamental flaw that led this Court to
17 impose the injunction – the failure to include a long-term range-wide monitoring
18 requirement. The justifications offered for this continuing failure are irrational and
19 unreasonable. WEG respectfully submits (1) that the FDs' pending Motion to Dissolve
20 should be denied and (2) that WEG should be given leave to conduct discovery as to the
21 factual representations that underlie any future Motion to Dissolve filed by the FDs. A
22 contrary result would reward the FDs for their continuing malfeasance with respect to the
23 conservation and recovery of the MSO. The injunction should be maintained in place
24 until the FDs demonstrate that they are acting with the institutional caution that the ESA
25 requires. Continuation of the decades-long pattern of institutional negligence, and of
26 managing national forests on the basis of speculation and surmise as to the impact of
27 forest treatments on MSOs should not be further countenanced by this Court.

Dated: November 18, 2019.

Respectfully submitted,

*/s/ Steven Sugarman*
Steven Sugarman
347 County Road 55A
Cerrillos, New Mexico 87010
(505) 672-5082
stevensugarman@hotmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of this Plaintiff's Opposition to Defendants' Motion to Dissolve the Court's Injunction Re the Cibola National Forest was served on counsel of record on November 18, 2019 through the Court's electronic CM-ECF system.

*/s/ Steven Sugarman*
Steven Sugarman

WildEarth Guardians v. USFWS, et al.
Civil No. 13-151-RCC

Plaintiff's Opposition to Motion to Dissolve
Page 18